# EXHIBIT B

ΠΡΩΤΟΔΙΚΕΙΟ ΠΕΙΡΑΙΩΣ

ΤΜΗΜΑ ΑΣΦΑΛΙΣΤΙΚΩΝ ΜΕΤΡΩΝ



Αριθμός 3023 /2006

899/2006

ΤΟ ΜΟΝΟΜΕΛΕΣ ΠΡΩΤΟΔΙΚΕΙΟ ΠΕΙΡΑΙΩΣ

(Διαδικασία Ασφαλιστικών Μέτρων)

————————

Αποτελούμενο από τη Δικαστή Μαρία Ανδρικοπούλου, Πρόεδρο Πρωτοδικών, η οποία ορίστηκε κατόπιν κληρώσεως σύμφωνα με τις διατάξεις του ν. 3327/2005, χωρίς τη σύμπραξη Γραμματέα.

Συνεδρίασε δημόσια στο ακροατήριό του στις 10/2/2006, για να δικάσει την αίτηση .

ΤΗΣ ΑΙΤΟΥΣΑΣ : Της εταιρείας με την επωνυμία Orient Shipping Rotterdam B. V., που εδρεύει στο Ρότερνταμ της Ολλανδίας και εκπροσωπείται νόμιμα, ως εφοπλίστριας του πλοίου Future Confidence που ανήκει κατά κυριότητα στην εταιρεία με την επωνυμία Extra Cover Maritime Inc., η οποία στο ακροατήριο εκπροσωπήθηκε από τον πληρεξούσιο δικηγόρο της Παναγιώτη Γαλάτη.

ΤΩΝ ΚΑΘ' ΩΝ Η ΑΙΤΗΣΗ : 1. Της τυπικά αλλοδαπής εταιρείας με την επωνυμία Marachart Shipping Co Ltd, που έχει την πραγματική της

έδρα στον Άγιο Στέφανο Αττικής και εκπροσωπείται νόμιμα από τον 3ο των καθ' ων, 2. Της τυπικά αλλοδαπής εταιρείας με την επωνυμία Sea Transport Contractors Ltd, που έχει την πραγματική της έδρα στον Άγιο Στέφανο Αττικής και εκπροσωπείται νόμιμα από τον 3ο των καθ' ων και 3. Αναστασίου Ραΐσση, εφοπλιστή, κατοίκου ως άνω, οι οποίοι στο ακροατήριο εκπροσωπήθηκαν από τον πληρεξούσιο δικηγόρο τους Κλέαρχο Κανελλόπουλο.

Η αιτούσα ζήτησε να γίνει δεκτή η αίτησή της που κατατέθηκε στη Γραμματεία αυτού του Δικαστηρίου με αριθμό 899/2006 και προσδιορίστηκε για την παρούσα δικάσιμο.

Κατά τη συζήτηση της υπόθεσης οι πληρεξούσιοι δικηγόροι των διαδίκων ανέπτυξαν τους ισχυρισμούς τους και ζήτησαν να γίνουν δεκτοί.

## ΜΕΛΕΤΗΣΕ ΤΗ ΔΙΚΟΓΡΑΦΙΑ
### ΣΚΕΦΘΗΚΕ ΚΑΤΑ ΤΟΝ ΝΟΜΟ

Με την κρινόμενη αίτησή της η αιτούσα εκθέτει ότι στις 29/9/2005 συμφωνήθηκε ένα χρονοναυλοσύμφωνο του τύπου NYPE, με τις συνήθεις προσθήκες και τροποποιήσεις που αναφέρονται σ' αυτό, μεταξύ αυτής ως εκναυλώτριας/ εφοπλίστριας του πλοίου Future Confidence και της 2ης των καθ' ων, με την διαμεσολάβηση της 1ης, ως χρονοναυλώτριας. Ότι σε εκτέλεση της εν λόγω χρονοναύλωσης το πιο πάνω πλοίο ξεκίνησε να φορτώνει το φορτίο του (τσιμέντο) την 1/10/2005 στον λιμένα Nanjing της Κίνας και για τη μεταφορά αυτή εκδόθηκαν, σύμφωνα με σχετικό όρο του ναυλοσυμφώνου, δύο φορτωτικές, από τους πράκτορες των ναυλωτών για λογαριασμό του πλοιάρχου, οι οποίες φέρονταν ως φορτωτικές υπογεγραμμένες από τους εκναυλωτές. Ότι οι εκδοθείσες φορτωτικές ανέφεραν ως λιμένες εκφόρτωσης Λιμάνια Δυτικής Αφρικής ενώ περιλάμβαναν, κατά την συνήθη πρακτική για πλοία που λειτουργούν υπό χρονοναύλωση, και τον όρο ότι ο ναύλος προπληρώθηκε. Ότι μετά την ολοκλήρωση της φόρτωσης το πλοίο ξεκίνησε το ταξίδι του, κατά τις οδηγίες των ναυλωτών, για την Bata της Δυτικής Αφρικής,

της υπ' αριθμ. 3023 /2006 απόφασης του Μονομελούς

Πρωτοδικείου Πειραιά (διαδικασία ασφαλιστικών μέτρων).

------------------------------------------------

που ήταν το πρώτο λιμάνι εκφόρτωσης, όπου έφθασε στις 22/11/2005 και του δόθηκε η εντολή να περιμένει εκεί για νεότερες εντολές εκ μέρους των ναυλωτών. Ότι στις 18/12/2005 η ναυλώτρια έδωσε εντολή στο πλοίο να αναχωρήσει από την Bata και να πλεύσει στη Luanda Δυτικής Αφρικής. Ότι, σε εκτέλεση της δοθείσας εντολής, το πλοίο απέπλευσε για τη Luanda με προβλεπόμενο χρόνο άφιξης την 22/12/2005, πλην, όμως, στις 20/12/2005 η αιτούσα έλαβε επιστολή από την τράπεζα Credit Suisse της Ελβετίας που την ενημέρωνε ότι ήταν κομίστρια εξ οπισθογραφήσεως της 1ης φορτωτικής και, ως κυρία του φορτίου, της δήλωνε ότι επιθυμούσε την εκφόρτωση του στη Bata. Ότι τότε για πρώτη φορά η αιτούσα ενημερώθηκε ότι οι υποναυλωτές του πλοίου όφειλαν χρήματα στη ναυλώτρια και ότι η τελευταία προτίθετο να ασκήσει το δικαίωμά της ενεχύρου επί του φορτίου, δικαίωμα, όμως, που κατά την άποψη της αιτούσας δεν το είχε αφού οι εκδοθείσες φορτωτικές έφεραν την ένδειξη Freight Prepaid (ναύλος προπληρωμένος). Ότι στις 30/12/2005 εμφανίστηκε η τράπεζα Banquet Cantonal της Γενεύης η οποία δήλωσε ότι είναι νόμιμη κομίστρια της 2ης φορτωτικής και ζήτησε και το δικό της φορτίο να εκφορτωθεί στη Bata. Ότι μετά από αυτά το πλοίο βρίσκεται ακινητοποιημένο σε διεθνή ύδατα 50 περίπου μίλια από τη Luanda περιμένοντας λύση στη διένεξη μεταξύ ναυλώτριας και τραπεζών. Ότι η ναυλώτρια εξέδωσε απόφαση των δικαστηρίων της Αγκόλας που διατάζει την εκφόρτωση του φορτίου στη Luanda πλην, όμως, η εν λόγω απόφαση δεν δεσμεύει την αιτούσα αφού εκδόθηκε μεταξύ της ναυλώτριας και των υποναυλωτών της ενώ είναι και λανθασμένη αφού εκδόθηκε με δωσιδικία που δεν υπήρχε και συγκεκριμένα επειδή η 2η των καθ' ων εμφάνισε το πλοίο ως ευρισκόμενο στο λιμάνι της Luanda κάτι, όμως, που δεν ήταν αληθές. Ότι η 2η των καθ' ων της κατέβαλε το συμφωνημένο ναύλο μέχρι τις 14/1/2006 και έκτοτε αρνείται να της τον καταβάλει ισχυριζόμενη ότι το πλοίο είναι εκτός

υποχρέωσης καταβολής χρονοναύλου αφού η εκναυλώτρια δεν ακολούθησε τις εντολές της ναυλώτριας για εκφόρτωση του φορτίου στη Luanda. Ότι η αιτούσα έχει προσφύγει στο δικαστήριο του Λονδίνου ζητώντας από αυτό να της πει σε ποιον πρέπει να παραδώσει το φορτίο. Ότι η 2η των καθ' ων από τις 15/1/2006 και μέχρι την προβλεπόμενη τελική παράδοση του φορτίου, που κατά τους μετριότερους υπολογισμούς θα χρειαστεί τουλάχιστον δύο μήνες, θα της οφείλει ναύλους 60 ημερών και συνολικά θα της οφείλει 990.000 $ πλέον του κόστους των καυσίμων που καταναλώνει καθημερινά το πλοίο. Ότι μετά την καθυστέρηση καταβολής των ναύλων η αιτούσα ζήτησε πληροφορίες για την φερεγγυότητα της ναυλώτριας και διαπίστωσε ότι αυτή δεν έχει εγκατασταθεί στην Ελλάδα σύμφωνα με τις διατάξεις του ν. 89/67 και ούτε διατηρεί γραφεία στη διεύθυνση που ανέφερε στο ναυλοσύμφωνο ενώ το μόνο περιουσιακό της στοιχείο είναι μια θυρίδα στον Άγιο Στέφανο Αττικής όπου και τα γραφεία των δύο άλλων καθ' ων. Ότι τόσο η 1η όσο και η 2η των καθ' ων είναι των ιδίων συμφερόντων και ουσιαστικά ανήκουν στον 3ο των καθ' ων η όλη δε σκηνοθεσία με την εμφάνιση της 2ης ως ναυλώτριας έγινε, με την ενεργό συμμετοχή της 1ης και του 3ου, προς τον σκοπό εξαπάτησης της αιτούσας. Ότι και η δήθεν υποναυλώτρια εταιρεία με την επωνυμία Rustal S.A. είναι μέρος της όλης σκηνοθεσίας των καθ' ων αφού ούτε γι' αυτήν δεν εντοπίστηκαν γραφεία στη Γενεύη της Ελβετίας. Ότι η πιο πάνω αδικοπρακτική συμπεριφορά των καθ' ων θεμελιώνει εις ολόκληρον ευθύνη τους ενώ επί πλέον ο 3ος εξ αυτών ευθύνεται και ως ο μοναδικός μέτοχος της 2ης η οποία είναι άκυρη εταιρεία στην Ελλάδα και θεωρείται ως «εν τοις πράγμασι» λειτουργούσα, με μορφή προσομοιάζουσα με εκείνη της ομόρρυθμης εταιρείας. Με βάση τα περιστατικά αυτά και επικαλούμενη επικείμενο κίνδυνο λόγω της αφερεγγυότητας των καθ' ων αλλά και επείγουσα περίπτωση λόγω της δεινής θέσης που βρίσκεται το πλοίο εξαιτίας της μη πληρωμής των ναύλων η οποία συνεπάγεται την μη προμήθεια τροφίμων, ύδατος κλπ. αλλά και του κινδύνου που αντιμετωπίζει από πειρατές, ζητεί τη συντηρητική κατάσχεση κάθε κινητής και ακίνητης περιουσίας των καθ' ων

13ο φύλλο της υπ' αριθμ.     3083  /2006 απόφασης του Μονομελούς Πρωτοδικείου Πειραιά (διαδικασία ασφαλιστικών μέτρων).

-------------------------------------------

στα χέρια τα δικά τους ή τρίτων μέχρι του ποσού του 1.000.000 €, για την εξασφάλιση της πιο πάνω απαίτησής της.

Με το πιο πάνω περιεχόμενο και αίτημα η κρινόμενη αίτηση, η οποία δικάζεται κατά τη διαδικασία των ασφαλιστικών μέτρων (άρθρο 686 επ. Κ.Πολ.Δ.), παραδεκτά και αρμόδια φέρεται προς εκδίκαση ενώπιον του παρόντος δικαστηρίου το οποίο έχει υλική και τοπική αρμοδιότητα ως εκ της επικαλούμενης στον Πειραιά πραγματικής έδρας της 1ης και 2ης των καθ' ων και της κατοικίας του 3ου εξ αυτών (άρθρα 683 § 1, 22, 25 παρ. 2 Κ.Πολ.Δ.) και συνακόλουθα διεθνή δικαιοδοσία κατά την διάταξη του άρθρου 2 παρ. 1 και 6 παρ. 1 του Κανονισμού (ΕΚ) 44/2001 του Συμβουλίου της 22ας Δεκεμβρίου του 2000 «για την διεθνή δικαιοδοσία, την αναγνώριση και την εκτέλεση αποφάσεων σε αστικές και εμπορικές υποθέσεις» που τέθηκε σε ισχύ από 1/3/2001 και αντικατέστησε τη Σύμβαση των Βρυξελλών. Περαιτέρω και όσον αφορά το εφαρμοστέο δίκαιο η κρινόμενη αίτηση, κατ' εκτίμηση του περιεχομένου της, θεμελιώνεται στην αδικοπρακτική συμπεριφορά των καθ' ων οι οποίοι με τις αναφερόμενες ενέργειές τους εξαπάτησαν την αιτούσα ως προς την φερεγγυότητα της 2ης των καθ' ων την οποία εμφάνισαν ως φερέγγυα ενώ στην πραγματικότητα δεν ήταν, πείθοντας με τον τρόπο αυτό την αιτούσα να καταρτίσει μαζί της την ένδικη σύμβαση ναύλωσης. Από το δικόγραφο της κρινόμενης αίτησης δεν προκύπτει, ωστόσο, ούτε ο τόπος τέλεσης της επικαλούμενης αδικοπραξίας ούτε ο τόπος επέλευσης των αποτελεσμάτων της αδικοπρακτικής αυτής συμπεριφοράς ώστε να κριθεί το εφαρμοστέο δίκαιο κατ' άρθρο 26 Α.Κ. Είτε, όμως, η αδικοπραξία τελέστηκε στην Ολλανδία είτε στην Ελλάδα είτε και αλλού, ενόψει του ότι δεν προσκομίζεται κανένα αλλοδαπό δίκαιο ούτε είναι εφικτό για το δικαστήριο να διατάξει, κατά την παρούσα διαδικασία των ασφαλιστικών μέτρων, την προσκομιδή του, εφαρμοστέο κρίνεται το ελληνικό ουσιαστικό δίκαιο το οποίο θεωρείται ότι

προσομοιάζει με τις διατάξεις του, τυχόν, εφαρμοστέου αλλοδαπού δικαίου (βλ. *Κρίσπη* Ι.Δ.Δ. παρ. 44, σελ. 353, *Φραγκίστα-Φαλτσή*, Δίκαιον Αποδείξεων 1975, παρ. 3, Μ.Π.Π. 788/1993, ΕΝΔ 21, 332) . Κατά συνέπεια η κρινόμενη αίτηση είναι νόμιμη στηριζόμενη στις διατάξεις των άρθρων 914, 926 Α.Κ., 707 επ., 713 Κ.Πολ.Δ. Περαιτέρω και όσον αφορά την επιχειρούμενη επάλληλη θεμελίωση της κρινόμενης αίτησης, ως προς τον 3ο των καθ' ων, στην επικαλούμενη ιδιότητά του ως ομορρύθμου εταίρου και μοναδικού μετόχου της 2ης, η οποία, μη έχουσα εγκατασταθεί νόμιμα στην ημεδαπή, λειτουργεί ως «εν τοις πράγμασι» εταιρεία με μορφή προσομοιάζουσα με αυτήν της ομορρύθμου θα πρέπει να λεχθούν τα ακόλουθα : Σύμφωνα με τη διάταξη του άρθρου 1 του ν. 791/78, ναυτιλιακές εταιρείες των οποίων η σύσταση έγινε κατά τους νόμους αλλοδαπής πολιτείας , εφόσον είναι ή ήσαν πλοιοκτήτριες ή διαχειρίστριες πλοίων (με εξαίρεση αυτές που είναι πλοιοκτήτριες ή διαχειρίστριες σκαφών αναψυχής) υπό ελληνική σημαία ή είναι εγκατεστημένες ή ήθελαν εγκατασταθεί στην Ελλάδα, δυνάμει των διατάξεων του άρθρου 25 του ν. 27/75 (που έχει αντικατασταθεί με το άρθρο 28 του ν. 814/78, τροποποιηθεί με το άρθρο 75 παρ. 5  του ν. 1892/1990 και αντικαταστάθηκε εκ νέου με το άρθρο 4  του ν. 2234/94) ή των α.ν. 89/67 και 378/68, διέπονται ως προς τη σύσταση και την ικανότητα δικαίου από το δίκαιο της Χώρας στην οποία βρίσκεται κατά το καταστατικό τους  η έδρα τους ανεξάρτητα  από τον τόπο από τον οποίο διευθύνονται  ή διευθύνονταν εξ ολοκλήρου ή εν μέρει οι υποθέσεις τους. Η εφαρμογή των διατάξεων  τούτων του άρθρου 1 του  ν. 791/78 επεκτάθηκε  και στις αλλοδαπές πλοιοκτήτριες εταιρείες πλοίων με ξένη σημαία εφόσον τα πλοία τους διαχειρίζονται γραφεία ή  υποκαταστήματα εταιρειών του άρθρου 25 του ν. 27/75, όπως αντικαταστάθηκε ως άνω. Με τις διατάξεις αυτές εισάγεται απόκλιση από τον κανόνα της πραγματικής έδρας των εταιριών κατά το άρθρο 10 Α.Κ. (Ολ Α.Π. 461/78, Ολ Α.Π. 2/99, Α.Π. 335/2001, ΕΝΔ29, 193). Ε.Π. 161/2003, ΕΝΔ 31, 39).  Στην προκειμένη περίπτωση η 2η των καθ' ων  είναι αλλοδαπή εταιρεία με έδρα τη Λιβερία  και αντικείμενο εργασιών, μεταξύ άλλων, τις ναυλώσεις πλοίων, διακανονισμό  αβαριών, μεσιτεία ναυλώσεων ή  αγοραπωλησιών ή

οι σύλλο της υπ' αριθμ.      3023   /2006 απόφασης του Μονομελούς Πρωτοδικείου Πειραιά (διαδικασία ασφαλιστικών μέτρων).

-------------------------------------------------

ναυπηγήσεων πλοίων με ελληνική ή ξένη σημαία κλπ.  Στην Ελλάδα έχει εγκαταστήσει γραφείο σύμφωνα με τις διατάξεις των α.ν. 378/68, ν. 27/75, 814/782234/94 (βλ. την υπ' αριθμ. 3122.1/3909/5/8-2-2006 βεβαίωση του ΥΕΝ και 181/20-9-2005 ΦΕΚ τ. ΤΑΠΣ). Κατά συνέπεια η 2η των καθ' ων, αλλοδαπή εταιρεία με τον προαναφερθέντα σκοπό, που αποτελεί άσκηση ναυτιλιακών δραστηριοτήτων προβλεπόμενων από το άρθρο 25 του ν. 27/75 όπως αντικαταστάθηκε από το άρθρο 28 του ν. 814/78, και    νόμιμη εγκατάσταση στην Ελλάδα,   δεν μπορεί να κριθεί ως ημεδαπή εταιρεία και περαιτέρω ως εταιρεία «εν τοις πράγμασι» (de facto) με μοναδικό μέτοχο τον 3ο των καθ' ων, λόγω μη τηρήσεως των υπό των ελληνικών διατάξεων προβλεπόμενων προϋποθέσεων για τη νομότυπη σύστασή της, όπως ισχυρίζεται η αιτούσα (ΠΠΠ 245/1996, ΕΝΔ 25, 98). Επομένως η αίτηση κατά το μέρος που αφορά τον 3ο των καθ' ων ως ευθυνόμενο με την ιδιότητά του ως μετόχου και μοναδικού εταίρου της 2ης είναι απορριπτέα ως μη νόμιμη. Κατόπιν αυτών η κρινόμενη αίτηση πρέπει να ερευνηθεί περαιτέρω και ως προς την ουσιαστική της βασιμότητα.

Στην προκειμένη περίπτωση από τις ένορκες, στο ακροατήριο αυτού του δικαστηρίου, καταθέσεις των μαρτύρων Δημητρίου Λιγνού (αιτούσας) και Ιωάννη Μαυρομάτη (καθ' ων), καθώς και όλα τα έγγραφα που οι διάδικοι νόμιμα προσκομίζουν και επικαλούνται πιθανολογήθηκαν τα ακόλουθα:  Η αιτούσα, η οποία είναι αλλοδαπή εταιρεία με έδρα το Ρότερνταμ της Ολλανδίας, ασκεί τον εφοπλισμό του, με σημαία Φιλιππίνων, πλοίου Future Confidence, κυριότητας της εταιρείας με την επωνυμία Extra Cover Maritime Inc. Η 1η των καθ' ων είναι κυπριακή εταιρεία με αντικείμενο εργασιών τη διαχείριση πλοίων και γραφείο νόμιμα εγκατεστημένο στην Ελλάδα βάσει των διατάξεων των ΑΝ 89/67, Ν 378/68, 27/75, 814/78, 2234/94 (βλ. την υπ' αριθμ. πρωτ. 3122.1/997/62/8-2-2006 βεβαίωση της Διεύθυνσης Ναυτιλιακής

Πολιτικής και Ανάπτυξης του ΥΕΝ). Η 2$^η$ των καθ' ων, εταιρεία με έδρα τη
Λιβερία και αντικείμενο εργασιών τις ναυλώσεις πλοίων,  έχει εγκαταστήσει
γραφείο στην Ελλάδα βάσει των διατάξεων των  Ν 378/68, 27/75, 814/78,
2234/94 (βλ. την υπ' αριθμ. πρωτ. 3122.1/3909/5/8-2-2006 βεβαίωση της
Διεύθυνσης Ναυτιλιακής Πολιτικής και Ανάπτυξης του ΥΕΝ). Ο 3$^{ος}$ των καθ'
ων είναι μέλος του ΔΣ της 1$^{ης}$, πρόεδρος του ΔΣ της 2$^{ης}$ και νόμιμος
εκπρόσωπος αμφοτέρων των καθ' ων. Στα πλαίσια των πιο πάνω
επιχειρηματικών της δραστηριοτήτων η 2$^η$ των καθ' ων  ανέθεσε, τον
Σεπτέμβριο του 2005, στην συνεργαζόμενη με αυτήν ναυλομεσιτική εταιρεία
με την επωνυμία "CHARTERHOUSE SHIPBROKING LIMITED", με έδρα
το Λονδίνο, την εξεύρεση ενός φορτηγού πλοίου για άμεση χρονοναύλωση
ενός ταξιδιού προς εκτέλεση θαλάσσιας μεταφοράς φορτίου τσιμέντου από την
περιοχή του ποταμού Yangtze της Κίνας σε λιμάνια της Δυτικής Αφρικής. Σε
εκτέλεση της εντολής αυτής ο διευθυντής του τμήματος ναυλώσεων της
Charterhouse απέστειλε, μέσω ηλεκτρονικού ταχυδρομείου, μια αγγελία προς
κάθε ενδιαφερόμενο από τους συνεργαζόμενους με την εταιρεία του
ναυλομεσίτες. Στην αγγελία αυτή απάντησε η ναυλομεσιτική εταιρεία με την
επωνυμία "Van Weelde Chartering BV", που εδρεύει στο Ρότερνταμ της
Ολλανδίας, η οποία, ενεργούσα για λογαριασμό της αιτούσας, δήλωσε ότι έχει
διαθέσιμο το πλοίο Future Confidence  και ζήτησε να πληροφορηθεί  την
επωνυμία των υποψήφιων ναυλωτών.  Ο άγγλος ναυλομεσίτης απάντησε
αυθημερόν δίνοντας τα στοιχεία της 2$^{ης}$ των καθ' ων. Την ίδια ημέρα ο
ολλανδός ναυλομεσίτης ζήτησε περαιτέρω πληροφορίες και συστάσεις για την
υποψήφια ναυλώτρια και ο άγγλος ναυλομεσίτης  απάντησε αμέσως
αποστέλλοντας  τρισέλιδο εμπιστευτικό μήνυμα στο οποίο έδινε όλες τις
ζητούμενες πληροφορίες για το ιστορικό της 2$^{ης}$ των καθ' ων και συγκεκριμένα
ανέφερε τα ονόματα των πλοίων που η εταιρεία είχε ναυλώσει κατά το
τελευταίο χρονικό διάστημα, καθώς και τις πλοιοκτήτριες εταιρείες των
πλοίων αυτών, προκειμένου οι εκναυλωτές να λάβουν, αν το επιθυμούσαν,
συστάσεις, και τους γνωστοποιούσε ότι η υποψήφια ναυλώτρια συνεργαζόταν
με την τράπεζα (E.F.G. EUROBANK ERGASIAS) μέσω της οποίας

5ο φύλλο της υπ' αριθμ.    3023    /2006 απόφασης του Μονομελούς Πρωτοδικείου Πειραιά (διαδικασία ασφαλιστικών μέτρων).

-------------------------------------

διεκπεραίωνε τις τραπεζικές της συναλλαγές. Τέλος δήλωνε ότι τις ως άνω πληροφορίες τις μετέφερε αυστηρά και μόνο ως μεσίτης, χωρίς καμία εγγύηση ή υπόσχεση ως προς την ορθότητά τους, και συνιστούσε στην αιτούσα να διενεργήσει και η ίδια δική της έρευνα Ο ολλανδός ναυλομεσίτης ευχαρίστησε τον άγγλο συνάδελφό του για την ενημέρωση και κατόπιν αυτών άρχισε κύκλος διαπραγματεύσεων μεταξύ των δύο ναυλομεσιτών, που ενεργούσαν για λογαριασμό της αιτούσας ως εκναυλώτριας και της 2ης των καθ' ων ως ναυλώτριας, με έγγραφες προσφορές και αντιπροσφορές οι οποίες κατέληξαν στις 29/9/2005 στο κλείσιμο της οριστικής συμφωνίας για την χρονοναύλωση του πλοίου Future Confidence, οι ουσιώδεις όροι της οποίας συμφωνήθηκαν επί τη βάσει του τυποποιημένου ναυλοσυμφώνου NYPE χωρίς ωστόσο να υπογραφεί έκτοτε ναυλοσύμφωνο. Μεταξύ άλλων συμφωνήθηκε ότι η αιτούσα ήταν η εκναυλώτρια του πλοίου Future Confidence και η 2η των καθ' ων η ναυλώτρια, αντιπρόσωπος της οποίας ήταν η 1η των καθ' ων μέσω της οποίας θα διενεργούντο όλες οι επικοινωνίες. Τόπος παραλαβής του πλοίου ήταν η περιοχή λιμένος Huangpu της Λαϊκής Δημοκρατίας της Κίνας και τόπος παράδοσης «το σημείο ρίψης άγκυρας στο όριο δράσης του πλοηγού ενός ασφαλούς λιμένος κειμένου εντός της ακτίνας Pointe Noire – Γκαμπόν, εξαιρέσει της Νιγηρίας, Ακτής Ελεφαντοστού, Τόγκο, Μπενίν, Γκάνας και Λιβερίας, επιτρεπομένων όμως της Αγκόλα και της Γουϊνέας Μπισάο (πορτογαλικής Γουϊνέας), όμως η Αγκόλα να μην συνιστά σημείο παράδοσης» Η διάρκεια της ναύλωσης συμφωνήθηκε ελάχιστη 55 ημέρες- ανώτατη 70 ημέρες, χωρίς δέσμευση ως προς το ανώτατο όριο, και ο ναύλος ορίστηκε στο ποσό των 16.500 $ Η.Π.Α. ημερησίως με χρόνο καταβολής του 1ου ναύλου μαζί με την αξία των πετρελαίων τρεις εργάσιμες, για τις τράπεζες, ημέρες μετά την παραλαβή του πλοίου από την 2η των καθ' ων και κατόπιν ανά 15ήμερο. Επί πλέον συμφωνήθηκε να καταβάλει η 2η των καθ' ων εφάπαξ

ποσό 5.000 $ Η.Π.Α., αντί για καθαρισμό κυτών, καθώς και ποσό 1.200 $
Η.Π.Α. μηνιαίως για τηλεπικοινωνίες/διατροφή/αναψυχή του πληρώματος.
Συμφωνήθηκε τέλος ότι ο πλοίαρχος θα παρέδιδε στους πράκτορες επιστολή
εξουσιοδότησης με την οποία θα εξουσιοδοτούνται οι ναυλωτές ή/και οι
πράκτορές τους να εκδίδουν και θέτουν την υπογραφή τους σε φορτωτικές για
λογαριασμό του πλοιάρχου ή/και των πλοιοκτητών, σύμφωνα με τα δελτία
παραλαβής του υποπλοιάρχου και με την επιφύλαξη των όρων του
ναυλοσυμφώνου. Ως προς απαιτήσεις από Γενική Αβαρία ή τυχόν διαφωνίες
απορρέουσες από τη ναύλωση  συμφωνήθηκε η υπαγωγή τους σε Διαιτησία
στο  Λονδίνο και η εφαρμογή του αγγλικού δικαίου. Η  ιδιότητα με την οποία
ενήργησε η αιτούσα στη συναφθείσα χρονοναύλωση, αυτή δηλαδή της
εκναυλώτριας του προαναφερθέντος πλοίου, προκύπτει από το με ημερομηνία
28/1/2003 χρονοναυλοσύμφωνο και τα πρόσθετα αυτού σύμφωνα, που έχει
συναφθεί μεταξύ των αιτούσας και της κυρίας του πλοίου Extra Cover
Maritime Inc.και δεν αναιρείται, όπως υποστηρίζουν οι καθ' ων, από την
κατάθεση του μάρτυρα Richard Crump, της δικηγορικής εταιρείας της
αιτούσας στο Λονδίνο, ο οποίος σε αίτηση που υποβλήθηκε, κατά τα όσα
παρακάτω αναλυτικά θα εκτεθούν, στο δικαστήριο High Court στο Λονδίνο
αναφέρει ότι η αιτούσα σύναψε την επίδικη σύμβαση για λογαριασμό της
κυρίας του πλοίου. Περαιτέρω πιθανολογήθηκε ότι αμέσως μετά τη σύναψη
της ως άνω συμφωνίας η 2η των καθ' ων σύναψε, ως υπεκναυλωτής – επί
χρήσει ιδιοκτήτης του προαναφερθέντος πλοίου, χρονοναύλωση με την,
εδρεύουσα στη Γενεύη της Ελβετίας, εταιρεία με την επωνυμία Rustal S.A. Το
αντικείμενο της χρονοναύλωσης αυτής ήταν ακριβώς το ίδιο με εκείνο της
χρονοναύλωσης με την αιτούσα, αφορούσε το ίδιο χρονικό διάστημα και είχε
ταυτόσημους όρους πλην εκείνου που προσδιόριζε το ύψος του ναύλου ο
οποίος  ορίστηκε στο ποσό των 17.750 $ Η.Π.Α. ημερησίως (βλ. το από
29/9/2005 χρονοναυλοσύμφωνο με τις πρόσθετες σ' αυτό ρήτρες).    Σε
εκτέλεση των πιο πάνω συμφωνιών το πλοίο ξεκίνησε τη φόρτωσή του την
1/10/2005 στο λιμένα Nanjing της Κίνας και ο πλοίαρχος παρέδωσε στους
ναυλωτές, κατά  τα συμφωνηθέντα, μια εξουσιοδότηση δίνοντας το στους

φύλλο της υπ' αριθμ.       3083 /2006 απόφασης του Μονομελούς Πρωτοδικείου Πειραιά (διαδικασία ασφαλιστικών μέτρων).

-----------------------------------

πλοίους ή και στους πράκτορές τους  να εκδίδουν φορτωτικές για λογαριασμό του ή/και για λογαριασμό των πλοιοκτητών. Με βάση την  εξουσιοδότηση αυτή εκδόθηκαν, από τους πράκτορες της 2ης των καθ' ων για λογαριασμό του πλοιάρχου, δύο φορτωτικές που φαίνονταν να έχουν εκδοθεί από τους εκναυλωτές, από τις οποίες η μια αφορούσε φορτίο 29.698 μ.τ. και η άλλη φορτίο 8.490 μ.τ. Στις εν λόγω φορτωτικές αναφέρεται ότι ο ναύλος έχει προπληρωθεί (freight prepaid)   σύμφωνα με τους όρους του από 29/9/2005 χρονοναυλοσυμφώνου, ενώ και οι δύο αναφέρουν ως λιμένες εκφόρτωσης Λιμάνια Δυτικής Αφρικής. Αμέσως μετά την ολοκλήρωση της φόρτωσης το πλοίο ξεκίνησε το ταξίδι του με οδηγίες των ναυλωτών να πλεύσει στο πρώτο λιμάνι εκφόρτωσης που ήταν αυτό της Bata. Το πλοίο έφθασε στο λιμάνι αυτό στις 22/11/2005 και εκεί πήρε εντολή να περιμένει για νεότερες οδηγίες εκ μέρους των χρονοναυλωτών. Ωστόσο ο χρόνος περνούσε και οι εκναυλωτές πίεζαν για περαιτέρω οδηγίες τους ναυλωτές οι οποίοι, έχοντας καταβάλει το ναύλο, τους υπόσχονταν ότι σύντομα θα τους έδιναν σχετικές εντολές. Η καθυστέρηση αυτή που δημιουργήθηκε ως προς τη χορήγηση σχετικής εντολής από την 2η των καθ' ων για την εκφόρτωση του φορτίου οφειλόταν, όπως πιθανολογήθηκε,  σε πρόβλημα που είχε προκύψει μεταξύ ναυλώτριας και υποναυλώτριας, Ειδικότερα, όπως πιθανολογήθηκε, η υποναυλώτρια του πλοίου εταιρεία Rustal είχε πάψει από τις 10/10/2005, λόγω οικονομικών προβλημάτων που αντιμετώπιζε, να καταβάλει τους συμφωνηθέντες ναύλους και η 2η των καθ' ων βρισκόταν σε διαρκή επικοινωνία μαζί της προκειμένου να διαγνώσει τη διάρκεια και την έκταση του προβλήματος (ολική ή μερική δυσχέρεια, διαρκής ή πρόσκαιρη κλπ.) και να αποφασίσει για τις περαιτέρω ενέργειές της.   Όταν η 2η των καθ' ων βεβαιώθηκε ότι η Rustal δεν είχε δυνατότητα να αντεπεξέλθει στις οικονομικές της υποχρεώσεις και δεν επρόκειτο να καταβάλει τους οφειλόμενους ναύλους αποφάσισε, αφού

συμβουλεύτηκε και τους δικηγόρους της, να κάνει χρήση του δικαιώματός άσκησης προνομίου επί του μεταφερόμενου φορτίου (lien), δικαίωμα το οποίο κατά την άποψη των νομικών της συμβούλων είχε και μπορούσε να το ασκήσει καθώς η ναύλωση ήταν εν εξελίξει και δεν είχε καταβληθεί ο οφειλόμενος ναύλος. Έτσι στις 13/12/2005 η 2η των καθ' ων απέστειλε μήνυμα προς την αιτούσα ζητώντας της μια επιβεβαίωση ότι το πλοίο δεν θα πρυμνοδετούσε χωρίς την έγγραφη εντολή της και στη συνέχεια και συγκεκριμένα στις 18/12/2005 της έδωσε εντολή να αναχωρήσει το πλοίο από την Bata και να πλεύσει για την Luanda. Πράγματι το πλοίο, σε εκτέλεση αυτής της εντολής, απέπλευσε αυθημερόν από την Bata για το νέο του προορισμό με προβλεπόμενο χρόνο άφιξης στη Luanda την 21/12/2005. Ωστόσο στις 20/12/2005 η αιτούσα έλαβε φαξ από την τράπεζα Credit Suisse της Ελβετίας με το οποίο η τελευταία της γνωστοποιούσε ότι είναι νόμιμη εξ οπισθογραφήσεως κομίστρια της 1ης φορτωτικής και ότι, ως κυρία του φορτίου, επιθυμούσε αυτό να εκφορτωθεί στη Bata ενώ της ζητούσε επιβεβαίωση ότι το πλοίο θα ενεργούσε με δικές της εντολές οι οποίες θα ακολουθούσαν. Τότε η αιτούσα ενημερώθηκε για πρώτη φορά σχετικά με το πρόβλημα που είχε προκύψει μεταξύ ναυλώτριας και υποναυλώτριας καθώς και ότι η 2η των καθ' ων επιθυμούσε την παράδοση σ' αυτήν, ως μεσεγγυούχου, του φορτίου προκειμένου να ασκήσει το προαναφερθέν δικαίωμά της επ' αυτού προς εξασφάλιση της απαίτησής της η οποία υπερέβαινε κατά τον χρόνο εκείνο το ποσό των 4,5 $ Η.Π.Α. Στις 22/12/2005 η αγγλική δικηγορική εταιρεία Stephenson Harwood, ενεργώντας για λογαριασμό της 2ης των καθ' ων, απέστειλε ένα φαξ στον αλληλασφαλιστικό οργανισμό της αιτούσας (UK Club) επιβεβαιώνοντας και εγγράφως την εντολή των πελατών τους για κατεύθυνση του πλοίου στη Luanda με σκοπό την εκφόρτωση του φορτίου, προς άσκηση του δικαιώματός τους ενεχυρίασης επ' αυτού, και την παράδοσή του στους πράκτορες των ναυλωτών, ως μεσεγγυούχων, οι οποίοι θα επιδίωκαν την δια της δικαστικής οδού πώλησή του προκειμένου να εισπράξουν το οφειλόμενο ποσό των ναύλων. Στο ίδιο έγγραφο τους γνωστοποιούν ότι, κατά την άποψή τους, οι ναυλωτές

φύλλο της υπ' αριθμ.     3023  /2006 απόφασης του Μονομελούς
Πρωτοδικείου Πειραιά (διαδικασία ασφαλιστικών μέτρων).

----------------------------------------

δικαιούνται στην άσκηση του προνομίου ενεχυρίασης επί του μεταφερόμενου
φορτίου εφόσον σύμφωνα με τον όρο 60 του μεταξύ εκναυλώτριας και
ναυλώτριας ισχύοντος ναυλοσυμφώνου, σε περίπτωση απουσίας των
πρωτότυπων φορτωτικών η εκφόρτωση μπορεί να γίνει έναντι εγγυητικής
επιστολής αποζημίωσης που θα καταθέσουν οι ναυλωτές ενώ τους
ενημερώνουν ότι η αναφορά στις εκδοθείσες από την υποναυλώτρια
φορτωτικές για προπληρωμένο ναύλο δεν ανταποκρινόταν στην
πραγματικότητα. Στα πλαίσια της θέσης τους αυτής ζητούν από την αιτούσα να
συντάξει εκείνη και να τους αποστείλει το λεκτικό μιας εγγυητικής επιστολής
που να την ικανοποιεί και της επισημαίνουν ότι αν δεν εκφορτωθεί το φορτίο
στη Luanda για να ασκηθεί επ' αυτού το δικαίωμα ενεχυρίασης του από τους
πελάτες τους οι τελευταίοι δεν είχαν άλλη δυνατότητα είσπραξης των
οφειλόμενων ναύλων  και στην περίπτωση αυτή οι εκναυλωτές θα είχαν
υποχρέωση να καλύψουν τη ζημιά των ναυλωτών αφού θα είχαν παραβεί τους
όρους του μεταξύ τους ισχύοντος ναυλοσυμφώνου   Στο μήνυμα αυτό
απάντησαν αυθημερόν οι δικηγόροι του αλληλασφαλιστικού οργανισμού της
αιτούσας και αφού διαβεβαίωσαν τους δικηγόρους των ναυλωτών ότι οι
πελάτες τους επιθυμούσαν να βοηθήσουν χωρίς, όμως, να εμπλακούν σε
διενέξεις με τους κυρίους του φορτίου, στη συνέχεια τους εξέφρασαν τους
προβληματισμούς τους σε σχέση με τη νομική πλευρά του ζητήματος που είχε
προκύψει ζητώντας τους να  προτείνουν λύσεις που θα εξυπηρετούσαν τους
ναυλωτές και παράλληλα θα κάλυπταν,, νομικά, τους εκναυλωτές. Στο μεταξύ
η τράπεζα Credit Suisse εξακολούθησε να επιμένει στη θέση της για το
δικαίωμά της να δίνει εκείνη οδηγίες για το φορτίο ως κύρια αυτού  και με
φαξ της 28/12/2005 προς την αιτούσα  της επανέλαβε ότι το φορτίο έπρεπε να
εκφορτωθεί μόνο με τις δικές της εντολές  και σε λιμάνι της επιθυμίας της.
Σχεδόν ταυτόχρονα και συγκεκριμένα στις 30/12/2005 εμφανίστηκε και άλλη

ελβετική τράπεζα, η Banquet Cantonal της Γενεύης, η οποία δήλωσε, με βάση που απέστειλαν οι δικηγόροι της στους δικηγόρους της αιτούσας, ότι είναι νόμιμη εξ οπισθογραφήσεως κομίστρια της 2ης φορτωτικής και ζήτησε και αυτή το φορτίο να εκφορτωθεί στη Bata. Ακολούθησαν διαπραγματεύσεις μεταξύ των αντιτιθέμενων μερών προς εξεύρεση κάποιας συμβιβαστικής λύσης. Κατά το διάστημα αυτό το πλοίο παρέμενε ανοιχτά της Luanda αναμένοντας λύση στη διένεξη της ναυλώτριας με τις τράπεζες ενώ η αιτούσα ήταν σε διαρκή επικοινωνία με τους δικούς της νομικούς συμβούλους για το τι ακριβώς έπρεπε η ίδια να πράξει. Ειδικότερα η αιτούσα είχε βρεθεί προς του ακόλουθου νομικού προβλήματος : Με βάση το ναυλοσύμφωνο που είχε υπογράψει με την 2η των καθ' ων έπρεπε να ενεργεί σύμφωνα με τις εντολές της και κατά συνέπεια να εκφορτώσει το φορτίο εκεί που η τελευταία θα της υποδείκνυε. Με βάση, όμως, τις φορτωτικές που είχαν εκδοθεί, κατ' εξουσιοδότησή της, είχε υποχρέωση να παραδώσει το φορτίο στους νομιμοποιούμενους κομιστές αυτών και κυρίους των φορτίων. Οι νομικοί της σύμβουλοι (του αλληλασφαλιστικού της οργανισμού που κάλυπτε το πλοίο κατά απαιτήσεων σχετιζόμενων με το φορτίο) διατηρούσαν αμφιβολίες και εξέφραζαν τον προβληματισμό τους για το αν ο προαναφερθείς όρος 60 του ναυλοσυμφώνου, κατά τον οποίο το φορτίο θα μπορούσε να εκφορτωθεί με την κατάθεση εγγυητικής επιστολής από πλευράς των φορτωτών, κάλυπτε την αιτούσα, αφού εκτιμούσαν ότι ο όρος αυτός είχε ισχύ στην περίπτωση που ο παραλήπτης του φορτίου δεν έχει μεν τις πρωτότυπες φορτωτικές πλην, όμως, είναι αυτός που δικαιούται πράγματι να το παραλάβει σύμφωνα με αυτές. Εξέφραζαν επίσης την άποψη ότι ναι μεν η αιτούσα υποχρεούτο να υπακούσει στις οδηγίες των ναυλωτών υπό την προϋπόθεση, όμως, ότι οι οδηγίες αυτές ήταν νόμιμες και υποστήριζαν ότι δεν υποχρεούτο να υπακούσει σε οδηγίες παράδοσης του φορτίου σε μη δικαιούμενο πρόσωπο. Τους ανέφεραν ακόμα ότι για να ασκήσει η ναυλώτρια δικαίωμα ενεχυρίασης επί του φορτίου θα έπρεπε να έχει την κατοχή του κάτι που θα γινόταν μόνο με την παράδοσή του από την αιτούσα η οποία, όμως, στην περίπτωση αυτή θα ενεργούσε αντίθετα στις υποχρεώσεις της έναντι των κομιστών των φορτωτικών. Τέλος τους

8° φύλλο της υπ' αριθμ.    3083 /2006 απόφασης του Μονομελούς Πρωτοδικείου Πειραιά (διαδικασία ασφαλιστικών μέτρων).

-----------------------------------

επαναλάμβαναν ότι η αιτούσα επιθυμούσε μεν να εξυπηρετήσει τους ναυλωτές χωρίς, όμως, να εκτεθεί η ίδια σε αξιώσεις από την πλευρά των κυρίων του φορτίου. Στα πλαίσια των συζητήσεων αυτών οι δικηγόροι της αιτούσας πρότειναν ότι θα μπορούσε, ενδεχομένως, να εκφορτωθεί το φορτίο σε αποθήκη παρακαταθήκης υπό κάποιες προϋποθέσεις εξασφάλισης της αιτούσας και συγκεκριμένα πρότειναν : α) να της παραδοθεί αντίγραφο του συμφωνητικού υποναυλώσεως στο οποίο να εμπεριέχεται ο όρος της ενεχυρίασης, β) να εκδοθεί διαταγή του δικαστηρίου της Αγκόλα για εκφόρτωση του φορτίου με μεσεγγύηση της ναυλώτριας και γ) να παραδοθεί από τη ναυλώτρια εγγυητική επιστολή αποζημίωσης με συγκεκριμένους όρους και οπισθογράφηση τράπεζας της έγκρισης της αιτούσας. Η 2η των καθ' ων στην προσπάθειά της να εξασφαλίσει την άσκηση ενεχυρίασης επί του φορτίου ώστε να καταφέρει να εισπράξει την απαίτησή της, κατέθεσε αμέσως αίτηση ενώπιον του δικαστηρίου της Luanda ζητώντας άδεια για την εκφόρτωση του φορτίου στο λιμάνι αυτό. Επί της αιτήσεως αυτής εκδόθηκε η υπ' αριθμ. 1/2006 απόφαση του πιο πάνω δικαστηρίου με την οποία διατάχθηκε η εκφόρτωση και παράδοση του φορτίου του πλοίου Future Confidence στην 2η των καθ' ων ως μεσεγγυούχο. Η εν λόγω απόφαση κοινοποιήθηκε στην αιτούσα στις 6/1/2006, πλην, όμως, αυτή και πάλι αρνήθηκε να εκφορτώσει το φορτίο υποστηρίζοντας ότι η απόφαση αυτή δεν την κάλυπτε έναντι της ευθύνης της προς τους κυρίους του φορτίου αφού είχε εκδοθεί μεταξύ 2ης των καθ' ων και υποναυλώτριας και συνεπώς δεν δέσμευε την ίδια ενώ, κατά τους ισχυρισμούς της, είχε εκδοθεί με βάση τοπική δωσιδικία που δεν υπήρχε αφού το πλοίο εμφανίστηκε ως ναυλοχούν στο λιμάνι της Luanda κάτι, όμως, που δεν ήταν αληθές. Στη συνέχεια και συγκεκριμένα στις 10/1/2006 η αιτούσα μαζί με την κυρία του πλοίου υπέβαλαν αίτηση (interpleader) στο δικαστήριο High Court του Λονδίνου, στρεφόμενες κατά της 2ης των καθ' ων

και των πιο πάνω ελβετικών τραπεζών Credit Suisse και Banque Nationale de Geneve, ζητώντας να τους δοθούν οδηγίες για το πρόσωπο στο οποίο έπρεπε να παραδώσουν το φορτίο. Στα πλαίσια της δίκης αυτής η τράπεζα Credit Suisse υπέβαλε παρεμπίπτουσα αίτηση ασφαλιστικών μέτρων στο ίδιο δικαστήριο, χωρίς κλήση των λοιπών διαδίκων αλλά με απλή γνωστοποίηση σ' αυτούς, ζητώντας να της παραδοθεί το φορτίο στο λιμένα Bata της Ισημερινής Γουϊνέας και δηλώνοντας παράλληλα ότι προτίθεται να παράσχει απεριόριστη εγγυοδοσία ως προς οιαδήποτε ζημία τυχόν υφίστατο οιοδήποτε των διαδίκων μερών εξ αιτίας της διαταγής αυτής. Οι άγγλοι δικηγόροι της 2ης των καθ' ων τη συμβούλευσαν να μην εναντιωθεί στο πιο πάνω αίτημα αφού ήταν βέβαιο ότι αυτό θα γινόταν δεκτό από το δικαστήριο λόγω της παρεχόμενης απεριόριστης εξασφάλισης από μια φερέγγυα ελβετική τράπεζα. Κατόπιν αυτού η 2η των καθ' ων δήλωσε ότι δεν είχε αντίρρηση στον κατάπλου του πλοίου στο λιμένα Bata και ότι δεν θα ελάμβανε δικαστικά μέτρα κατά του φορτίου στον ως άνω λιμένα επιφυλασσόμενη παντός δικαιώματός της κατά της αιτούσας σχετικά με την άρνησή της να εκτελέσει προηγούμενες εντολές της. Μετά την πιο πάνω συμφωνία το πλοίο Future Confidence κατέπλευσε στο λιμάνι Bata όπου στις 23/1/2006 άρχισε η εκφόρτωσή του. Έκτοτε και μετά την εξέλιξη αυτή κανένα από τα διάδικα μέρη που είχαν προσφύγει στο High Court του Λονδίνου δεν επέσπευσε την ενώπιόν του διαδικασία. Η 2η των καθ' ων μετά την άρνηση της αιτούσας να συμμορφωθεί προς τις εντολές της θεώρησε ότι η εκναυλώτρια αθέτησε υπαίτια τις εκ του ναυλοσυμφώνου απορρέουσες υποχρεώσεις της και, ως εκ τούτου, έθεσε το πλοίο εκτός ναύλωσης, κατόπιν δε αυτού έπαψε στις 15/1/2006 να καταβάλει τον συμφωνηθέντα ναύλο. Στις 31/1/2006 οι άγγλοι δικηγόροι της αιτούσας ανακοίνωσαν στους άγγλους δικηγόρους της 2ης των καθ' ων ότι προέβησαν στον διορισμό διαιτητού, κάνοντας χρήση της σχετικής ρήτρας που υπήρχε στο ναυλοσύμφωνο, ισχυριζόμενοι ότι η αιτούσα έχει απαίτηση κατά της 2ης των καθ' ων για μη καταβληθέντες ναύλους (βλ. το από 31/1/2006 έγγραφο μήνυμα). Στη διαδικασία αυτή η 2η των καθ' ων προτίθεται να συμμετάσχει για να προβάλει την δική της ανταπαίτηση κατά της αιτούσας

'9° φύλλο της υπ' αριθμ.    3093    /2006 απόφασης του Μονομελούς
Πρωτοδικείου Πειραιά (διαδικασία ασφαλιστικών μέτρων).

—————————————————————————————

(βλ. την από 10/2/2006 ένορκη βεβαίωση του άγγλου δικηγόρου Mark O'
Neil). Από τα πιο πάνω ιστορούμενα πραγματικά περιστατικά αναμφίβολα
προκύπτει ότι μεταξύ των διαδίκων υφίσταται διαφορά εξαιτίας της διαφωνίας
τους σε σχέση με το γεγονός της υποχρέωσης ή μη της ναυλώτριας να
καταβάλει ναύλους στην εκναυλώτρια μέχρι τον τελικό χρόνο της
αναμενόμενης εκφόρτωσης του φορτίου και για την επίλυση της διαφοράς
αυτής τα μέρη προσέφυγαν σε διαιτησία στο Λονδίνο. Ωστόσο από κανένα
αποδεικτικό στοιχείο δεν πιθανολογήθηκε αδικοπρακτική συμπεριφορά των
καθ' ων η αίτηση, όπως ισχυρίζεται η αιτούσα, και μάλιστα σε σχέση με την
φερεγγυότητα της 2ης των καθ' ων. Ειδικότερα, όπως προαναφέρθηκε, από την
έναρξη ακόμα των διαπραγματεύσεων οι άγγλοι ναυλομεσίτες της 2ης των καθ'
ων έδωσαν στους ναυλομεσίτες της αιτούσας όλα τα στοιχεία που γνώριζαν
και είχαν στη διάθεσή τους και τα οποία αφορούσαν την 2η των καθ' ων
επισημαίνοντάς τους μάλιστα ότι τα στοιχεία αυτά τα παρέθεταν χωρίς
εγγύηση και προτρέποντάς τους να διενεργήσουν κι εκείνοι δική τους έρευνα.
Από κανένα αποδεικτικό στοιχείο δεν πιθανολογήθηκε ότι η 1η των καθ' ων
διεξήγαγε τις διαπραγματεύσεις για δικό της λογαριασμό και όταν κλείστηκε η
συμφωνία ζήτησε το ναυλοσύμφωνο να υπογραφεί με την 2η των καθ' ων,
όπως ισχυρίστηκε η αιτούσα. Αντίθετα, όπως προκύπτει από όσα αναλυτικά
αναφέρθηκαν παραπάνω, η 2η των καθ' ων εμφανίστηκε εξ αρχής ως
υποψήφια ναυλώτρια και η 1η ως διαμεσολαβούσα στη ναύλωση, κάτι που
αναφέρεται και στο ναυλοσύμφωνο το οποίο συνήφθη μεταξύ των διαδίκων,
όπως και η ίδια η αιτούσα συνομολογεί στην ένδικη αίτησή της. Περαιτέρω
πιθανολογήθηκε ότι τόσο η 2η των καθ' ων όσο και η 1η είναι αλλοδαπές
εταιρείες που έχουν νόμιμα εγκατασταθεί στην Ελλάδα. Το γεγονός ότι η
εγκατάσταση της 2ης έγινε λίγο πριν την κατάρτιση του επίδικου
ναυλοσύμφωνου δεν μπορεί να θεωρηθεί, από μόνο του και άνευ άλλου τινός,

επιλήψιμο ούτε καθιστά την εν λόγω εταιρεία ένοχη ή ύποπτη για τέλεση απάτης. Το ίδιο ισχύει και για την δηλωθείσα στο ναυλοσύμφωνο διεύθυνση της (Κουντουριώτη 269) η οποία στη συνέχεια άλλαξε αφού η έδρα αυτή ήταν προσωρινή (βλ. το από 23/9/2005 ιδιωτικό συμφωνητικό μισθώσεως τριμήνου διάρκειας θεωρημένο από την αρμόδια Δ.Ο.Υ.) και κατόπιν η εταιρεία μεταφέρθηκε επί της οδού Γκινοσάτη αρ. 8 και Ήβης στον Δήμο Μεταμόρφωσης Αττικής (βλ. το από 21/12/2005 ιδιωτικό συμφωνητικό υπομίσθωσης θεωρημένο από την αρμόδια Δ.Ο.Υ). Η αλλαγή αυτή της έδρας της 2ης των καθ' ων, ως ενέργεια μη απαγορευόμενη από καμία διάταξη νόμου, ήταν δικαίωμά της και σε καμία περίπτωση δεν μπορεί να θεωρηθεί ότι αποτελεί αποδεικτικό στοιχείο της προσπάθειάς της να εξαπατήσει την αιτούσα. Άλλωστε, όπως προαναφέρθηκε, αμέσως μετά την εμφάνιση του προβλήματος που δημιουργήθηκε οι δικηγόροι της αιτούσας ήταν σε διαρκή επαφή με τους δικηγόρους των καθ' ων ανταλλάσσοντας απόψεις και προσπαθώντας να βρουν ικανοποιητική για αμφότερα τα μέρη λύση και από κανένα αποδεικτικό στοιχείο δεν προέκυψε ότι η αιτούσα έχασε ποτέ τα ίχνη της 2ης των καθ' ων ή την επαφή μαζί της ούτε ότι δεν είχε τη δυνατότητα να μάθει τη νέα της έδρα. Επίσης και το ότι η αιτούσα δεν κατάφερε να εντοπίσει γραφεία της υποναυλώτριας εταιρείας στη Γενεύη, εκτός του ότι δεν πιθανολογήθηκε ως αληθές, ωστόσο και αν ακόμα ήθελε υποτεθεί ότι ανταποκρίνεται στην πραγματικότητα και πάλι δεν μπορεί να θεμελιώσει συνέργεια των καθ' ων με αυτήν για την εξαπάτηση της αιτούσας. Το γεγονός, επίσης, ότι η 2η των καθ' ων επιδίωξε να εκδοθεί απόφαση του δικαστηρίου της Luanda για την εκφόρτωση του φορτίου στο λιμάνι αυτό υποδηλώνει ακριβώς το αντίθετο από αυτό που ισχυρίζεται η αιτούσα και συγκεκριμένα υποδηλώνει ότι η 2η των καθ' ων προσπάθησε, με όλα τα νόμιμα μέσα που είχε στη διάθεσή της, να διεκδικήσει τα δικαιώματά της. Άλλωστε μια τέτοια απόφαση είχε ζητήσει, αρχικά, η αιτούσα για την κάλυψή της σε περίπτωση που αποφάσιζε να υπακούσει στις εντολές των ναυλωτών της. Το αν το πλοίο εμφανίστηκε ως ναυλοχούν στο λιμάνι της Luanda ενώ αυτό βρισκόταν σε διεθνή ύδατα, ακόμα και αν υποτεθεί ως αληθές, και πάλι δεν θεμελιώνει

10° φύλλο της υπ' αριθμ.    3023 /2006 απόφασης του Μονομελούς Πρωτοδικείου Πειραιά (διαδικασία ασφαλιστικών μέτρων).

--------------------------------------------

αδικοπρακτική συμπεριφορά της 2ης των καθ' ων αφού είναι προφανές ότι οι ενέργειες αυτές (σύνταξη αίτησης, περιεχόμενο αυτής κλπ) έγιναν από τους νομικούς παραστάτες της στα πλαίσια της στρατηγικής που εκείνοι έκριναν πλέον πρόσφορη και επέλεξαν για την διεκδίκηση των δικαιωμάτων των πελατών τους. Τέλος θα πρέπει να αναφερθεί πως το γεγονός και μόνο ότι η 2η των καθ' ων ήταν συνεπέστατη στις οικονομικές της υποχρεώσεις απέναντι στην αιτούσα και κατέβαλε ανελλιπώς τον συμφωνηθέντα ημερήσιο ναύλο μέχρι τις 14/1/2006, μολονότι η υποναυλώτρια είχε πάψει από τις 10/10/2005 να καταβάλει σ' εκείνη τον οφειλόμενο ναύλο, καταρρίπτει οποιαδήποτε υπόνοια για προσπάθειά της να εξαπατήσει την αιτούσα αφού αν είχε τέτοια πρόθεση θα το είχε πράξει εξ αρχής και δεν θα ανέμενε την ολοκλήρωση, σχεδόν, του πλου για να το πράξει. Από όλα τα ανωτέρω πραγματικά περιστατικά που πιθανολογήθηκαν δεν προέκυψε ότι οι καθ' ων επέδειξαν οποιαδήποτε αδικοπρακτική συμπεριφορά σε βάρος της αιτούσας.. Ως εκ περισσού θα πρέπει να αναφερθεί ότι, όπως ήδη ειπώθηκε, το πλοίο κατά τον χρόνο συζήτησης της αίτησης είχε ήδη αρχίσει, μετά τη συναίνεση όλων των εμπλεκόμενων μερών, την εκφόρτωση του φορτίου του και επόμενως δεν βρίσκεται πλέον σε διεθνή ύδατα ούτε αντιμετωπίζει τους επικαλούμενους με την κρινόμενη αίτηση κινδύνους. Κατόπιν αυτών η κρινόμενη αίτηση θα πρέπει να απορριφθεί ως ουσιαστικά αβάσιμη και να συμψηφιστεί η δικαστική δαπάνη μεταξύ των διαδίκων, κατ' άρθρο 179 Κ.Πολ.Δ., λόγω της δυσχερούς ερμηνείας των κανόνων που εφαρμόστηκαν

### ΓΙΑ ΤΟΥΣ ΛΟΓΟΥΣ ΑΥΤΟΥΣ

Δικάζει κατ' αντιμωλία των διαδίκων.

Απορρίπτει την αίτηση.

Συμψηφίζει τη δικαστική δαπάνη μεταξύ των διαδίκων.

Κρίθηκε, αποφασίστηκε και δημοσιεύθηκε στον Πειραιά στις 27/3/2006 σε έκτακτη, δημόσια και στο ακροατήριο συνεδρίαση χωρίς του δικηγόρους των διαδίκων με την παρουσία και του Γραμματέα Θεοφάνης Μπαλαφούτης.

Η  ΔΙΚΑΣΤΗΣ                                   Ο  ΓΡΑΜΜΑΤΕΑΣ

Θεοφάνης Μπαλαφούτης

Ακριβές αντίγραφο
το οποίο θεωρήθηκε
για τη νόμιμη σήμανση
Πειραιάς

Ακριβές αντίγραφο
το οποίο θεωρήθηκε για
τη νόμιμη σήμανση
2 8 ΝΟΕ. 2007

**TRANSLATION**

------------------------------------------------

Decision No. 3023/2006

899/2006

PIRAEUS SINLE-MEMBERED FIRST INSTANCE COURT

(Security Measures Procedure)

Constituted by the Judge Maria Andrikopoulou, President of the First Instance Court who was appointed following a ballot in accordance with Law 3327/2005 without the attendance of a Clerk.

The court convened at an open court session on 10th February 2006 to hear the petition:

OF THE PETITIONER: The company named "Orient Shipping Rotterdam B.V.", with registered offices in Rotterdam, Holland, lawfully represented in its capacity as managing company of the vessel called "Future Confidence" in the ownership the company named "Extra Cover Maritime Inc.", represented before the court by the attorney at law Panagiotis Galatis.

AGAINST THE RESPONDENTS: 1. The company named "Marachart Shipping Co Ltd" officially registered abroad but in reality seated in Agios Stefanos, Attiki, lawfully represented by the third respondent.

2. The company named "Sea Transport Contractors Ltd." officially registered abroad but in reality seated in Agios Stefanos, Attiki, lawfully represented by the third respondent.

3. Anastasios Raisis, ship manager, resident of Agios Stefanos, Attiki, all three respondents being represented before the court by attorney at law Klearchos Kanellopoulos.

The petitioner requested that its petition filed with the Secretariat of this Court under reference no. 899/2006 pursuant to which this hearing was fixed be upheld.

During the hearing of the case the attorneys of the litigant parties submitted their arguments requesting that same be upheld.

THE COURT STUDIED THE FILE

AND DELIBERATED IN ACCORDANCE WITH THE LAW

In the petition under consideration the petitioner stated the following : On 29.9.2005 a NYPE time charterparty was entered into containing the standard addenda and amendments between the managing company of the vessel "Future Confidence" (the

2

"Disponent Owner") and the second respondent as time charterer (the "Charterer"). Pursuant to the abovementioned time charter for which the first respondent acted as intermediary, the above vessel commenced loading its cargo (cement) on 1.10.2005 at the port of Nanjing in China and in this connection and in accordance with the relevant term of the charterparty two bills of lading were issued by the agents of the Charterers on behalf of the master of the vessel which appeared to be signed by the Disponent Owners. The bills of lading which were issued stated that the ports of discharge were ports in West Africa and included the standard term of time-charterparties that the freight was prepaid. After the vessel completed loading it commenced its voyage in accordance with the Charterers instructions having as its destination the port of Bata, West Africa which was the first port of discharge. The vessel arrived at the aforementioned port on 22.11.2005 where it was instructed to stay until further notice was provided by the Charterers. On 18.12.2005 the charterers ordered the vessel to leave the port of Bata and sail to the port of Luanda in West Africa. Pursuant to the abovementioned order the vessel sailed to Luanda with expected date of arrival 22.12.2005. However on 20.12.2005 the petitioner received a letter from Credit Suisse, the Swiss bank, advising that by virtue of an endorsement it was the bearer of the first bill of lading and as owner of the cargo it desired that discharge take place in Bata. This was the first time the petitioner was informed that the sub-charterers owed money to the charterer and that the latter intended to arrest the cargo, a right which in the petitioner's opinion it did not have given the fact the bills of lading stated Freight Prepaid. On 30.12.2005 Banquet National of Geneva appeared stating that it was the lawful bearer of the second bill of lading and requested that its cargo be discharged in Bata. The vessel remained stationary at its position at approximately 50 nautical miles outside Luanda waiting for the dispute between the charterer and the banks to be resolved. The Charterer resorted to the courts of Angola which issued a decision ordering the discharge of the cargo in Luanda, which decision however does not bind the petitioner given that it was issued pursuant to the dispute between the Charterer and its subcharterer, and, moreover, is erroneous having been issued pursuant to the wrong jurisdiction specifically because the second respondent presented the vessel as being in the port of Luanda, which was untrue. The second respondent paid the agreed freight up until 14.1.2006 and from that point in time refuses to pay the balance claiming that the vessel is off hire because the Disponent Owner did not follow the Charterer's orders for discharge of the cargo to take place in Luanda. The petitioner has appealed to the courts in London requesting that it be directed to whom the cargo should be delivered. The second respondent shall, from 15.1.2006 and up until the estimated

3

time of delivery of the cargo, which according to modest calculations should at least be two months, owe freight of 60 days and shall therefore owe in total United States Dollars 990,000 plus daily costs of bunkers. Following the delay in payment of the freight the petitioner requested information with regard to the Charterer's credit worthiness. It was advised that the Charterer had not established branch offices in Greece pursuant to Law No. 89/1967 nor did it maintain offices at the address referred to in the charterparty. Moreover, its only asset was a Post Box in Agios Stefanos, Attiki, where the offices of the other two respondents were located. The first and the second respondents belong to the same beneficial interests and in essence belong to the third respondent. The appearance of the second respondent was made with the first and third respondent's active participation in the plan to deceive the petitioner. The so-called sub-charterer named "Rustal S.A" is also part of this plan to deceive the petitioner given that its offices in Geneva, Switzerland too cannot be located. The respondents sole and several liability is substantiated by virtue of the abovementioned tortious conduct. Furthermore the third respondent is also liable as sole shareholder of the second respondent company which is legally invalid in Greece and is considered to be operating in practice in a form similar to that of an OE general partnership. On the basis of the above events and citing imminent danger due to the respondents uncreditworthiness and the urgency of the case due to the vessel's difficult position arising from the non payment of freight, leading to the non supply of food and water etc. and also the danger of piracy, the petitioner requests, in security of its claim, the provisional attachment of all moveable and immoveable property of the respondents whether in their possession or in the possession of third parties valued up to the amount of 1,000,000 Euros.

The petition under consideration containing the above information and claim currently heard during the security measures procedure (article 686 of the Civil Procedure Code) is lawfully and admissibly brought before this court which has jurisdiction both on the basis of the nature of the claim and the locality arising from the alleged actual registered offices of the first and second respondents and the home address of the third respondent are in Piraeus (articles 683 para. 1, article 22, article 25 para. 2 of the Civil Procedure Code) and consequently international jurisdiction in accordance with article 2 para.1. and article 6 para. 1 of EC/Regulation No. 44/2001 of the Council dated 22nd December 2000 concerning "jurisdiction, recognition and enforcement of judgments in civil and commercial matters" which entered into force on 1.3.2001 substituting the Brussels Convention. Furthermore, as regards the applicable law, the petition under consideration is substantiated by virtue of the tortious conduct of the respondents who by their actions deceived the petitioner with

4

regard to the creditworthiness of the second respondent thereby persuading the petitioner to enter into the charterparty under dispute. However, neither the place where the tortious conduct was committed, nor the place where the consequences of the tortious conduct occurred, are apparent from the contents of the petition enabling the applicable law to be defined pursuant to article 26 of the Civil Code. Nevertheless, regardless whether the tortious act took place in Holland or in Greece or elsewhere, in view of the fact that no other applicable foreign law has been adduced and the fact that the court is unable to issue a provisional judgment ordering the parties to prove this point, the court finds that Greek law applies, such Greek law provisions being considered similar to those of any foreign applicable law (see Krispis I.D.D. para. 44, page 353, Fragista – Faitsi, Law of Evidence 1975, para.3 P.F.I. 788/1993, END 21,332). Therefore the petition under consideration is lawfully founded on articles 914, 926 of the Civil Code and articles 707 et al and on article 713 of the Civil Procedure Code. Moreover, regarding the substantiation of the petition under consideration in respect of the third respondent and his adduced capacity as a partner in the general partnership and sole shareholder of the second respondent company which in the absence of lawful establishment in Greece is operating as a "de facto" company in a form similar to that of a general partnership (OE company), the following should be noted: In accordance with article 1 of Law 791/1978 shipping companies which were incorporated pursuant to the laws of a foreign state and which own or manage vessels (with the exception of the companies which own or manage pleasure boats) flying the Greek flag or which have been established or wish to be established in Greece pursuant to article 25 of Law 27/1975 (which has been replaced by article 28 of Law 814/1978 as amended by article 75 para. 5 of Law 1892/1990 and replaced by articles 4 of Law 2234/1994) or Laws 89/1967 and 378/1968, are governed as regards their incorporation and legal capacity by the law of the country where their registered office is located as per their articles of incorporation, independently of where their affairs are managed from in whole or in part. The applicability of article 1 of Law 791/1978 also extended to foreign shipowning companies of vessels with foreign flags provided their vessels were managed by offices or branches of companies of article 25 of Law 27/1975, as substituted. By virtue of these provisions a deviation from the rule of the real seat of companies provided by article 10 of the Civil Code is introduced (Supreme Court Decision no. 461/1978, Supreme Court Decision No. 2/1999, Supreme Court Decision no. 335/2001, END 29 page 193) Piraeus Court of Appeal No. 161/2003, END 31,39). In the case in point the second respondent is a foreign company with registered office in Liberia having as its objects, inter alia, the chartering of vessels,

5



settlement of general average claims, brokerage of chartering and sale and purchase or construction of vessels with Greek or foreign flag etc. The respondent has established an office in Greece pursuant to Laws 378/1968, 27/1975, 814/1978 and 2234/1994 (see certificate no. 3122.1/3909/5.8.2006 of the Ministry of Mercantile Marine and Government Gazette no. 181/20.9.2005). Thus the second respondent foreign company with the abovementioned objects constituting the operation of shipping activities in accordance with article 25 of Law 27/1975 as replaced by article 28 of law 814/1978, which is lawfully established in Greece, cannot be considered a Greek company or a de facto company with the third respondent as sole shareholder due to non compliance with Greek law provisions concerning its lawful incorporation, as alleged by the petitioner (Decision No. 245/1996 of Piraeus Multimember First Instance Court, END 25,98). Therefore the part of the petition regarding the third respondent being the liable party in his capacity as shareholder and sole partner of the second respondent company is rejected as unlawful. Following the above finding, the petition should further be considered in its substance.

In the case in point according to the sworn testimonies before the court of the witnesses Dimitrios Lignos (for the petitioner) and Ioannis Mavromatis (for the respondents) and according to all the documents which the litigant parties have lawfully adduced and asserted, the following appear to have taken place: the petitioner which is a foreign company seated in Roterdam, Holland, manages the vessel named "Future Confidence" flying the Philippines flag owned by the company named "Extra Cover Maritime inc. " The first respondent which is a Cypriot company having as its object the management of vessels, has a lawfully established office in Greece pursuant to Laws 89/1967, 378/1968, 27/1975, 814/1978 and 2234/1994 (see certificate no. 3122.1/997/62/8.2.2006 issued by the Directorate of Shipping Policy and Development of the Ministry of Mercantile Marine). The second respondent seated in Liberia, having as its object the chartering of vessels, has established an office in Greece pursuant to the provisions of Laws 378/1968, 27/1975, 814/1978 and 2234/1994 (see certificate no. 3122.1/3909/5/8.2.2006 issued by the Directorate of Shipping Policy and Development of the Ministry of Mercantile Marine). The third respondent is a member of the Board of Directors of the first respondent, chairman of the Board of Directors of the second respondent and lawful representative of each of the above respondents. In September 2005, in the context of the abovementioned business activities, the second respondent company instructed "CHARTERHOUSE SHIPBROKING LIMITED", seated in London, a chartering firm with which it conducted business, to find a vessel for immediate hire to carry a cargo of cement from the Yangtze river in China to the ports of West Africa.

6

Pursuant to the above instructions, the head of the chartering department of Charterhouse sent via email an advertisement to all potentially interested parties who had done business with his company. The chartering firm "Van Weedle Chartering BV", seated in Rotterdam, Holland, replying to this advertisement on behalf of the petitioner, informed that the vessel "Future Confidence" was available and asked for the name of the prospective charterers. The English shipbroker replied on the same date by giving the details of the second respondent company. On the same date the Dutch shipbroker requested further information and recommendations with regard to the prospective charterer and the English shipbroker replied by sending a confidential three page message containing all the requested information as well as a profile of the second respondent. Specifically, it set out the names of the vessels it had recently chartered and the names of the owning companies of these vessels enabling the Disponent Owners to obtain references if they so wished. The English shipbroker also informed that the prospective charterer had dealings with the bank ("EFG EUROBANK ERGASIAS") through which it would perform its banking transactions. Lastly, the shipbroker stated that he provided this information strictly and only as broker and that he did not provide any guarantee or undertaking with regard to the accuracy of the abovementioned information recommending that the petitioner carry out its own investigation. The Dutch shipbroker thanked the English shipbroker for the brief and thereafter negotiations began between the two brokers who acted on behalf of the petitioner in its capacity as Disponent Owner of the vessel under charter and the second respondent in its capacity as charterer during which written offers and counter offers were exchanged ending with the closing of a final agreement on 29.9.2005 for the time charter of the vessel "Future Confidence". The substantive terms of the time charter were agreed on the basis of a standard form NYPE charterparty although no charterparty was in fact signed from then on. Amongst other things, it was agreed that the petitioner would charter the vessel "Future Confidence" to the second respondent which was represented by the first respondent and through which all communications would be made. The place of delivery of the vessel was Huangpu port in the Republic of China and the place of redelivery was "at an anchorage within pilot station limits of one safe port within Point Noire – Gabon range excluding Nigeria, Ivory Coast, Tongo, Benin, Ganas and Liberia including however Angola and Guinea Bisao (Portuguese Guinea), Angola not being a place of redelivery". The term of the charterparty was agreed to be minimum 55 days and maximum 70 days, no guarantee being given as to the maximum duration. The freight was agreed at United States Dollars 16,500 daily to be paid by the second respondent, initially with the value of bunkers, three banking days following delivery



of the vessel by the second respondent and every fortnight thereafter. Moreover, it was agreed that the second respondent would pay a lump sum of United States Dollars 5,000 in lieu of holds cleaning as well as the amount of United States Dollars 1,200 monthly for telecommunications/board/entertainment of the crew. Finally, it was agreed that the master would deliver to the agents an authorization whereby the Charterers and/or their agents would be authorized to issue bills of lading and sign same on behalf of the master and/or the owners in accordance with the first mate's receipts and with reservation of the charterparty terms. As regards General Average claims or prospective disputes arising from the charter it was agreed that these be resolved by arbitration in London and that English law be applicable. The capacity under which the petitioner acted in the time charter, in other words as disponent owners who had chartered out the  vessel, results from the time charter dated 28.1.2003 and its addenda which have been entered into between the petitioner and the owning company of the vessel "Extra Cover Maritime Inc." and this is not rebutted as alleged by the respondents by the testimony of the witness Richard Crump of the petitioner's law firm in London which in a petition filed before the High Court of London and referred to below, states that the petitioner entered into the agreement on behalf of the vessel's owner. Moreover, it is probable, that immediately following the execution of the above agreement the second respondent as "subcharterer - disponent owner" of the aforementioned vessel entered into a time charter with the Swiss company "Rustal S.A." seated in Geneva. The object of the time charter was exactly the same as that of the time charter with the petitioner. It had the same duration and contained identical terms with the exception of the term concerning freight. This was fixed at a daily rate of United States Dollars 17,750 (see time charterparty dated 29.9.2005 with additional clauses). In performance of the above agreements the vessel commenced loading on 1.10.2006 at the port of Nanjing, China. As had been agreed the master delivered an authorization to the Charterers authorizing them or their agents to issue bills of lading on his behalf and/or behalf of the owners. Pursuant to this authorization two bills of lading were issued by the agents of the second respondent on behalf of the master and which appeared to have been issued by the owners. The first bill of lading concerned a cargo of 29,698 m.t.. The other bill of lading concerned a cargo of 8,490 m.t. In the relevant bills of lading it is stated that freight has been prepaid pursuant to the terms of the time charter dated 29.9.2005. Both bills of lading state that the discharge ports are ports in West Africa. Immediately following completion of loading the vessel commenced its voyage on the charterers' instructions to sail to the first port of discharge which was Bata. The vessel arrived at the aforementioned port on 22.11.2005 and received

8



instructions to wait for new orders by the time charterers. However, time was passing and the Disponent Owners pressed the charterers for further instructions. The Charterers, having paid the freight, promised that they would soon provide the relevant instructions. This delay which was caused in the provision of the relevant orders by the second respondent as regards the unloading of the cargo was probably due to a problem which arose between the Charterer and the subcharterer. Specifically, as was adduced, the subcharterer of the vessel "Rustal" had ceased to pay the agreed freight as of 10.10.2005 due to financial problems it was encountering in paying the agreed freights, and the second respondent was in constant communication with them in order to determine the duration and extent of the problem (total or partial inability, permanent or temporary etc.) and to decide on its course of action. When the second respondent ascertained that "Rustal" could not carry out its financial obligations and would not pay the freight owed, it decided, following consultation with its lawyers, to enforce its lien over the cargo, a right which it had in the opinion of its lawyers and could enforce given that the charter was still running and the freight was outstanding. Thus on 13.12.2005 the second respondent sent a message to the petitioner requesting confirmation that the vessel would not berth without its written instructions and on 18.12.2005 ordered the vessel to leave Bata and sail for Luanda. Indeed, pursuant to these instructions the vessel sailed on the same day from Bata having as new destination the port of Luanda and estimated date of arrival 21.12.2005. Nevertheless, on 20.12.2005 the petitioner received a fax from Credit Suisse in Switzerland in which the latter advised that it was the lawful bearer by endorsement of the first bill of lading and that as owner of the cargo it desired that same be unloaded in Bata. Further the bank requested confirmation that the vessel would act on and comply with its instructions. Then the petitioner was advised for the first time with regard to the problem that had arisen between the charterer and the subcharterer and that the second respondent wanted to take delivery of the cargo in its capacity as trustee so that it could enforce the abovementioned right over it in security of its claim which at that time exceeded United States Dollars 4,5 million. On 22.12.2005 the English law firm "Stephenson Harwood" acting on behalf of the second respondent sent a fax to the petitioner's mutual protection and indemnity association ("UK Club") confirming in writing their clients instructions for the vessel to set sail for Luanda for the purpose of unloading the cargo, to enforce their lien over the cargo and deliver same to charterers' agents as trustees. In the same document they advise that in their opinion the charterers are entitled to enforce their lien over the cargo given that in accordance with clause 60 of the time charter between the Disponent Owner and Charterer, if the original bills of

9

ΣΥΜΒΟΛΑΙΟΓΡΑΦΙΚΗ
ΣΕ ΤΚ 186 37
270 41 61 369
ΝΑ ΑΜΑΞΑ ΕΡΓΑΣ

lading are unavailable, unloading could take place against a letter of indemnity which the Charterers would deposit. They further advised that the "freight prepaid" remark on bills of lading issued by the charterers was untrue. In this context they requested that the petitioner draw up and send them the wording of the letter of indemnity which would be acceptable pointing out that If the cargo was not discharged in Luanda enabling their clients to exercise their lien, the latter would have no other way of recovering the outstanding freight. In such a case the Disponent Owners would be obliged to cover the Charterers' damages as they would be in breach of the charterparty which was in force between them. The lawyers of the petitioner's protection and indemnity association replied on the same day to this message and after reassuring the Charterers' lawyers that their clients wished to help, without however becoming involved in the disputes with the cargo's owners, they expressed their concern with regard to the legal side of the issue which had arisen and requested that solutions be proposed which would serve the Charterers and at the same time afford legal protection to the Disponent Owner. In the meantime "Credit Suisse" bank insisted that it had the right to give instructions with regard to the cargo in its capacity as owner of same. In its fax dated 28.12.2005 addressed to the petitioner it repeated that the cargo should only be unloaded on its instructions at a port it would specify. Almost simultaneously on 30.12.2005 another Swiss bank "Banquet Cantonal of Geneva", appeared, which stated via a fax sent by its lawyers addressed to the petitioner's lawyers, that it was the lawful bearer by endorsement of the second bill of lading and requested that the cargo be unloaded in Bata. Negotiations ensued between the opposing parties in an attempt to reach a settlement. During this period of time the vessel remained outside Luanda waiting for a resolution of the dispute between the charterer and the banks whilst the petitioner remained in constant communication with its own legal advisers as to what actions it should take. Specifically, the petitioner came before the following legal issue: pursuant to the charterparty it had signed with the second respondent it should act on its instructions and thus unload the cargo at the place specified by it. Pursuant however to the bills of lading which had been issued upon its authorization it had an obligation to deliver the cargo to the lawful bearers of the bills of lading and owners of the cargoes. Its legal advisers (of the protection and indemnity association which covered the vessel against cargo claims) had doubts and expressed their concern that the aforementioned clause 60 of the time charterparty pursuant to which the cargo could be unloaded against the submission of a letter of indemnity by the shippers covered the petitioner because they considered that this term was enforceable in the case where the consignee of the cargo did not have the original

bills of lading but was actually entitled to accept delivery. They also expressed the opinion that the although the petitioner was obliged to act on the charterers orders, this was so only where these instructions were lawful and they supported the view that it was not obliged to act on instructions to deliver the cargo to someone who was not lawfully entitled to take delivery. Further, they advised that in order for the Charterer to exercise its lien over the cargo it would have to possess the cargo. This would only be possible upon its delivery from the petitioner, in which case it would act contrary to its obligation against the bearers of the bills of lading. Finally, they repeated that the petitioner wanted to assist the Charterers but did not wish to become exposed to a claim by cargo owners. In the context of these discussions the petitioner's lawyers proposed that the cargo could possibly be unloaded and placed in a bonded warehouse under certain conditions securing the petitioner. Specifically it was proposed that: a) a copy of the sub-charterparty containing the term relating to the lien be delivered to the petitioner, b) an order be issued by the Angola court ordering that the cargo be unloaded and kept in trust by the Charterer and c) that a letter of indemnity be delivered to the charterer containing specific terms endorsed by the bank and approved by the petitioner. In an effort to enforce the lien over the cargo and thus collect the amount owed, the second respondent immediately filed a petition before the Luanda courts requesting permission to unload the cargo at its port. Decision no. 1/2006 was issued by the abovementioned court ordering the discharge of the cargo of "Future Confidence" and its delivery to the second respondent as trustee. The relevant decision was served on the petitioner on 6.1.2006. Nevertheless, the petitioner refused to unload the cargo once more alleging that this decision did not afford protection against liability towards the owners of the cargo given that it had been issued pursuant to a dispute between the second respondent and the sub-charterer and therefore did not bind the petitioner. Moreover, it was alleged that the court did not have jurisdiction because the decision had been issued on the basis of a claim that the vessel was anchored at the port of Luanda, something was untrue. Thereafter and specifically on 10.1.2006 the petitioner together with the owner of the vessel filed an interpleader before the High Court of London against the second respondent and the abovementioned Swiss banks "Credit Suisse" and "Banque Nationale de Geneve", requesting that instructions be given to them as to the person who should take delivery of the cargo. In the context of these court proceedings "Credit Suisse" filed an application for conservatory measures before the same court, without summoning the remaining litigants but simply notifying them of the proceedings, requesting the issuance of a decision ordering that it take delivery of the cargo at the port of Bata of Equatorial Guinea, declaring that it was

11



willing to provide an unlimited indemnity for any damage suffered by any litigant party due to this order. The second respondent was advised by its English lawyers not to oppose this petition as it was certain the court would uphold this petition due to the unlimited indemnity offered by a credit worthy Swiss bank. Thereafter, the second respondent stated that it did not object to the vessel sailing to the port of Bata and that it would not initiate court proceedings with regard to the cargo at the abovementioned port reserving its rights against the petitioner with regard to its refusal to carry out its previous instructions. Following the above agreement the "Future Confidence" sailed to the port of Bata on 23.1.2006 and commenced discharge. Thereafter and after this development none of the litigant parties which had brought proceedings before the High Court of London pursued these proceedings. Following the petitioner's refusal to comply with the second respondent's orders, the latter assumed that the petitioner was in deliberate breach of its obligations under the charterparty, and placed the vessel off charter and for this reason on 15.1.2006 it ceased to pay the agreed freight. On 31.1.2006 the English lawyers of the petitioner announced to the second respondent's English lawyers that they had proceeded with the appointment of an arbitrator pursuant to the relevant clause in the charterparty, alleging that the petitioner had a claim against the second respondent for non payment of freight (see written message dated 31.1.2006). The second respondent intends to participate in these proceedings and to initiate its own claim against the petitioner (see affidavit dated 10.2.2006 of the English lawyer Mark O'Neil). From the abovementioned events there is no doubt that a dispute exists between the litigant parties arising from a disagreement relating to the obligation of the Charterer to pay freight up until the final discharge of the cargo. In order to resolve this dispute the parties resorted to arbitration in London. Notwithstanding the above, no evidence has been brought proving the respondents' tortious conduct alleged by the petitioner and indeed with regard to the credit worthiness of the second respondent. Specifically, as mentioned above, even from the commencement of the negotiations, the second respondent's English shipbrokers provided to the petitioner's ship brokers all the information in their possession concerning the second respondent, pointing out that this information was provided without guarantee and prompting them to carry out their own investigation. No evidence was adduced proving that the first respondent carried out negotiations on its own behalf, and when the agreement was concluded it requested that the charterparty be signed with the second respondent as alleged by the petitioner. On the contrary, as results from the above, the second respondent appeared from the beginning as a prospective charterer and the first respondent appeared as an intermediate party as stated in the

12

charterparty between the litigants and as the petitioner itself confirms in its petition. Moreover, it is assumed that the first and second respondents are foreign companies lawfully established in Greece. The mere fact that the second respondent's establishment took place a short time period before the relevant charterparty cannot be considered objectionable and does not render the company guilty or suspicious of fraud. The same applies with regard to its address inserted in the charterparty (269, Kountourioti) which changed, given that this seat was temporary (see lease dated 23.9.2005 for three months certified by the tax office) and was later transferred to 8, Ginosati and Ivi Street in Metamorphosi, Attiki (see sub - lease dated 21.12.2005 certified by the competent tax office). This change in seat of the second respondent is not prohibited by law. The respondent had the right to change its seat and under no circumstances may this change be considered as evidence to deceive the petitioner. In any event, as mentioned above, as soon as the problem arose the petitioner's lawyers were in constant communication with the respondents' lawyers exchanging views and trying to find a satisfactory solution. There is no evidence to suggest that the petitioner could not locate the second respondent or that it was unable to learn its new seat. Further, the allegation that the petitioner could not locate the sub-charterers offices in Geneva was not confirmed by the court to be true. Even if it is assumed to be true, it does not substantiate the claim that the respondents took part in a plan to deceive the petitioner. The fact also that the second respondent filed a petition before the Luanda courts in order to obtain an order to discharge the cargo at that port indicates exactly the opposite of what is alleged by the petitioner. More particularly, it indicates that the second respondent pursued all lawful means at its disposal in the exercise of its legal rights. Moreover, such an order was initially also requested by the petitioner which sought cover should it have decided to comply with the charterers' instructions. Even assuming it was represented that the vessel was in the port of Luanda when in fact it was in international waters, tortious conduct on the part of the second respondent is not substantiated since it is obvious that these actions (filing of application for issuance of order, its contents etc) were made by its legal counselors in the context of a strategy they considered to be expedient and which they chose in pursuance of their clients' interests. Finally, it should be mentioned that the fact that the second respondent was punctual in its financial obligations towards the petitioner and it unfailingly paid the daily freight up until 14.1.2006 despite the fact the sub-charterer had ceased to pay the freight it owed on 10.10.2005, on its own, rebuts any suspicion to deceive the petitioner given that if it had such an intention it would have done so from the beginning and would not have waited for the completion of the voyage to do so. None of the abovementioned

13

events prove the respondents tortious conduct towards the petitioner. Also, it should be noted that, as already stated, the vessel had commenced discharge of the cargo at the time the hearing of the petition took place following agreement of all concerned parties. Thus, it is no longer in international waters, nor does it face the dangers alleged in the petition under consideration. It follows that the petition should be dismissed since it is unfounded in substance and court costs should be set off between the parties in accordance with article 179 of the Civil Procedure Code, due to difficult interpretation of the rules applied.

### FOR THESE REASONS

The Court heard the case in the presence of both parties.

The Court dismisses the petition and sets off the court costs between the litigants.

Decided, issued and published at an extraordinary open court session on 27th March 2006 in Piraeus without the attendance of the litigant parties' attorneys and in the presence of the Clerk Theofanis Balafoutis.

THE JUDGE                                         THE CLERK

Signature                                           Siganture

Exact official copy issued on 29 March 2006

The Court Clerk

(Seal and signature)

Exact official copy issued on 28th November 2007

The Clerk Dimitrios Tzigeroglou

(Seal and signature)

Certified as a true translation of
the attached Greek text.

Niki Pantazis

Pantazis-Kanellopoulos & Partners Law Firm

12/12/2007

jp/translations/orientdecicion

