**EXHIBIT 2**

**TO THE**

**AFFIDAVIT OF THOMAS H. BELKNAP, JR.**

Code Name: **"NYPE 93"**

Recommended by:
The Baltic and International Maritime Council (BIMCO)
The Federation of National Associations of
Ship Brokers and Agents (FONASBA)



# TIME CHARTER©

New York Produce Exchange Form
*Issued by the Association of Ship Brokers and Agents (U.S.A.), Inc.*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946;
Revised June 12th, 1981; September 14th 1993.

THIS CHARTER PARTY, made and concluded in London                                                    1
this **9th** day of September 1 2005.                                                               2

Between **Far Eastern Shipping Co PLC - 15 Aleutskaya Street - Vladivostok, Russia**                3
                                                                                                    4
Owners of the Vessel described below, and **Sea Transport Conractors Ltd - 80 Broad Street - Monrovia,**   5
**Liberia**                                                                                         
                                                                                                    6
                                                                                                    7
Charterers.                                                                                         8

**Description of Vessel See also description clause**                                               9

Name **Chelyabinsk** Flag **Russian** Built **1984**(year).                                          10
Port and number of Registry **Vladivostok 831947**                                                   11
Classed **RS KM\*^3 bulkcarrier (ESP)** in                                                           12
Deadweight **23,181.40** long\*/metric\* tons (cargo and bunkers, including freshwater and            13
stores not exceeding        long\*/metric\* tons) on a salt water draft of **10.17 meters**           14
on summer freeboard.                                                                                 15

Capacity **29,727** cubic meters feet grain **29,131** cubic meters feet bale space.                  16
Tonnage **16,794**GT/GRT.                                                                            17
Speed about **12.6** knots, fully laden, in good weather conditions up to and including maximum        18
Force 4 on the Beaufort wind scale, on a consumption of about **24.5** long\*/metric\*                 19
tons of **IFO 180CST (RME25) plus about 3.1 metric tons of MGO (DMA)**                                20

\* *Delete as appropriate.*                                                                          21
*For further description see Appendix "A" (if applicable )*                                           22

1. **Duration**                                                                                      23

The Owners agree to let and the Charterers agree to hire the Vessel from the time of delivery for a period   24
of **one (1) time charter trip via safe port(s), safe berth(s), safe anchorages always within institute**    25
**warranty limits always afloat with allowable cargo - intention bagged rice.**                       
                                                                                                    26
                                                                                                    27
                                          within below mentioned trading limits.                    28

2. **Delivery**                                                                                      29

The Vessel shall be placed at the disposal of the Charterers at **dropping last outward pilot Shanghai any time**   30
**day or night Sundays and holidays included (i.e. dropping outward rivr pilot, not dropping last outward**
**sea pilot/cjk pilot station at Yangtze River)**
                                                                                                    31
                                                                                                    32
                                          The Vessel on her delivery                                33

This document is a computer generated NYPE 93 form printed by authority of the Association of Ship Brokers and Agents (U.S.A.), Inc. (ASBA). Any insertion or deletion to the form must be
clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original ASBA document shall apply. BIMCO and ASBA
assume no responsibility for any loss, damage or expense as a result of discrepancies between the original ASBA approved document and this computer generated document.

Printed by BIMCO's idea

shall be ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted   34
for ordinary cargo service, having water ballast and with sufficient power to operate all cargo-handling gear   35
simultaneously.   36

The Owners shall give the Charterers not less than 1 days notice of expected date of   37
delivery. See also clause 87.   38

### 3.   On-Off Hire Survey See Clause 61.   39

Prior to delivery and redelivery the parties shall, unless otherwise agreed, each appoint surveyors, for their   40
respective accounts, who shall not later than at first loading port/last discharging port respectively, conduct   41
joint on-hire/off-hire surveys, for the purpose of ascertaining quantity of bunkers on board and the condition   42
of the Vessel. A single report shall be prepared on each occasion and signed by each surveyor, without   43
prejudice to his right to file a separate report setting forth items upon which the surveyors cannot agree.   44
If either party fails to have a representative attend the survey and sign the joint survey report, such party   45
shall nevertheless be bound for all purposes by the findings in any report prepared by the other party.   46
On-hire survey shall be on Charterers' time and off-hire survey on Owners' time.   47

### 4. Dangerous Cargo/Cargo Exclusions   48

(a) The Vessel shall be employed in carrying lawful merchandise excluding any goods of a dangerous,   49
injurious, flammable or corrosive nature unless carried in accordance with the requirements or   50
recommendations of the competent authorities of the country of the Vessel's registry and of ports of   51
shipment and discharge and of any intermediate countries or ports through whose waters the Vessel must   52
pass. Without prejudice to the generality of the foregoing, in addition the following are specifically   53
excluded: livestock of any description, arms, ammunition, explosives, nuclear and radioactive materials,   54

55
56
57
58
59
60
61
62
63
64

(b) If IMO-classified cargo is agreed to be carried, the amount of such cargo shall be limited to   65
——tons and the Charterers shall provide the Master with any evidence he may   66
reasonably require to show that the cargo is packaged, labelled, loaded and stowed in accordance with IMO   67
regulations, failing which the Master is entitled to refuse such cargo or, if already loaded, to unload it at   68
the Charterers' risk and expense.   69

### 5. Trading Limits See clause 74   70

The Vessel shall be employed in such lawful trades between safe ports and safe places   71
within——————   72
—————————————excluding   73
—   74
—   75
—————————————————as the Charterers shall direct.   76

### 6. Owners to Provide   77

The Owners shall provide and pay for the insurance of the Vessel, except as otherwise provided, and for   78
all provisions, cabin, deck, engine-room and other necessary stores, including boiler water; shall pay for   79
wages, consular shipping and discharging fees of the crew and charges for port services pertaining to the   80
crew; shall maintain the Vessel's class and keep her in a thoroughly efficient state in hull, machinery and   81
equipment for and during the service, and have a full complement of officers and crew.   82

This document is a computer generated NYPE 93 form printed by authority of the Association of Ship Brokers and Agents (U.S.A.), Inc. (ASBA). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original ASBA document shall apply. BIMCO and ASBA assume no responsibility for any loss, damage or expense as a result of discrepancies between the original ASBA approved document and this computer generated document.

7 .**Charterers to Provide**                                                                    83

The Charterers, while the Vessel is on hire, shall provide and pay for all the bunkers except as otherwise        84
agreed; shall pay for port charges (including compulsory watchmen and cargo watchmen and compulsory              85
garbage disposal), all communication expenses pertaining to the Charterers' business at cost, pilotages,         86
towages, agencies, commissions, consular charges (except those pertaining to individual crew members            87
or flag of the Vessel), and all other usual expenses except those stated in <u>Clause 6</u>, but when the Vessel   88
puts into a port for causes for which the Vessel is responsible (other than by stress of weather), then all      89
such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew            90
shall be for the Owners' account. Fumigations ordered because of cargoes carried or ports visited while          91
the Vessel is employed under this Charter Party shall be for the Charterers' ~~account~~ **account including crew**  92
**hotel accommodation if necessary**t. All other fumigations
shall be for the Charterers' account after the Vessel has been on charter for a continuous period of six         93
months or more.                                                                                                  94

The Charterers shall provide and pay for necessary dunnage and also any extra fittings requisite for a           95
special trade or unusual cargo, but the Owners shall allow them the use of any dunnage already aboard             96
the Vessel. Prior to redelivery the Charterers shall remove their dunnage and fittings at their cost and in       97
their time.                                                                                                      98

8. **Performance of Voyages**                                                                   99

(a) The Master shall perform the voyages with due despatch, and shall render all customary assistance           100
with the Vessel's crew. The Master shall be conversant with the English language and (although                  101
appointed by the Owners) shall be under the orders and directions of the Charterers as regards                  102
employment and agency; and the Charterers shall perform all cargo handling, including but not limited to        103
loading, stowing, trimming, lashing, securing, dunnaging, unlashing, discharging, and tallying, at their risk   104
and expense, under the supervision of the Master.                                                               105

(b) If the Charterers shall have reasonable cause to be dissatisfied with the conduct of the Master or          106
officers, the Owners shall, on receiving particulars of the complaint, investigate the same, and, if            107
necessary, make a change in the appointments.                                                                   108

9. **Bunkers See also clause 72**                                                               109

(a) The Charterers on delivery, and the Owners on redelivery, shall take over and pay for all fuel and          110
diesel oil remaining on board the Vessel as hereunder. The Vessel shall be delivered with:                      111
    long*/metric* tons of fuel oil at the price of    per ton;           112
    tons of diesel oil at the price of    per ton. The vessel shall      113
be redelivered with:    tons of fuel oil at the price of    per ton;     114
    tons of diesel oil at the price of    per ton.                       115

* *Same tons apply throughout this clause.*                                                      116

(b) The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines               117
and auxiliaries and which conform to the specification(s) as set out in Appendix A.                             118

The Owners reserve their right to make a claim against the Charterers for any damage to the main engines        119
or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed                 120
specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed                121
specification(s) or otherwise prove unsuitable for burning in the Vessel's engines or auxiliaries, the Owners   122
shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker       123
consumption, nor for any time lost and any other consequences.                                                  124

10. **Rate of Hire/Redelivery Areas and Notices**                                               125

The Charterers shall pay for the use and hire of the said Vessel at the rate of $ **10,000**                    126
U.S. currency, daily, ~~or $        U.S. currency per ton on the Vessel's total deadweight~~                     127
~~carrying capacity, including bunkers and stores, on        summer freeboard, per 30 days,~~                   128

This document is a computer generated NYPE 93 form printed by authority of the Association of Ship Brokers and Agents (U.S.A), Inc. (ASBA). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original ASBA document shall apply. BIMCO and ASBA assume no responsibility for any loss, damage or expense as a result of discrepancies between the original ASBA approved document and this computer generated document.

Printed by BIMCO's idea

commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any part    129
of a month; hire shall continue until the hour of the day of her redelivery in like good order and condition,    130
ordinary wear and tear excepted, to the Owners (unless Vessel lost) at **See clause 75**    131
    132
    133
unless otherwise mutually agreed.    134

The Charterers shall give the Owners not less than **25/15/10/5/3/2/1** days notice of the Vessel's    135
expected date and probable port of redelivery.    136

For the purpose of hire calculations, the times of delivery, redelivery or termination of charter shall be    137
adjusted to GMT.    138

11. <u>Hire Payment</u>    139

(a) <u>Payment</u>    140

WORKING COPY

Payment of Hire shall be made so as to be received by the Owners or their designated payee in    141
**See clause 81** , viz    142
    143
    144
in    145
currency, or in United States Currency, in funds available to the    146
Owners on the due date, 15 days in advance, and for the last month or part of same the approximate    147
amount of hire, and should same not cover the actual time, hire shall be paid for the balance day by day    148
as it becomes due, if so required by the Owners. Failing the punctual and regular payment of the hire,    149
or on any fundamental breach whatsoever of this Charter Party, the Owners shall be at liberty to    150
withdraw the Vessel from the service of the Charterers without prejudice to any claims they (the Owners)    151
may otherwise have on the Charterers. **First hire plus bunkers payable 3 banking days after delivery.**    152

At any time after the expiry of the grace period provided in <u>Sub-clause 11 (b)</u> hereunder and while the    153
hire is outstanding, the Owners shall, without prejudice to the liberty to withdraw, be entitled to withhold    154
the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever    155
for any consequences thereof, in respect of which the Charterers hereby indemnify the Owners, and hire    156
shall continue to accrue and any extra expenses resulting from such withholding shall be for the    157
Charterers' account.    158

(b ) <u>Grace Period</u>    159

Where there is failure to make punctual and regular payment of hire due to oversight, negligence, errors    160
or omissions on the part of the Charterers or their bankers, the Charterers shall be given by the Owners    161
**5** clear banking days (as recognized at the agreed place of payment) written notice to rectify the    162
failure, and when so rectified within those **5** days following the Owners' notice, the payment shall    163
stand as regular and punctual.    164

Failure by the Charterers to pay the hire within 5 days of their receiving the Owners' notice as    165
provided herein, shall entitle the Owners to withdraw as set forth in <u>Sub-clause 11 (a)</u> above.    166

(c) <u>Last Hire Payment</u>    167

Should the Vessel be on her voyage towards port of redelivery at the time the last and/or the penultimate    168
payment of hire is/are due, said payment(s) is/are to be made for such length of time as the Owners and    169
the Charterers may agree upon as being the estimated time necessary to complete the voyage, and taking    170
into account bunkers actually on board, to be taken over by the Owners and estimated disbursements for    171
the Owners' account before redelivery. Should same not cover the actual time, hire is to be paid for the    172
balance, day by day, as it becomes due. When the Vessel has been redelivered, any difference is to be    173
refunded by the Owners or paid by the Charterers, as the case may be.    174

(d) <u>Cash Advances</u>    175

This document is a computer generated NYPE 93 form printed by authority of the Association of Ship Brokers and Agents (U.S.A.), Inc. (ASBA). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original ASBA document shall apply. BIMCO and ASBA assume no responsibility for any loss, damage or expense as a result of discrepancies between the original ASBA approved document and this computer generated document.

Cash for the Vessel's ordinary disbursements at any port may be advanced by the Charterers, as required          176
by the Owners, subject to 2½ percent commission and such advances shall be deducted from the hire.             177
The Charterers, however, shall in no way be responsible for the application of such advances.                   178

12. **Berths**                                                                                                  179

The Vessel shall be loaded and discharged in any safe dock or at any safe berth or safe place that             180
Charterers or their agents may direct, provided the Vessel can safely enter, lie and depart always afloat      181
at any time of tide. **Except as per clause 79.**                                                               182

13. **Spaces Available**                                                                                        183

(a) The whole reach of the Vessel's holds, decks, and other cargo spaces (not more than she can                184
reasonably and safely stow and carry), also accommodations for supercargo, if carried, shall be at the         185
Charterers' disposal, reserving only proper and sufficient space for the Vessel's officers, crew, tackle,      186
apparel, furniture, provisions, stores and fuel.                                                                187

(b) In the event of deck cargo being carried, the Owners are to be and are hereby indemnified by the           188
Charterers for any loss and/or damage and/or liability of whatsoever nature caused to the Vessel as a          189
result of the carriage of deck cargo and which would not have arisen had deck cargo not been loaded.           190

14. **Supercargo and Meals**                                                                                    191

The Charterers are entitled to appoint a supercargo, who shall accompany the Vessel at the Charterers'         192
risk and see that voyages are performed with due despatch. He is to be furnished with free                     193
accommodation and same fare as provided for the Master's table, the Charterers paying at the rate of           194
**See clause 80** per day. The Owners shall victual pilots and customs officers, and also, when                 195
authorized by the Charterers or their agents, shall victual tally clerks, stevedore's foreman, etc.,           196
Charterers paying at the rate of          per meal for all such victualling.                                    197

15. **Sailing Orders and Logs**                                                                                 198

The Charterers shall furnish the Master from time to time with all requisite instructions and sailing          199
directions, in writing, in the English language, and the Master shall keep full and correct deck and engine    200
logs of the voyage or voyages, which are to be patent to the Charterers or their agents, and furnish the       201
Charterers, their agents or supercargo, when required, with a true copy of such deck and engine logs,          202
showing the course of the Vessel, distance run and the consumption of bunkers. Any log extracts                203
required by the Charterers shall be in the English language.                                                    204

16. **Delivery/Cancelling**                                                                                     205

If required by the Charterers, time shall not commence before **10th September 2005** and should the            206
Vessel not be ready for delivery on or before **15th September 2005** but not later than **2400 hours**          207
the Charterers shall have the option of cancelling this Charter Party.                                          208

*Extension of Cancelling*                                                                                       209

If the Owners warrant that, despite the exercise of due diligence by them, the Vessel will not be ready         210
for delivery by the cancelling date, and provided the Owners are able to state with reasonable certainty       211
the date on which the Vessel will be ready, they may, at the earliest seven days before the Vessel is          212
expected to sail for the port or place of delivery, require the Charterers to declare whether or not they will 213
cancel the Charter Party. Should the Charterers elect not to cancel, or should they fail to reply within two   214
days or by the cancelling date, whichever shall first occur, then the seventh day after the expected date      215
of readiness for delivery as notified by the Owners shall replace the original cancelling date. Should the     216
Vessel be further delayed, the Owners shall be entitled to require further declarations of the Charterers in   217
accordance with this Clause.                                                                                    218

17. **Off Hire**                                                                                                219

This document is a computer generated NYPE 93 form printed by authority of the Association of Ship Brokers and Agents (U.S.A.), Inc. (ASBA). Any insertion or deletion to the form must be
clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original ASBA document shall apply. BIMCO and ASBA
assume no responsibility for any loss, damage or expense as a result of discrepancies between the original ASBA approved document and this computer generated document.

Printed by BIMCO's idea

In the event of loss of time from deficiency and/or default and/or strike of officers or crew, or deficiency 220
of stores, fire, breakdown of, or damages to hull, machinery or equipment, grounding, detention by the 221
arrest of the Vessel, (unless such arrest is caused by events for which the Charterers, their servants, 222
agents or subcontractors are responsible), or detention by average accidents to the Vessel or cargo unless 223
resulting from inherent vice, quality or defect of the cargo, drydocking for the purpose of examination or 224
painting bottom, or by any other similar cause preventing the full working of the Vessel, the payment of 225
hire and overtime, if any, shall cease for the time thereby lost. Should the Vessel deviate or put back 226
during a voyage, contrary to the orders or directions of the Charterers, for any reason other than accident 227
to the cargo or where permitted in lines 257 to 258 hereunder, the hire is to be suspended from the time 228
of her deviating or putting back until she is again in the same or equidistant position from the destination 229
and the voyage resumed therefrom. All bunkers used by the Vessel while off hire shall be for the Owners' 230
account. In the event of the Vessel being driven into port or to anchorage through stress of weather, 231
trading to shallow harbors or to rivers or ports with bars, any detention of the Vessel and/or expenses 232
resulting from such detention shall be for the Charterers' account. If upon the voyage the speed be 233
reduced by defect in, or breakdown of, any part of her hull, machinery or equipment, the time so lost, and 234
the cost of any extra bunkers consumed in consequence thereof, and all extra proven expenses may be 235
deducted from the hire. 236

## 18. Sublet                                                                                                     237

Printed by BIMCO's idea

~~Unless otherwise agreed, the Charterers shall have the liberty to sublet the Vessel for all or any part of~~ 238
~~the time covered by this Charter Party, but the Charterers remain responsible for the fulfillment of this~~ 239
~~Charter Party.~~ **The Charterers shall have the option of subletting the vessel subject to the Owners' prior** 240
**approval which shall not be unreasonably withheld, upon giving notice in writing to the Owners, but the**
**original Charterers always remain responsible to the Owners for due performance of the Chartr Party and**
**contractors of person of company taking such subletting shall be deemed contractors of the Charterers**
**for all the purposes of this Charter Party. Acceptance of delivery by Charterers shall not constitute any**
**waiver of Charterers' rights hereunder.**

## 19. Drydocking                                                                                                 241

~~The Vessel was last drydocked---------~~                                                                        242

~~*(a) The Owners shall have the option to place the Vessel in drydock during the currency of this Charter~~     243
~~at a convenient time and place, to be mutually agreed upon between the Owners and the Charterers, for~~        244
~~bottom cleaning and painting and/or repair as required by class or dictated by circumstances.~~                245

*(b) Except in case of emergency no drydocking shall take place during the currency of this Charter            246
Party.                                                                                                          247

* Delete as appropriate                                                                                         248

## 20. Total Loss                                                                                                 249

Should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or           250
being last heard of) shall be returned to the Charterers at once.                                             251

## 21. Exceptions                                                                                                 252

The act of God, enemies, fire, restraint of princes, rulers and people, and all dangers and accidents of the 253
seas, rivers, machinery, boilers, and navigation, and errors of navigation throughout this Charter, always 254
mutually excepted. 255

## 22. Liberties                                                                                                  256

The Vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels 257
in distress, and to deviate for the purpose of saving life and property. 258

This document is a computer generated NYPE 93 form printed by authority of the Association of Ship Brokers and Agents (U.S.A), Inc. (ASBA). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original ASBA document shall apply. BIMCO and ASBA assume no responsibility for any loss, damage or expense as a result of discrepancies between the original ASBA approved document and this computer generated document.

23. **Liens**                                                                                     259

The Owners shall have a lien upon all cargoes and all sub-freights and/or sub-hire for any amounts due        260
under this Charter Party, including general average contributions, and the Charterers shall have a lien on     261
the Vessel for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be        262
returned at once.                                                                                 263

The Charterers will not directly or indirectly suffer, nor permit to be continued, any lien or encumbrance,    264
which might have priority over the title and interest of the Owners in the Vessel. The Charterers              265
undertake that during the period of this Charter Party, they will not procure any supplies or necessaries      266
or services, including any port expenses and bunkers, on the credit of the Owners or in the Owners' time.      267

24. **Salvage**                                                                                   268

All derelicts and salvage shall be for the Owners' and the Charterers' equal benefit after deducting           269
Owners' and Charterers' expenses and crews proportion.                                            270

25. **General Average**                                                                           271

General average shall be adjusted according to York-Antwerp Rules 1974, as amended 1990, or any               272
subsequent modification thereof, in **London** and settled in **U.S.**                            273
currency. **English Law to apply.**                                                               274

The Charterers **and Owners** shall procure that all bills of lading issued during the currency of the Charter Party  275
will
contain a provision to the effect that general average shall be adjusted according to York-Antwerp Rules       276
1974, as amended 1990, or any subsequent modification thereof and will include the "New Jason                  277
Clause" as per <u>Clause 31</u> .                                                                 278

Time charter hire shall not contribute to general average.                                        279

26. **Navigation**                                                                                280

Nothing herein stated is to be construed as a demise of the Vessel to the Time Charterers. The Owners          281
shall remain responsible for the navigation of the Vessel, acts of pilots and tug boats, insurance, crew,      282
and all other matters, same as when trading for their own account.                                283

27. **Cargo Claims**                                                                              284

Cargo claims as between the Owners and the Charterers shall be settled in accordance with the Inter-Club       285
New York Produce Exchange Agreement of February 1970, as amended May, 1984, 1996, or any subsequent            286
modification or replacement thereof.                                                              287

28. **Cargo Gear and Lights**                                                                     288

The Owners shall maintain the cargo handling gear of the Vessel which is as follows: Crane (boom max=24m,      289
min=3.5m): 4/25t electrical single 25t/24m                                                        290
                                                                                                  291
                                                                                                  292

providing gear (for all derricks or cranes) capable of lifting capacity as described. The Owners shall also    293
provide on the Vessel for night work lights as on board, but all additional lights over those on board shall   294
be at the Charterers' expense. The Charterers shall have the use of any gear on board the Vessel. If           295
required by the Charterers, the Vessel shall work night and day and all cargo handling gear shall be at the    296
Charterers' disposal during loading and discharging. In the event of disabled cargo handling gear, or          297
insufficient power to operate the same, the Vessel is to be considered to be off hire to the extent that       298
time is actually lost to the Charterers and the Owners to pay stevedore stand-by charges occasioned            299
thereby, unless such disablement or insufficiency of power is caused by the Charterers' stevedores. If         300
required by the Charterers, the Owners shall bear the cost of hiring shore gear in lieu thereof, in which      301

This document is a computer generated NYPE 93 form printed by authority of the Association of Ship Brokers and Agents (U.S.A), Inc. (ASBA). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original ASBA document shall apply. BIMCO and ASBA assume no responsibility for any loss, damage or expense as a result of discrepancies between the original ASBA approved document and this computer generated document.

Printed by BIMCO's idea

case the Vessel shall remain on hire.                                                                      302

29. **Crew Overtime**                                                                                      303

In lieu of any overtime payments to officers and crew for work ordered by the Charterers or their agents,  304
the Charterers shall pay the Owners, concurrently with the hire ——— per month                            305
or pro rata.                                                                                               306

30. **Bills of Lading See clause 76**                                                                      307

(a) The Master shall sign the bills of lading or waybills for cargo as presented in conformity with mates  308
or tally clerk's receipts. However, the Charterers may sign bills of lading or waybills on behalf of the   309
Master, with the Owner's prior written authority, always in conformity with mates or tally clerk's receipts. 310

(b) All bills of lading or waybills shall be without prejudice to this Charter Party and the Charterers shall 311
indemnify the Owners against all consequences or liabilities which may arise from any inconsistency        312
between this Charter Party and any bills of lading or waybills signed by the Charterers or by the Master   313
at their request.                                                                                          314

(c) Bills of lading covering deck cargo shall be claused: "Shipped on deck at Charterers', Shippers' and   315
Receivers' risk, expense and responsibility, without liability on the part of the Vessel, or her Owners for 316
any loss, damage, expense or delay howsoever caused."                                                      317

31. **Protective Clauses**                                                                                 318

This Charter Party is subject to the following clauses all of which are also to be included in all bills of lading 319
or waybills issued hereunder:                                                                              320

(a) CLAUSE PARAMOUNT                                                                                       321
"This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the 322
United States, the Hague Rules, or the Hague-Visby Rules, as applicable, or such other similar national    323
legislation as may mandatorily apply by virtue of origin or destination of the bills of lading, which shall 324
be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the        325
carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said 326
applicable Act. If any term of this bill of lading be repugnant to said applicable Act to any extent, such  327
term shall be void to that extent, but no further."                                                        328

and                                                                                                        329

(b) BOTH-TO-BLAME COLLISION CLAUSE                                                                         330

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any 331
act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in 332
the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against  333
all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents 334
loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other  335
or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the   336
other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.       337

The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or   338
objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or 339
contact."                                                                                                  340

and                                                                                                        341

(c) NEW JASON CLAUSE                                                                                       342

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage       343
resulting from any cause whatsoever, whether due to negligence or not, for which, or for the               344

This document is a computer generated NYPE 93 form printed by authority of the Association of Ship Brokers and Agents (U.S.A), Inc. (ASBA). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original ASBA document shall apply. BIMCO and ASBA assume no responsibility for any loss, damage or expense as a result of discrepancies between the original ASBA approved document and this computer generated document.

consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, 345
shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the 346
payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, 347
and shall pay salvage and special charges incurred in respect of the goods. 348

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if salving ship 349
or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover 350
the estimated contribution of the goods and any salvage and special charges thereon shall, if required, 351
be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery." 352

and 353

(d) U.S. TRADE -DRUG CLAUSE 354

"In pursuance of the provisions of the U.S. Anti Drug Abuse Act 1986 or any re-enactment thereof, the 355
Charterers warrant to exercise the highest degree of care and diligence in preventing any unmanifested 356
narcotic drugs and marijuana to be loaded or concealed on board the Vessel. 357

Non-compliance with the provisions of this clause shall amount to breach of warranty for consequences 358
of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel 359
harmless and shall keep them indemnified against all claims whatsoever which may arise and be made 360
against them individually or jointly. Furthermore, all time lost and all expenses incurred, including fines, 361
as a result of the Charterers' breach of the provisions of this clause shall be for the Charterer's account 362
and the Vessel shall remain on hire. 363

Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this 364
clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable 365
time the Vessel is released and at their expense put up the bails to secure release of the Vessel. 366

The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the 367
event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the 368
Vessel's personnel." 369

and 370

(e) WAR CLAUSES Conwartime clause to apply, see clause 71 371

~~"(i) No contraband of war shall be shipped. The Vessel shall not be required, without the consent of the~~ 372
~~Owners, which shall not be unreasonably withheld, to enter any port or zone which is involved in a state~~ 373
~~of war, warlike operations, or hostilities, civil strife, insurrection or piracy whether there be a declaration~~ 374
~~of war or not, where the Vessel, cargo or crew might reasonably be expected to be subject to capture,~~ 375
~~seizure or arrest, or to a hostile act by a belligerent power (the term "power" meaning any de jure or de~~ 376
~~facto authority or any purported governmental organization maintaining naval, military or air forces).~~ 377

~~(ii) If such consent is given by the Owners, the Charterers will pay the provable additional cost of insuring~~ 378
~~the Vessel against full war risks in an amount equal to the value under her ordinary hull policy but not~~ 379
~~exceeding a valuation of_____ In addition, the Owners may purchase and the~~ 380
~~Charterers will pay for war risk insurance on ancillary risks such as loss of hire, freight disbursements,~~ 381
~~total loss, blocking and trapping, etc. If such insurance is not obtainable commercially or through a~~ 382
~~government program, the Vessel shall not be required to enter or remain at any such port or zone.~~ 383

~~(iii) In the event of the existence of the conditions described in (i) subsequent to the date of this Charter,~~ 384
~~or while the Vessel is on-hire under this Charter, the Charterers shall, in respect of voyages to any such~~ 385
~~port or zone assume the provable additional cost of wages and insurance properly incurred in connection~~ 386
~~with master, officers and crew as a consequence of such war, warlike operations or hostilities.~~ 387

~~(iv) Any war bonus to officers and crew due to the Vessel's trading or cargo carried shall be for the~~ 388
~~Charterers' account."~~ 389

This document is a computer generated NYPE 93 form printed by authority of the Association of Ship Brokers and Agents (U.S.A.), Inc. (ASBA). Any insertion or deletion to the form must be
clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original ASBA document shall apply. BIMCO and ASBA
assume no responsibility for any loss, damage or expense as a result of discrepancies between the original ASBA approved document and this computer generated document.

Printed by BIMCO's Idea

## 32. War Cancellation

390

In the event of the outbreak of war (whether there be a declaration of war or not) between any two or
more of the following countries:

391
392
393
394
395

either the Owners or the Charterers may cancel this Charter Party. Whereupon, the Charterers shall
redeliver the Vessel to the Owners in accordance with Clause 10; if she has cargo on board, after
discharge thereof at destination, or, if debarred under this Clause from reaching or entering it, at a near
open and safe port as directed by the Owners; or, if she has no cargo on board, at the port at which she
then is; or, if at sea, at a near open and safe port as directed by the Owners. In all cases hire shall
continue to be paid in accordance with Clause 11 and except as aforesaid all other provisions of this
Charter Party shall apply until redelivery.

396
397
398
399
400
401
402

## 33. Ice

403

The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area
where lights or lightships have been or are about to be withdrawn by reason of ice, nor where there is
risk that in the ordinary course of things the Vessel will not be able on account of ice to safely enter and
remain in the port or area or to get out after having completed loading or discharging. Subject to the
Owners' prior approval the Vessel is to follow ice-breakers when reasonably required or to force ice consistent
with her capacity and with regard to her
size, construction and ice class.

404
405
406
407
408

409

## 34. Requisition

410

Should the Vessel be requisitioned by the government of the Vessel's flag during the period of this Charter
Party, the Vessel shall be deemed to be off-hire during the period of such requisition, and any hire paid
by the said government in respect of such requisition period shall be retained by the Owners. The period
during which the Vessel is on requisition to the said government shall count as part of the period provided
for in this Charter Party.
If the period of requisition exceeds ———— months, either party shall have the option
of cancelling this Charter Party and no consequential claim may be made by either party.

411
412
413
414
415
416
417

## 35. Stevedore Damage

418

Notwithstanding anything contained herein to the contrary, the Charterers shall pay for any and all
damage to the Vessel caused by stevedores provided the Master has notified the Charterers and/or their
agents in writing as soon as practical but not later than 48 hours after any damage is discovered. Such
notice to specify the damage in detail and to invite Charterers to appoint a surveyor to assess the extent
of such damage.

419
420
421
422
423

(a) In case of any and all damage(s) affecting the Vessel's seaworthiness and/or the safety of the crew
and/or affecting the trading capabilities of the Vessel the Charterers shall immediately arrange for repairs
of such damage(s) at their expense and the Vessel is to remain on hire until such repairs are completed
and if required passed by the Vessel's classification society.

424
425
426
427

(b) Any and all damage(s) not described under point (a) above shall be repaired at the Charterers' option,
before or after redelivery concurrently with the Owners' work. In such case no hire and/or expenses will
be paid to the Owners except and insofar as the time and/or the expenses required for the repairs for
which the Charterers are responsible, exceed the time and/or expenses necessary to carry out the
Owners' work.

428
429
430
431
432

## 36. Cleaning of Holds

433

The Charterers shall provide and pay extra for sweeping and/or washing and/or cleaning of holds between
Voyages and/or between cargoes provided such work can be undertaken by the crew and is permitted by
local regulations, at the rate of ———— per hold.

434
435
436

This document is a computer generated NYPE 93 form printed by authority of the Association of Ship Brokers and Agents (U.S.A.), Inc. (ASBA). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original ASBA document shall apply. BIMCO and ASBA assume no responsibility for any loss, damage or expense as a result of discrepancies between the original ASBA approved document and this computer generated document.

~~in connection with any such operation, the Owners shall not be responsible if the Vessel's holds are not~~ 437
~~accepted or passed by the port or any other authority.~~ The Charterers shall have the option to re-deliver 438
the Vessel with unclean/unswept holds against a lumpsum payment of **USD 4,000** in lieu of cleaning. 439

### 37. Taxes 440

Charterers to pay all local, State, National taxes and/or dues assessed on the Vessel or the Owners 441
resulting from the Charterers' orders herein, whether assessed during or after the currency of this Charter 442
Party including any taxes and/or dues on cargo and/or freights and/or sub-freights and/or hire (excluding 443
taxes levied by the country of the flag of the Vessel or the Owners). 444

### 38. ~~Charterers' Colors~~ 445

~~The Charterers shall have the privilege of flying their own house flag and painting the Vessel with their~~ 446
~~own markings. The Vessel shall be repainted in the Owners colors before termination of the Charter~~ 447
~~Party. Cost and time of painting, maintaining and repainting those changes effected by the Charterers~~ 448
~~shall be for the Charterers' account.~~ 449

### 39. Laid Up Returns 450

The Charterers shall have the benefit of any return insurance premium receivable by the Owners from their 451
underwriters as and when received from underwriters by reason of the Vessel being in port for a minimum 452
period of 30 days if on full hire for this period or pro rata for the time actually on hire. 453

### 40. Documentation 454

The Owners shall provide any documentation relating to the Vessel that may be required to permit the 455
Vessel to trade within the agreed trade limits, including, but not limited to certificates of financial 456
responsibility for oil pollution, provided such oil pollution certificates are obtainable from the Owners' 457
P & I club, valid international tonnage certificate, Suez and Panama tonnage certificates H+M, P&I, DOC, SMC, 458
**ISM and class, as a bare minimum, which shall always be available, updated and valid onboard,** valid
certificate
of registry and certificates relating to the strength and/or serviceability of the Vessel's gear. 459

### 41. Stowaways 460

(a)  (i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining 461
Access to the Vessel by means of secreting away in the goods and/or containers shipped by the 462
Charterers. 463

(ii) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained 464
Access to the Vessel by means of secreting away in the goods and/or containers shipped by the 465
Charterers, this shall amount to breach of charter for the consequences of which the Charterers 466
shall be liable and shall hold the Owners harmless and shall keep them indemnified against all 467
claims whatsoever which may arise and be made against them. Furthermore, all time lost and all 468
expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account 469
and the Vessel shall remain on hire. 470

(iii) Should the Vessel be arrested as a result of the Charterers' breach of charter according to 471
sub-clause (a)(ii) above, the Charterers shall take all reasonable steps to secure that, within a 472
reasonable time, the Vessel is released and at their expense put up bail to secure release of the 473
Vessel. 474

(b) (i) If, despite the exercise of due care and diligence by the Owners, stowaways have gained 475
access to the Vessel by means other than secreting away in the goods and/or containers shipped 476
by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including 477
fines, shall be for the Owners' account and the Vessel shall be off hire. 478

This document is a computer generated NYPE 93 form printed by authority of the Association of Ship Brokers and Agents (U.S.A.), Inc. (ASBA). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original ASBA document shall apply. BIMCO and ASBA assume no responsibility for any loss, damage or expense as a result of discrepancies between the original ASBA approved document and this computer generated document.

(ii) Should the Vessel be arrested as a result of stowaways having gained access to the Vessel
by means other than secreting away in the goods and/or containers shipped by the Charterers,
the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel
is released and at their expense put up bail to secure release of the Vessel.

479
480
481
482

## 42. Smuggling

483

In the event of smuggling by the Master, Officers and/or crew, the Owners shall bear the cost of any
fines, taxes, or imposts levied and the Vessel shall be off hire for any time lost as a result thereof.

484
485

## 43. Commissions

486

A commission of **1.25** percent is payable by the Vessel and the Owners to **Charterhouse Shipbroking Ltd,
London plus 1.25 percent brokerage commission to Cornavin Shipping Ltd, Kent.**

487

WORKING COPY

488
489
490

on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

491

## 44. Address Commission

492

An address commission of **4** percent is payable to **Charterers' Agens Messrs. Marachart Shipping Co Ltd of
24 Helmou Street, Agios Stefanos, GR-145 65 Athens, Greece**

493
494
495

on hire earned and paid under this Charter.

496

## 45. Arbitration

497

(a) NEW YORK
All disputes arising out of this contract shall be arbitrated at New York in the following manner, and
subject to U.S. Law:

498
499
500

One Arbitrator is to be appointed by each of the parties hereto and a third by the two so chosen. Their
decision or that of any two of them shall be final, and for the purpose of enforcing any award, this
agreement may be made a rule of the court. The Arbitrators shall be commercial men, conversant with
shipping matters. Such Arbitration is to be conducted in accordance with the rules of the Society of
Maritime Arbitrators Inc.

501
502
503
504
505

For disputes where the total amount claimed by either party does not exceed US $ _____ **
the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society
of Maritime Arbitrators Inc.

506
507
508

(b) LONDON
All disputes arising out of this contract shall be arbitrated at London and, unless the parties agree
forthwith on a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying on business
in London who shall be members of the Baltic Mercantile & Shipping Exchange and engaged in Shipping,
One to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire. No
award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as
above, unless objection to his action be taken before the award is made. Any dispute arising hereunder
shall be governed by English Law.

509
510
511
512
513
514
515
516

For disputes where the total amount claimed by either party does not exceed US $ **50,000 ****
the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime
Arbitrators Association. **Arbitration should be under LMAA terms.**

517
518
519

*Delete para (a) or (b) as appropriate

520

** Where no figure is supplied in the blank space this provision only shall be void but the other provisions

521

This document is a computer generated NYPE 93 form printed by authority of the Association of Ship Brokers and Agents (U.S.A.), Inc. (ASBA). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original ASBA document shall apply. BIMCO and ASBA assume no responsibility for any loss, damage or expense as a result of discrepancies between the original ASBA approved document and this computer generated document.

Printed by BIMCO's idea

*of this clause shall have full force and remain in effect.*                                     522

if mutually agreed, clauses **46** to **93**, both inclusive, as attached hereto are fully          523
incorporated in this Charter Party.                                                             524

# WORKING COPY

Printed by BIMCO's idea

# WORKING COPY

This document is a computer generated NYPE 93 form printed by authority of the Association of Ship Brokers and Agents (U.S.A), Inc. (ASBA). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original ASBA document shall apply. BIMCO and ASBA assume no responsibility for any loss, damage or expense as a result of discrepancies between the original ASBA approved document and this computer generated document.

525

**APPENDIX "A"**

526

To Charter Party dated                                                                                527
Between **Far Eastern Shipping Co PLC of Vladivostok, Russia** Owners                              528
And **Sea Transport Contractors Ltd of Monrovia, Liberia** Charterers                              529

**Further details of the Vessel: Chelyabinsk as per the description clause.**                      530

# WORKING COPY

Printed by BIMCO's idea

# WORKING COPY

This document is a computer generated NYPE 93 form printed by authority of the Association of Ship Brokers and Agents (U.S.A), Inc. (ASBA). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original ASBA document shall apply. BIMCO and ASBA assume no responsibility for any loss, damage or expense as a result of discrepancies between the original ASBA approved document and this computer generated document.

**ADDITIONAL CLAUSES TO**
**m/v "CHELYABINSK" / Sea Transport Contractors Ltd – C/P dated 9/9/2005**

**Clause 46 – Breaking IWL**
Subject to Owners' approval, Charterers have the right to breach Institute Warranties
Limit. The Charterers to reimburse extra insurance incurred thereby are entitled to
have the benefit of any discounts received by the Owners for such extra insurance.
Charterers remain to be fully responsible for all vessels damages caused by sailing by
ice and, if any, to repair such damages for their time / account keeping vessel on hire.

**Clause 47 – War Risk Insurance**
Basic war risk insurance premium for worldwide trading shall be for Owners' account
and additional premiums including blocking and trapping shall be invoiced to Owners
based on quotation from Owners' P and I Club for Hull and Machinery and
officers/crew due to the vessel's trading to restricted area shall be for Charterers'
account. Owners undertake always to do their utmost to obtain cheapest additional
premium (if any at all) from their Underwriters. Conwartime terms to apply.

**Clause 48 – Change of Political Situation**
Should political social and/or other situation change to the extent not to affect the
vessel's trading to the excluded countries, the Charterers shall be allowed to make the
vessel trade to such countries subject to the Owners consent which shall not be
unreasonably withheld.

**Clause 49 – Black List**
Owners guarantee that vessel is not Black Listed by any Arab League Countries or
USA/Canadian Longshoreman's union. Owners guarantee vessel is not Black Listed
by trading countries due to vessel's flag/Ownership/operators/age and whatsoever

**Clause 50 – Panama / Suez Canal transit**
Owners guarantee that the vessel shall be fully fitted for Panama/Suez Canal transit
and in possession of valid necessary certificates during the currency of this charter to
comply with current regulations and requirements of both Canals.

**Clause 51 – ITF**
Owners guarantee that the vessel's officer and crew are employed under the terms and
conditions of an ITF equivalent or affiliated trade union agreement.

**Clause 52 – Vessel's description 'all figures about'**

m/v "Chelyabinsk"

year built: 1984
Place built: Wismar, Germany
IMO no.: 8311003
Loading Capacity:  20600.0 t
Ship Type - The single-screw, single deck motor ship with short forecastle, long poop,
after engine room and house, bulbous bow and transom stern.

Flag: RUS
Call sign: UHWM
Class: KM*?3
Classification society: RS
Service speed laden; 12.6
Service speed ballast: 13.4

PARTICULARS
Length o.a.: 176.6m
Length between perpendiculars: 167.40m
Breadth: 22.86m
Depth: 14.0m
Overall height above base line: 43.00m
Draft summer load line: 10.17m
Draft timber load line: 10.54m
Deadweight: 23181.4 t
Grain: 29727 m3
Bale: 29131 m3
Register tonnage gross: 16794
Net: 8843
Suez canal capacity brut: 16960.35
Net: 13244.01
Type of hatch covers: folding type, hydralically operated
Crane ( boom max=24m, min=3.5m): 4/25t electrical single 25t/24m

PERMISSIBLE LOADING
On tank top: N1,2,4 - 12.2t/m2;  N3 - 23.2 t/m2;  N5 - 15.6 t/m2
On deck: 2.7 t/m2
On hatch covers: 1.75 t/m2

Hold size(m)  Grain(cbm)  Hatch size (m)
1. 23.0 x 4.5/15.0 x 9.8 3891 2 x 13.6 x 7.45
2. 25.2 x 15.0/19.4 x 12.0 6595 2 x 19.5 x 8.95
3. 24.5 x 19.4 x 12.0 6403 2 x 19.5 x 8.95
4. 24.5 x 19.4 x 12.0 6491 2 x 19.5 x 8.95
5. 24.5 x 19.4/12.0 x 12.0 6347 2 x 19.5 x 8.95

MAX TH COAMING HEIGHT
HLD 2-5/16M
HLD 1 1.8

DAILY FUEL CONSUMPTION
Type I.F.O.180 / RMA 10
Recommended RME25 , RMA10
Viscosity, Cst 180.0 / 10.0
At sea, t 24.5 / 3.1
In port, with cargo operation 1.0 / 2.7
In port, without cargo operation  1.0 / 1.4
For maneuver, kg/h 0.0  735

Ship's store (bunker),t
RME25 - 1603t, RMA10 - 270t, DMA - 57t.
To ensure work of ME and ADG when starting and stopping and to ensure work of emergency DG aboard motor vessel the supplies of diesel oil (gasoil DMA) are provided in amount of 5% of fuel oil demand.

- Vessel is single decker but bulkhead in each hold between two hatches 1.56 m wide and 4 m depth does not reach the bottom.
- Vessel is self-trimming single deck bulkcarrier (and was originally constructed as a bulkcarrier) with engine/bridge and accommodation aft.
- Vessel has no cargo battens and vessel has no horizontal corrugations.
- Vessel does not have acceptling bulkhead beam or any other obstructions.
- Vessel is capable of ballasting/de-ballasting without interruption to the continuous loading/discharge operation but same depending on loading /discharging speed and vessel's stress/trim.
- Vessel is classed Lloyds highest or equivalent and class shall be maintained during the entire currency of the Charter Party.
- Vessel has clear unobstructed main holds.
- Vessel is steel floored throughout.
- Vessel shall not change ownership or class or flag without Charterers' written consent which shall not be unreasonably withheld.
- Vessel's Hull and Machinery Insurance shall be fully maintained and will   not be changed.
- Vessel to remain fully P&I covered during the entire currency of the Charter.
- Vessel's all hatches are water-tight and to remain so throughout the entire voyage.
- Vessel is suitable in all respects for the loading, safe carriage and discharge of intended cargo of bagged rice.
- Vessel is free of all encubrances except mortgage from bank.

## Clause 53 – Deratting certificate
The vessel shall be delivered with valid deratting certificate or deratting exemption certificate. If such certificate does not cover the whole period of this charter, costs or renewal of certificate and fumigation, if necessary, shall be for Owners' account. Any detention and extra expenses incurred thereby shall be also for the Owners' account.

## Clause 54 – Quarantined / Radio Pratique
Normal quarantine time and expenses for the vessel's entering port shall be for Charterers' account, but any time of detention and expenses for quarantine due to pestilence, illness etc., of Master, Officers and crew shall be for Owners' account. Further the vessel shall be in possession of valid certificate necessary to prepare radio pratique at port or ports where radio pratique is available.

## Clause 55 – Health Certificate
The vessel shall be in possession of necessary certificates to comply with safety and health regulations and all current requirements at all port(s) of call during this charter.

## Clause 56 – Grain Loading Certificate
Owners guarantee that the vessel is a self-trimming bulk and shall be suitable for carrying all kinds of grain in bulk without shifting boards, bagging or securing,

subject to the requirements of the vessel's grain loading book. The vessel shall have the latest grain loading certificates in compliance with IMO regulations on board.

The vessel is also to load part cargoes of grain and/or other bulk cargoes and to shift between ports with holds empty and/or slack subject to the Master's approval, which shall not be unreasonably withheld.

**Clause 57 – Cargo Gear and Equipment**

The vessel's cargo gear and all other equipment shall comply with the regulations and/or requirements in effect at port(s) of call and canals and countries in which the vessel will be employed. The Owners also guarantee that the vessel shall be at all times in possession of valid and up to date certificates on board to comply with such regulations and/or requirements.

If stevedores, longshoremen or other laborers are not permitted to work by reason of any failure of the Master, the Owners and/or their agents to comply with such regulations or by reason that the vessel is not in possession of such valid and up-to-date certificates, the Owners shall make immediate corrective measures. The Charterers may suspend hire for time lost thereby and any extra expenses including stevedores' standby time shall be for Owners' account.

**Clause 58 – WWF Requirement**

Owners guarantee that the construction of the vessel with her cargo gear, fittings and other equipment shall comply with the requirements and/or recommendations of Australian shore labour and pilots.

**Clause 59 – P and I Club**

Owners guarantee that the vessel is covered by the UK P & I Club.

**Clause 60 – Owners' Agents**

Charterer's agents at ports of call should take care of normal ships services. Should the vessel require any unusual assistance above and beyond normal husbandry matters, then the Owners are either to appoint their own supervisory agent to attend these matters or negotiate a reasonable fee with Charterers agent for their services. If agents as per tariff are entitled to an agency fee for handling Owners' matters, same always to be for Owners' account.

**Clause 61 – On/Off Hire Survey**

A joint on/off hire survey including bunker survey is to be carried out with Owners and Charterers each contributing 50 percent to the relevant invoices.

Vessels holds on delivery to be clean / swept, washed down by fresh water, and dried up, free from rust/rust scale and ready to receive Charterers' intended cargo and in all respects ready to pass all necessary inspections. If the vessel fails to pass such necessary inspections. then vessel to be offhire from the moment of failure till vessel passed again.

Charterers have an option to carry out general H&M survey of the vessel prior commencement of loading or prior sailing of last port before delivery to chars to check vessels suitability to carry bagged rice as per their underwriters requirements.

Owners guarantee that vessel's hatch covers are to be watertight all throughout this charter period and if any hatch covers found defective, same to be rectified immediately at owners time and expenses to Charterers' / their surveyors' satisfaction.

Owners to allow Charterers at their expense to conduct ultra sonic water tight test of vessel's hatches, if same fails then vessel is to be off-hire until such time and vessel has made the repairs and any costs associated with same to be for owners account. Charterers also have the right to carry out hose test on all hatches on delivery.

### Clause 62 – Oil Pollution

The Owners are required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place territorial or contiguous waters of any country or state in performance of this Charter Party. The Owners shall make all arrangements by bond or otherwise may be necessitate to satisfy such requirements at Owners' sole expense.

The Owners shall indemnify the Charterers harmless against all consequences (including fines if any imposed on the Charterers) of oil or other pollution damage and any failure or inability of the Owners to do so as provided above.

In connection with the above reference is also made to a certificate of financial responsibility in compliance with requirements of the U.S. Water Quality Improvement Act of 1970 and any amendments thereto.

### Clause 63 – Deviation

Should the vessel put back whilst on voyage by reason of breakdown of machinery, collision, stranding, fire or other accident or damage to the vessel, or dry-docking or periodical survey, or deviate from the course of the voyage caused by sickness of or an accident to the Master, Officers, crew or any person on board the vessel other than persons traveling by the Charterers' request, or by reason of sending stowaway(s) or refugee(s), salvage or by reason of refusal of the Master, Officers or crew to do their duties, or any Owners' matters, the payment of hire shall be suspended from the time of inefficiency in port or area until the vessel is again efficient in the same position or regains a point of progress equivalent to that the hire ceased hereunder. Bunker consumed while the vessel is off-hire and all extra expenses incurred during such period shall be for the Owners' account.

### Clause 64 – Capture, Seizure, Arrest

Should the vessel be captured or seized or detained or arrested by any authority or by any legal process during the currency of this Charter Party, the payment of hire shall be suspended until the time of her release unless such capture or seizure to detention or arrest is occasioned by any personal act or omission or default of the Charterers' or their agents. Any extra expenses directly related to the vessel incurred by and/or during the above capture or seizure or detention or arrest shall be for the Owners' account.

### Clause 65 – Preparation for loading / discharging

The vessel's officers and crew shall perform shaping up of the vessel's hatches, and cranes and gangway prior to and upon arrival at a port in order to commence loading and/or discharging operations as soon as possible.

Opening and closing of all hatch covers and erecting and dismantling of shifting boards shall be performed by the officers and crew in addition to the usual operations performed by them, with free costs to the Charterers and unless prohibited by port regulations.

The Owners and the Master to undertake best efforts to cooperate with the Charterers for the best stowage of cargo and the Master / officers / crew to make best efforts to collect, re-stow, provide any useful dunnage, lashings, container fittings etc for the next use after completion of the voyage during this charter.

**Clause 66 – P. + C.**

All negotiations and fixture to be kept strictly private and confidential

**Clause 67 - BIMCO ISM Clause**

From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of the Charter Party, the Owners shall procure that both the vessel and the company (as defined by ISM Code) shall comply with the requirements of ISM Code.

Upon request the Owners shall provide a copy of the relevant document of compliance (DOC) and Safety Management Certificate (SMC) to the Charterers. Except as otherwise provided in the Charter Party, loss, damage, expenses or delays by failure on the part of the Owners or the Company to comply with the ISM Code shall be for Owners account.

**Clause 68 - Bulk Carrier Safety Clause**

(a) The Charterers shall instruct the Terminal Operators or their representatives to co-operate with the Master in completing the IMO SHIP/SHORE SAFETY CHECKLIST and shall arrange all cargo operations strictly in accordance with the guidelines set out therein.

(b) In addition to the above and notwithstanding any provision in this Charter Party in respect of loading/discharging rates, the Charterers shall instruct the Terminal Operators to load/discharge the Vessel in accordance with the loading/discharging plan, which shall be approved by the Master with due regard to the Vessel's draught, trim, stability, stress or any other factor which may affect the safety of the Vessel.

(c) At any time during cargo operations the Master may, if he deems it necessary for reasons of safety of the Vessel, instruct the Terminal Operators or their representatives to slow down or stop the loading or discharging.

**Clause 69 – USDA / NCB Clause**

Owners guarantee that the vessel is free from Asian Gypsy Moth. If vessel has called US Pacific ports since March 2001 than Owners guarantee that the vessel has on board a valid Phytosanitary Certificate issued by the Inspectors of the State Plant Quarantine Inspection of Russian Federation.

Furthermore Owners guarantee that the vessel meets all National Cargo Bureau / United States Department of Agricultural plant protection and quarantine office regulations.

**Clause 70 – Hull and Machinery**

Hull and Machinery insured with Dalacfes Insurance Company and the insured value is US$ 6,000,000.00.

**Clause 71 – War risks – Conwartime**

(1)      For the purpose of this Clause, the words:

(A) "Owners" shall include the Shipowners, Bareboat Charterers, Disponent Owners, Managers or other Operators who are charged with the management of the Vessel, and the Master; and

(B) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(2)      The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgment of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(3)      The Vessel shall not be required to load contraband cargo, or to pass through any blockades, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents right of search and/or confiscation.

(4)      (A) The Owners may affect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefore shall be for their account.

(B) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

(5)      If the Owners becomes liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

(6)      The Vessel shall have liberty:

(A) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power of compel compliance with their orders or directions;

(B) to comply with the order, directions or recommendations of any war risks Underwriters who have the authority to give the same under the terms of the war risks insurance;

(C) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(D) to divert and discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(E) to divert and call at any other port to change the crew or any part thereof of other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(7)     If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers.

No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(8)     If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfillment of this Charter Party.

**Clause 72 – Bunkers on Delivery/Redelivery.**
As per clause 9. Estimated bunkers on delivery IFO 450 mt and MGO 120 mt, but vessel to have sufficient bunkers on board to reach Singapore with a safety margin. Charterers to pay bunkers as on board on delivery with first hire. Vessel to be redelivered with about same quantities as on delivery.
Prices/ends as per prices ruling on the date of delivery at the nearest main bunker port (Shanghai).

**Clause 73 – Cargo Exclusions.**
Vessel shall be employed in carrying harmless and non-dangerous lawful merchandises. Imco cargo, if any, to be carried under special permission from Owners which not to be unreasonably withheld.
Cargo exclusions shall incorporate asphalt, livestock, hides, acids, inflammable and injurious cargoes, cargoes which may evolve inflammable and injurious/toxic gases, tar in bulk, arms, ammunition, blasting bombs (loaded or not), detonators, nuclear and

radioactive materials, petroleum and/or its products, calcium carbide, fishmeal in bulk, Turpentine, borax, motor spirits, waste, asbestos, naphtha, cement in bulk, ferrosilicon in bulk (but allowed fesi in bags), h.b.i., cakes, all cargo is to be in accordance with IMO regulations and all cargo is to be loaded, stowed, carried and discharged in accordance with IMO regulations and Master's satisfaction.

**Clause 74 – Trading Limits and exclusions.**
The vessel shall not call: CIS pacific ports, Cuba, North Korea, Israel, Albania, Libya, Cambodia, Angola, TOC, Iraq, Somalia, Bangladesh, Nigeria, Zaire, war areas or warlike areas. Cuba can be accepted if the Charterers agree to work the vessel another 6 months after calling Cuba.

**Clause 75 – Redelivery**
Redelivery in Charterers' option on dropping last outward sea pilot 1 safe port Luanda-Nouakchott range.

**Clause 76 – Bill of Lading**
As per Clause 30. Congenbill(s) or other Bimco recognized/approved Bill(s) of Lading form to be used. Bill(s) of Lading to be signed by Master or Charterers/their agents in accordance with the Charterers' written instructions, but always in accordance with Mate's Receipts. Where it is customary, in grain/agricultural products trading, Mate's Receipt to be issued in accordance with elevators figures.

Master to provide Charterers' Agents at load port with a Letter of Authority, authorising Charterers or their Agents to sign Bills of Lading on his behalf in accordance with the Mate's Receipts.

Fesco is not to be shown as a Carrier in the Bill(s) of Lading.
No liner or through Bill(s) of Lading will be issued during the currency of this Charter Party.

Charterers to indemnify Owners against any claims, or damages arising from Bill(s) of Lading not being in conformity with Mate's Receipt.

At discharging port, cargo to be released against original of respective Bills of Lading. In case original Bill(s) of Lading are not arrived in time to discharging port, Owners agree to discharge cargo as per Charterers' written instruction and against Letter of Indemnity as per Owners' P and I Club wording issued/signed by Charterers on their letterhead, which to be provided to Owns together with copy b/l in question. Charterers will keep Owners advised about actual arrival of Original Bills(s) of Lading to discharging port, and upon arrival of original Bill(s) of Lading same duly endorsed by receivers will be exchanged to the Charterers Letter of Indemnity.

**Clause 77 – Fumigation**
Before delivery into time-charter, the vessel is ordered at her last discharge port for survey for checking her availability/suitability for in-transit fumigation. Further in-transit fumigation to be allowed subject to vessels technical conditions and survey report.
Then, subject to survey report, Charterers are allowed the privilege of in transit fumigation of cargo for account of the Charterers. Fumigants used only to be those

which are common at all major loading ports, and those which have been approved by local loading authorities in port/s in which they will be applied.

Prior to any fumigation, Master to be notified by Charterers about the type of fumigant to be used, and to be given written instructions for their safe application. Master to notify Charterers in a timely manner of any equipment Master will require for safe administration of the fumigant. Master's requirements for any equipment will not exceed those as recommended by IMO according to BIMCO edition "Recommendations on the safe use of pesticides in ships". All costs related to the purchase and supply of equipment to fulfill Master's requirements will be for Charterer's account.

Crew will stay aboard whilst vessel is undergoing fumigation with fumigants 'Aluminium Phosphide/Magnesium Phosphine' and products that generate Phosphine Gas (PH3).

Master and crew to judiciously follow all instructions pertaining to fumigant safety which may include venting of the cargo either at sea or prior to arrival at the discharge port.

If the vessel is not permitted to fumigate cargo in-transit in accordance with IMO regulations or local Port Authorities Rules for such operations, Charterer's to have option to fumigate the cargo in port with all costs for Charterer's account and fumigation to be performed in Charterers time and at their risk. In this case fumigation is not to take place whilst crew are on board vessel unless the fumigants in question are those listed above. For other fumigants all crew costs ashore including accommodation, meals and transport to be for Charterer's account.

**Clause 78 - Master's Gratuity**
In addition to c/v/e as per Clause 80, Master's gratuity to be agreed with the Master directly but not less than USD 75.00 per port call.

**Clause 79 – NAABSA**
Charterers have the option of NAABSA for such vessels size and construction available where customary as per NYPE 1946 clause 6.

**Clause 80 – Communication Expenses / Victualling / Entertainment**
Cable and communication Victualling and Entertainment expenses shall be payable by Charterers at the rate of USD 1000.00 per month pro rata.

**Clause 81 – Owners banking details**
In favour of the Far-Eastern Shipping Company, 15 Aleutskaya Street, Vladivostok, Russia, A/C No: 40703840724008000236 with Bank of Foreign Trade Vladivostok, Russia Vladivostok Branch, SWIFT code: VTBRRUM2VDV Corr/acct No: 890-0546-042 with Bank of New York, N.Y. 10286, ABA# 021000018 SWIFT code: IRVTUS3N.

**Clause 82 – U.S. Customs 24 hour rule**
(a) If loading cargo destined for the US or passing through US ports in transit, the Charterers shall:
(i) Provide all necessary information, upon request by the Owners, to the Owners and/or their agents to enable them to submit a timely and accurate cargo declaration directly to the US Customs; or

(ii) If permitted by US Customs Regulations (19 CFR 4.7) or any subsequent amendments thereto, submit a cargo declaration directly to the US Customs and provide the Owners with a copy thereof.

In all circumstances, the cargo declaration must be submitted to the US Customs latest 24 hours in advance of loading.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' (c) If the Vessel is detained, attached, seized or arrested as a result of the Charterers' failure to comply with the provisions of sub-clause (a), the Charterers shall provide a bond or other security to ensure the prompt release of the Vessel. Notwithstanding any other provision in this Charter Party to the contrary, the Vessel shall remain on hire.

**Clause 83 – Fumigation – (see clause 77.)**

**Clause 84 – deleted**

**Clause 85 – Bunkering**
Charterers shall bunker Vessel as per ISO 8217 and Vessels specifications to comply with Regulation 18, Annex VI of MARPOL 73/78. Vessel will participate in the DNV fuel quality testing programme. Samples will be taken during each bunkering.

During the currency of the Charter the Charterers shall ensure that bunker delivery receipts are presented to the Vessel on the delivery of fuel(s) and that during bunkering representative samples of the fuel(s) supplied shall be taken at the Vessels bunkering manifold and sealed in the presence of competent representatives of the Charterers (including tanker/bunker barge Master or chief officer) with their seal and of the Vessel. The respective receipt to be signed by both parties. The fuel samples shall be retained by the Vessel for 12 (twelve) months after the date of delivery or for whatever period necessary in the case of a prior dispute and any dispute as to whether the bunker fuels conform to the agreed specification(s) shall be settled by analysis of the sample(s) by FUEL EXPERTS TO BE MUTUALLY AGREED whose findings shall be conclusive evidence as to conformity or otherwise with the bunker fuels specification(s). The Charterers have to replace the off-test bunker as quickly as physically possible. The cost and expenses related to analysis and eplacing of such bunker shall be at Charterers account.

In order to exclude mixing of Vessel fuel in stock with new bunkering fuel the tanks with fuel remains are to be deducted from fuel quantity calculated for bunkering. In case of Charterer's request to take full bunker, the final judgement for fuel mixing is the vessel decision.

The Owners reserve their right to make a claim against the Charterers for any damage to the main engines or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed pecification(s).

Notwithstanding anything else contained in this Charter Party, if bunker fuels supplied do not conform with the specification(s) or otherwise prove unsuitable for burning in the ships engines or auxiliaries the Owners shall not be held responsible for

any reduction in the Vessels speed performance and/or increased bunker consumption or for any time lost and other consequences.

Vessel's bunker specifications requirements are:
Type I.F.O.180 / RMA 10
Recommended RME25 , RMA10 Viscosity, Cst 180.0 / 10.0
and MGO DMA.

**Clause 86 – US Customs Advance Notification/AMS Clause for Time Charter Parties**

(a)  If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

  i)  Have in place a SCAC (Standard Carrier Alpha Code);  ii)  Have in place an ICB (International Carrier Bond);  iii)  Provide the Owners with a timely confirmation of i) and ii) above; and  iv)  Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d)  The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

**Clause 87 – Vessel's Performance Clause**

Vessel must maintain full speed/consumption as per Charter Party warranty during the whole voyage unless otherwise instructed. In the meanhile, whenever vessel's running speed goes down more than 1 knot during consecutive 24 hours, Captain must immediately advise Charterers of reason thereof in addition to regular noon reports. However Charterers shall have the right to claim for vessel's underperformance if the ship does not perform as described by Owners in the Charter Party.

**Clause 88 - ISPS**
**ISPS Clause for Time Charter Parties**

(a) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code

relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b) (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:
"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners'/Master's negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

**Clause 88 - U.S. Security Clause for Time Chartering**
If the Vessel calls in the United States, including any U.S. territory, the following provisions shall apply with respect to any applicable security regulations or measures: Notwithstanding anything else contained in this Charter Party all costs or expenses arising out of or related to security regulations or measures required by any U.S. authority including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners'/Master's negligence.

**Clause 89 - U.S. Trade – Unique Bill of Lading Identifier Clause**
The Charterers warrant that each transport document accompanying a shipment of cargo destined to a port or place in the United States of America shall have been endorsed with a Unique Bill of Lading Identifier as required by the U.S. Customs Regulations (19 CRF Part 4 Section 4.7.a) including subsequent changes, amendments or modifications thereto, not later than the first port of call.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.

Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account.

### Clause 90 – Weather Routing

Charterers may supply Ocean Routes or similar advice to the Master and Master to follow Ocean Routes/DMI or similar instructions regarding reporting procedure, however the Master to remain responsible for the safe navigation and choice of route. Good weather conditions are understood to mean winds maximum Beaufort force 4 and/or Douglas Sea State 3. Evidence of weather conditions to be taken from vessels deck logs and Ocean Routes/DMI or similar weather reports. In the event of consistent discrepancy between the deck log and Ocean Routes weather reports, then the coastal stations weather reports are to be taken as ruling.

### Clause 91 - Delivery

Acceptance of delivery by Charterers shall not constitute any waiver of Owners obligations under this Charterparty. Vessel on her delivery to be ready to receive the intended cargo with dry and clean-swept holds to Charterers' inspector's satisfaction. In case of more than one loading port the obligation that holds are to be ready to receive the intended cargo with dry and clean-swept holds to Charterers' inspector's satisfaction is extended to the respective holds/port.

### Clause 92 - Oil pollution

Owners warrant that throughout the currency of this charter party they will comply fully with any legislation enacted in respect of oil pollution by any government, department thereof or other authority, including but not limited to providing the vessel with the certificates issued pursuant to section 1016 (a) of the Oil Pollution Act 1990, and section 108 (a) of the Comprehensive Environmental Response, Compensation and Liability

Act 1980, as amended, in accordance with part 138 of Coast Guard regulations 33 CFR.

### Clause 93 - B/l-date

The Owners accept that bills of lading issued under this charter party might bear a reference to a charter party to which the Owners are not a party. The Charterers hereby undertake to indemnify and hold harmless the Owners for any and all consequences following from the issuance of bills of lading by the Owners which bear such reference.