# EXHIBIT 9
# TO THE
# AFFIDAVIT OF THOMAS H. BELKNAP, JR.

Ex. A:
Raissis

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

SEA TRANSPORT CONTRACTORS LTD.

        Plaintiff,

   against

INDUSTRIES CHIMIQUES du SENEGAL

        Defendant,

DECLARATION IN
ACCORDANCE WITH
28 U.S.C. §1746

-------------------------------------------------------X

ANASTASIOS G. RAISSIS declares and states as follows:

1. I have read all of the Defendant's evidence in support of its application for an emergency hearing to vacate the present attachment. In this context I have read the declarations of Mr. Ousmane N'Diaye and Mr. Mamadou Diop and am appalled that these two individuals, who I know and respect, are prepared to openly lie to the New York Court to try to secure their objective to lift the attachment. In this declaration I will give a true and accurate account of events behind the Plaintiff's association with the Defendant, the Contract of Exclusive Co-operation dated 6 April 2005 (the "Contract") and my in depth knowledge of the problems currently faced by the Defendant. I will also comment in detail on the false and misleading evidence served by Mr N'Diaye and Mr Diop. Furthermore, I am fully prepared to come to the New York Court and personally testify under oath on the matters contained within this Declaration;

THE PLAINTIFF'S ORGANISATION

2. I am the President of the Board of Directors and the Managing Director of Sea Transport Contractors Ltd of 80 Broad Street, Monrovia, Liberia ("STC");

3. STC is registered in Greece pursuant to CL 89/1967 and I am the legal representative of the company pursuant to Greek Law;

4. STC is actually STC MKII as the 1st STC (Sea Transport Contractors S.A.) was established in 1969 under the Laws of Panama by my father Mr. George L. Raissis, a very well known and respected shipping personality in the global shipping market, and was also registered in Greece under CL 89/1967. My father was the legal representative of this company;

5. STC Monrovia was established by myself in 1997 with the specific objective of entering/taking shipping Contracts of Affreightment ("COAs") and shipping individual cargoes. STC was never meant as a broking company and as such has never conducted any broking business whatsoever. STC operates as a Charterer and, hence, disponent Owner only;

6. For the avoidance of doubt, I can confirm that I am also the Managing Director and legal representative of another company, namely Marachart Shipping Co Ltd of Cyprus ("Marachart"), also registered in Greece under CL 89/1967. This company is a member of the Raissis Group of Companies that was established in 1927 by my late grandfather Leonidas Raissis, another well known

\P\3439754.2                                    1

A 71

personality in the shipping world of his time. More information about this company can be found on the company's website: www.marachart.gr;

7. Marachart has only ever been involved in broking and management of dry cargo vessels and never in operating as Charterers and disponent Owners, which is the purpose for which STC was established;

8. In relation to ICS' counsels' representation that "*The Plaintiff is a Monrovia, Liberian entity with a purported office and principal place of business at 80 Broad Street, Monrovia, Liberia. Investigation reveals that there is absolutely no office for Sea Transport at 80 Broad Street, Monrovia, Liberia – this address being recognized mail drop for virtually all off-shore Liberian entities who choose to incorporate in Liberia to mask their corporate identity and otherwise take advantage of the lax corporate regulations*", such representation either demonstrates a woeful lack of understanding as to how international legitimate shipping companies are set up and administered, which I very much doubt exists, or is intentionally misleading and self-serving. As I have stated above, STC is established and registered in Greece under CL89/1967, which is Greek legislation passed for shipping companies. 99% of Greek shipping companies dealing in international transport with foreign flagged ships are off-shore entities registered in Greece under the same CL.89/1967 and have a legal representative, which in the case of STC is me. ICS' maritime counsel will be fully aware of this fact;

### THE POSITION OF MR JEROME GODART

9. ICS and their US counsel have made various allegations concerning alleged links between Mr Jerome Godart and STC, and Mr Godart's alleged strategic objectives in bringing STC's claim against ICS. This allegation is also repeated in the Declaration of Mr N'Diaye. Such allegations are complete nonsense and have been raised before by ICS in the context of their French counsel's correspondence with STC's London counsel Stephenson Harwood. Neither I nor my London counsel understand the objective of these allegations, which have never been substantiated and/or particularised. ICS appear to believe that there is some point to be scored here which is not immediately obvious. From the outset, I can categorically confirm that Mr. Jerome Godart is not and has never been *"the controlling mind behind STC"* as is wrongly stated by Mr. Ousmane N'Diaye. Furthermore, he has never had (nor does he have) any interest in STC, either as a director or as a shareholder. Furthermore, Mr. Ousmane N'Diaye was always aware of this position as all negotiations between STC and ICS were conducted directly between Mr. N'Diaye and myself;

10. The only "controlling mind behind STC" is myself;

11. The other members of the BOD of STC are my father Mr. George L. Raissis and Mr. Christos Tolios who has been the chief accountant of our companies for many years and is currently our advisor on accounting matters since he was retired a couple of years ago;

### GENERAL BACKGROUND TO THE CONTRACT

12. In December 2004, I was called by Mr. Jerome Godart, who is a very good friend in business and in personal life, whilst I was on Christmas vacations in Sweden visiting my wife's family, and was told that he had been asked by

certain high level contacts of his within Senegal to assist in restructuring ICS with a view to saving the company from bankruptcy;

13. He advised me that one of the major problems which ICS was facing was bad management of their imports and exports as they had no expertise in shipping and were relying on their suppliers and buyers to provide the vessels at the freight rates declared by them;

14. I was asked if I was interested in helping in this process and, of course, I confirmed that I was as the business opportunity was significant;

15. I was then asked to produce a market survey on the sulphur freight from Saudi Arabia to Senegal and on the Chemical Tanker market for the export of Phosphoric Acid ex Senegal to India;

16. I was advised that the contracts for the Phosphoric Acid business had been held for many years by Stolt Nielsen Transportation Group B.V. of Holland (Stolt), Odfjell Seachem AS of Bergen (Odfjell) and Jo Tankers B.V. of Holland (Jo) and that the new Managing Director of ICS, Mr. N'Diaye, wanted to break this monopoly and try to optimize the freights. Various articles have been written recently in the Senegalese press about this monopoly;

17. In that respect I spoke to a good friend of mine who is in Tanker Business (Mr. Xenofon Kyriakou of Athenian Tankers) who, after making the necessary enquiries, advised me that he could not assist me on that front as the tankers required should have stainless steel tanks and his company did not operate this type of tankers;

18. I then made enquiries through Charterhouse Shipbroking Ltd in London (Mr. John Weir) who in turn discussed the matter with one of his friends in Germany who advised him that he could talk to Tokyo Marine and a few other smaller operators to try and establish something;

19. I also made contact with Mr. Nils Tholstrup of Acidchem Chartering Aps, Copenhagen, who I understood to have been the broker for the COA with Odfjell and discussed the possibility of giving some of the quantities of Stolt and Jo to other operators. We established very good contact and, as I was not an expert in tanker business, let alone in this highly specialised chemical tanker business, I decided that should a contract be signed with ICS which included the Phosphoric Acid business, I would use Nils as an exclusive broker for this business and use his expertise to everybody's benefit. I met Nils personally in Paris in the middle of February;

20. In the process of working on this item, Mr. N'Diaye during our first meeting in Paris in the middle of February 2005, asked me to stop the enquiries as this was a "highly political file" and he did not want to upset ICS's Indian partners (IFFCO) who were responsible for arranging these contracts, even though he realized that the freights paid were on the "high side";

21. At the same time, on 17th January 2005, I chartered a vessel in the name of STC and sublet her to ICS for a cargo of 30,000 MT +/- 10% of Bulk Sulphur from Jubail to Dakar. This was the m/v "HALIS KALKAVAN". STC's contractual counterparts were Messrs. Progress Bulkcarriers which had the vessel on T/C;

22. As ICS were very satisfied with the freight rate and the performance of the contract, they asked me to enter into a COA for 120,000 MT 10% more or less Owners' option to be shipped in 4 bottoms each of 30,000 MT +/- 10% of Bulk Sulphur from Jubail to Dakar. The first shipment was to take place in April 2005,

the second shipment in June 2005, the third shipment in August 2005 and the fourth shipment in October 2005, with ICS having an option for a further quantity of 30,000 MT +/- 10% in Owners' option to be shipped in December 2005 with this option declarable in October 2005;

23. I entered into a COA on 4th February 2005 and sublet the same to Progress Bulkcarriers who were very interested in that business;

24. Before our first meeting in Paris with Mr. N'Diaye, Mr. Godart had asked me if I was interested in a long term contract with ICS to provide shipping for all of their imports and exports. I obviously was. He then told me that Mr. N'Diaye (whom Mr. Godart regarded very highly at the time) would like to have a formal presentation from me on why he should agree to such a commitment with STC in order that he could present it to the BOD of ICS and obtain its approval;

25. I prepared a very basic presentation (a copy of which I attach to my statement) explaining some of the reasons which I thought were important as to why ICS should subcontract its shipping function to STC and presented this to Mr. N'Diaye and Mr. Yoro Ba (both of ICS) in Paris during our first meeting in the middle of February 2005 (I met with Mr. N'Diaye on 15th, 16 and 17th February 2005);

26. Mr. N'diaye also asked me to prepare a draft contract for that meeting, which I did and which I presented to him. This draft contract was the skeleton/initial draft of the Contract;

27. I understand that in the middle of February, at the time of our first meeting with the ICS officials, the annual meeting of ICS was being held in Paris with IFFCO and was being attended, amongst others, by representatives of the three shipping companies involved in the Phosphoric Acid transportation;

28. When Mr. N'Diaye told me that he could not contract with STC for the Phosphoric Acid, I was a little disappointed because of all my preparation work over the previous two months. On the other hand, I was also quite relieved, as I did not hide from anyone the fact that I was not a specialist in that field and that our specialty was dry cargo;

29. I then met with Mr. N'Diaye on various further occasions in Paris and in Senegal, prior to 6th April 2005 (the date upon which the Contract was executed);

30. During our first meeting in Paris in the middle of February, Mr N'Diaye explained to me that ICS were facing certain problems with its port facilities and installations, principally due to bad maintenance, and asked me if I would like to sign a contract for the management of the port installations as well;

31. I replied that, in principal, this was of interest, but that I first needed to have a team from my company inspect the relevant installations and perform a feasibility study;

32. In light of this additional aspect, when I was invited to Senegal for the signature of the Contract for the dry cargo (which did not take place during my visit to Dakar) I took with me Marachart's Port Captain and Operations Manager for the dry cargo (Capt. John Mavrommatis) and Marachart's Technical Manager (Mr. Stylianos Karambiakas) to perform this feasibility study and prepare a report;

33. A feasibility study report was prepared and I was congratulated for the good work of Marachart's team in that respect (copy of the report in question is attached to this statement);

34. During our visit in Dakar, Mr. N'Diaye advised me on a daily basis that the Contract would be signed on the same day and, finally, that it was to be signed on the last day at the hotel in which I was staying prior to leaving for the airport. Needless to say, he did not deliver on his representations. My said visit to Dakar was from 20th March 2005 to 25th March 2005;

35. During my various meetings with Mr. N'Diaye, he had made it very clear to me and to all persons attending that he envisaged a contract which would run indefinitely and intermittently, and that he regarded STC and ICS as lifelong partners. This was also my view of the situation, and it was for this reason that I had devoted so much time, money and attention to this particular project. Some of the persons attending these meetings were:

   i)   Mr. Jerome Godart;
   ii)  Mr. Stephane Brabant;
   iii) Mr. Philippe Nakad;
   iv)  Mr. Charles Carriere;
   v)   Capt. John Mavrommatis;
   vi)  Mr. Stylianos Karamblakas.

36. The final touches to the Contract took place just a couple of days prior to the date of signature. The draft specified a contract period of 10 years, which would be renewed for further periods thereafter. Mr. N'Diaye advised me in the presence of Mr. Jerome Godart and Mr. Stephane Brabant that he could not sign a contract for such a long stated period due to internal administrative reasons, but that he would like to find a way round this problem and achieve an indefinite and interminable contract through other means. The solution which was agreed on by all present was to have a contract which was "automatically" renewed on a rolling 2 year basis without any termination provision (except in the case of breach in which case either side would of course be entitled to sue the other);

37. It was on that basis that we agreed on the *"initial period of two (2) years from the date hereof and is automatically renewed thereafter for further two (2) year periods on a rolling basis unless either of the Parties has acted in material breach of their obligations hereunder and have failed to remedy that breach within a period of three (3) months from the date of written notification of that material breach from their respective counterpart"*. The clear intention of both parties was that this provision would provide the basis of the lifelong co-operation envisaged without the ability of either party to terminate;

38. The three month grace period (in the event of breach) was inserted, as discussed with Mr. N'Diaye, so that either party would have more than sufficient time to rectify any breach and the contract would thus be protected to the best interest of both parties. This of course would have been the case if both parties were acting in good faith;

39. It was discussed with Mr. N'Diaye that on the back of the Contract STC would look into the viability of purchasing vessels to perform and optimise the freight rates for ICS, such vessels having a guaranteed employment. This was a "win-win" situation for both parties;

40. It was also discussed that STC would be willing to invest in a shipping agency in Dakar, as well as in logistic operations both inside and outside Dakar, in order to optimize operations and achieve savings for ICS;

41. On that front, STC was willing to start by purchasing two Cranes of 25-30 MT each to install in the port of Dakar in order to optimize the operations of the vessels and would also be willing to purchase trucks for the fastest transportation of the goods from and to ICS's plants and anything else needed to optimise the operations;

42. These various other issues discussed are also included as terms 15, 16 and 17 in the Contract;

43. The reason that STC was prepared to agree to these terms was firstly the fact that ICS guaranteed quantities of minimum 1,100,000 MT on an annual basis, and that Mr. N'Diaye envisaged an increase on these amounts by an additional 600,000 MT per annum, and secondly, the indefinite duration of the Contract. Without these factors, there would have been little incentive for STC to invest in the infrastructure contemplated;

44. After execution of the Contract, I asked Mr. Yoro Ba by several emails for the remaining program for 2005 and he provided me with the same for imports only on 31st May 2005 (a copy of which I attach to this Declaration);

45. From then on I was never presented with any quantities to ship and, in breach of their obligations, ICS purchased all of their imported raw materials/goods on CFR basis, thus leaving STC out of the picture;

46. I complained about ICS' breaches many times on the telephone to Mr. Yoro Ba and during personal meetings with Mr. N'Diaye, when the latter visited me in Greece from 17th June 2005 to 19th June 2005 and on several other occasions when we met in Paris. I also placed ICS on formal notice of their breach in writing on two occasions, as per the terms of the Contract, hoping that they would thereby rectify the breach in accordance with the terms of the said Contract;

47. They have not rectified and they have not provided STC with the import and export program for 2006 (whether definite or tentative) by end November 2005, as provided by term no. 8 of the Contract;

## THE NATURE OF THE CONTRACT

48. The Contract was never meant to be a "broking" contract as is presently being conveniently alleged by ICS and their New York counsel. How could this be in circumstances in which STC was intended to charter in vessels in its own name and sublet them to ICS on a back-to-back basis, save for the freight differential and address commission (see term no.6)?;

49. The Contract was in essence a long term COA, with a few additional bolt on provisions contemplating the additional co-operation as outlined above. The reason why it is not drafted in a traditional Charter Party/COA format and does not contain firm rate agreements is due to the nature of the business contemplated and the intended long duration. To be more specific, for every cargo carried, different C/P terms would be required to be used e.g. the carriage of Urea does not involve the same risks as per the carriage of Sulphur, the loading terms in Juball are not the same per the loading terms in Kherson and in Dakar, etc... Also, nobody could know the origins and destinations of future

cargoes or their appropriate freight rates, and loading/discharging terms. What is more, nobody could give rates which would be valid for the next 50 years on the basis of the rolling term of the Contract. Did the Contract require STC to provide ships to ICS for the carriage of ICS' various cargoes, such ships to be chartered by STC, in the manner of a COA? Of course it did;

50. It was for that reason that it was agreed that STC would earn it's <u>address</u> commission and <u>not</u> brokerage commission, which is something totally different – see most of the printed forms of C/Ps, e.g. NYPE 93 (a Draft Copy of which is attached to this Declaration) which make a clear distinction between brokerage commission and address commission) plus a minimum of USD 1.00 per MT, with the exact figure to be determined by the parties on a voyage by voyage basis. STC would be obliged to declare to ICS the freight obtained by the third parties and then ICS and STC would agree on whether the freight differential for STC would be the minimum as per Contract of USD 1.00/MT or if ICS could afford a further profit for STC, having evaluated the overall performance of STC;

51. Pursuant to term no. 7 of the Contract "*ICS undertakes and agrees on receipt of STC's demand in writing to immediately pay to STC freight, deadfreight, demurrage, detention and any other sums that may from time to time become due in accordance with Charter Party terms and conditions, thus enabling STC to perform its obligations vis-à-vis the various third parties*". A broking contract is a contract in which the broker is bringing together two parties which are conducting business between themselves with any payments being effected directly between the parties and the broker earning a brokerage commission (usually of 1.25% of the gross freight, deadfreight and demurrage) in that respect. The broker is never receiving "*freight, deadfreight, demurrage, detention and any other sums in its own name that may from time to time become due in accordance with Charter Party terms*" and a broker does not have any obligations towards any third parties whatsoever;

52. In light of my comments above, I do not understand the basis on which ICS' New York counsel allege that the Contract is a brokerage contract, although I fully understand the reason why they try so hard to argue that it is;

53. ICS' counsel appear to base their argument that the Contract was a brokerage contract on the fact that pursuant to term 13 of the Contract STC undertakes to organise the quality and quantity/weight inspection of all cargoes imported to and exported from Senegal for the account of ICS. They argue that such a service is not a necessary service for the purposes of a maritime contract. This is a desperate argument and is clearly incorrect. Inspection, whether preshipment or conducted during loading, is indeed a necessary service in maritime contracts for the reasons of assessing whether the cargo to be shipped is fit for transport [to avoid liability deriving from inherent vice of cargo (see STC's attached presentation to ICS dated February 15th 2005) and in the case of bagged/packaged cargo to avoid the loading of damaged bags/packages] and to establish the quantity/weight to avoid claims of short shipment. It is not stated in the Contract (as is alleged) that the inspections were to be conducted before carriage. Any P&I Club will support this assertion, as all P&I Clubs have correspondent surveying companies in virtually every port of the world for the purposes of conducting such surveys and always encourage their members to appoint a survey company to conduct the said surveys. In any event, such a provision in the Contract would certainly not preclude the existence of a maritime contract;

54. A further argument raised by ICS' counsel in support of their contention that the Contract is not a maritime contract is the fact that term no.14 provides that STC undertakes to arrange the training of an officer of ICS in the offices of Messrs.

NY10439754.2                                  7

Marachart Shipping Co Ltd in Greece. The reason for this training was because ICS has no expertise in shipping and an officer needed to be trained in shipping matters, e.g. Laytime Calculations, checking of Masters' reports and vessels' positions, checking Agents' conduct etc... All these are very relevant to the vessels' operations and as such maritime related services. It is a fact that this service was also necessary for the good execution of the Contract so that ICS would have the comfort that at least one of its officers could control if STC was performing its obligations properly;

### DECLARATION OF MR MAMADOU DIOP

55. It is obviously not for me to comment on the question of United States law as to whether ICS is owned by Senegal or by other foreign sovereigns. What I can say is that this company has never acted as a state owned company throughout my dealings with it. Had it done so then one would have expected the requirement for shipping services (as contemplated within the Contract) to go out to public tender. Quite the opposite was true as the Contract was negotiated and approved in a manner which was customary for a privately owned company. Furthermore, and I think very significantly, in the context of a recent application made by STC in Senegal to arrest a cargo of Sulphur, STC was informed by its London counsel that the latter's Senegalese correspondent lawyer, Maitre Fall, has confirmed that the Senegalese Government was itself looking to arrest assets of ICS for a claim of approximately EURO 50,000. Had ICS been a state owned company, then it would not have needed to take this action which would have been ridiculous (effectively arresting itself!).

### DECLARATION OF MR OUSMANE N'DIAYE

56. I have already stated that I find Mr N'Diaye's evidence appalling and I stand by that observation.

57. Mr N'Diaye would have the Court believe that ICS' present problems and difficulties can be solely attributed to STC's claim and the present attachment. What he unbelievably fails to mention is the fact that ICS is in breach of a whole host of other international agreements and protocols and has been effectively brought to its knees and is facing bankruptcy as a result. His self-serving submissions in paragraphs 12 and 13 of his Declaration conveniently fail to mention the fact that ICS is presently being sued by Total Fina Elf Dakar for the sum of EURO 16 million, by Caterpillar for the sum of USD 2 million (which has now stopped supplying ICS) and by Offnor Shipping and Trading Ltd (the company represented by Mr Godart and with which ICS signed a separate tolling contract on 27th May 2005) for approximately USD 70 million. Furthermore, SENELEC (the National Senegalese Electricity Company) has placed ICS on notice of its claims and all of ICS's international banks have frozen their credit lines. I either know about these breaches and corresponding proceedings from my dealings with ICS, or have been informed about them by Mr Godart during previous discussions. In any event, they are a matter of public record. With regard to the proceedings commenced by Offnor, I have requested from Mr Godart and he has provided a copy (attached to this Declaration) of that company's pleadings before the Commercial Court in France and which sets out in detail ICS' present difficulties and its various breaches of various agreements. The Court is invited to consider these pleadings in detail which are extremely informative and illustrative of ICS' bad faith in its dealings with its contractual counterparts. This is not a problem which is limited to STC as Mr N'Diaye would have the Court conveniently believe. The fact that he has not made mention of this situation is misleading in the extreme.

Far from ICS being the "good boy" and STC the "bad boy" - which is the picture conveniently drawn by ICS - the position is quite the reverse.

58. The attachment order obtained in France and referred to in paragraph 16 of Mr N'Diaye's Declaration was obtained by STC's French Counsel. At the time, STC's London co-ordinating counsel could not be certain that any funds had been attached in New York owing to Societe Generale's refusal to confirm one way or another (presumably on the instructions of ICS). In any event, the French Court did not consider the merits of STC's claim and limit the security granted based on such consideration as Mr N'Diaye would have the Court believe. I refer to the Declaration of Mr Henri De Richemont, STC's French counsel, for a further explanation of the attachment order obtained in France.

59. Paragraph 19 of Mr N'Diaye's Declaration is cynical. STC's present attachment is completely irrelevant to the continued financial survival of ICS as a going concern, which will be decided by its banks and shareholders.

## CONCLUSION

60. Contrary to what ICS and its New York counsel would have the Court believe, STC has a very legitimate claim against ICS as a result of that company's breach of the Contract and separate COA agreement. STC afforded ICS every opportunity to rectify the breach, which it failed to do. STC then demanded security for its claim, as it was legally entitled to do, and ICS again ignored such request. Far from the fantasy *litigation juggernaut* described by ICS' counsel, STC is simply legitimately trying to recover damages and secure its position against a company which is in serious financial trouble with its banks and creditors.

I declare under penalty of perjury under the Laws of the United States of America that the foregoing is true and correct.

_____
Anastasios G. Raissis

Executed this .....3rd..... day of January 2006 in Athens, Greece.

Ex B

# INDUSTRIES CHIMIQUES DU SENEGAL

# CARGO MOVEMENT ANALYSIS

15th February 2005

Anastasios G. Raissis
Marachart Shipping Co Ltd

### *WHY BUY FOB AND SELL CFR?*

- When arranging purchases to be on a FOB basis, ICS can control the shipping part and ensure that it is never left without goods for its factory.

- When arranging sales on CFR basis, ICS can control the shipping of its goods and ensure that they are shipped in time and are not remaining in their storage for a long period of time.

- The volumes of import of Sulphur of ICS are large and as such, ICS can achieve better freight rates, as well as, service, by combining its imports under one chartering umbrella.

- The volumes of export of Phosphoric Acid of ICS are large and as such, ICS can achieve better freight rates, as well as, service by combining its exports under one chartering umbrella.

- ICS, through its chartering arm, can become a major player in the freight market of Sulphur and Phosphoric Acid by taking over the shipping of their imported and exported goods.

- ICS, can have better planning of their production, stocks and exports by controlling its own shipping.

- ICS can make economize on the freight by controlling their own shipping by good "freight management", a "weapon" of which would be the large quantities moved – "economy of scale".

2

A 81

### *RISKS INVOLVED IN SHIPPING & WAYS TO BE COVERED*

> Freight market may fluctuate a lot and freight rates may increase well above the planned/calculated freight rates on concluding a sale or purchase.

The way to be covered against this risk for the imported cargoes is to spread the risk in a way of booking Contracts of Affreightment (COA) in a bullish market for the majority of the shipments, thus economizing in scale, but keeping part of the imports for the spot market.

To our understanding, the Sulphur import program of ICS is as follows:

- About 150,000 MT ex Jubail (ARAMCO);

- About 100,000 MT ex Ruwais (TRANSFERT/ADNOC);

- About 100,000 MT ex various origins (Continent, St. Croix, Canada…);

- About 300,000 MT ex Russia (FEDCOM).

For the ARAMCO program a COA has been entered into at very favourable freight rate considering the current market situation. The first vessel namely "HALIS KALKAVAN" has already completed loading of the first cargo.

ICS should establish through STC a "freight management".

> Charterers' risk / exposure.

It is true that when taking over the chartering for such a big import/export program there are certain risks involved.

- Damage to vessel caused by the inherent properties (vice) of cargo;

- Damage to vessel caused by stevedores' negligence or mishandling of loading and/or discharging equipment;

3

- Charter Party disputes arising and involving huge Lawyers' fees to defend.

All of the above risks are covered by Charterers' P&I Clubs (Charterers' Liability Insurance).

STC has a cover with the Raets Club and is now in the process of achieving a second cover with one of the biggest P&I Clubs worldwide.

STC has a cover both for Charterers' risks of damages to Hull, as well as, F D & D, to cover the legal costs.

Most of the risks, e.g. stevedore damage, will be covered most of the times by Charter Party clauses.

### *WHY SHOULD ICS NOT APPEAR AS CHARTERERS*

- Why should not ICS appear as Charterers in the market, but STC?

    ICS has a lot of property in Senegal and it thus gives the various shipowners the chance to seek for security in the event of a dispute, by arresting its assets. This may create a huge problem to ICS.

    It is a mistake to expose ICS in any such eventual problem.

- STC is managed by Marachart Shipping Co Ltd, a company member of the Raissis Group which was established in 1927. Marachart being ship-managers themselves have a broad experience and knowledge of the market to cover most risks and provide professional advice. Marachart has the qualified personnel to attend most of the problems that may arise. The professional personnel of Marachart consists of:

    o  1 port Captain specializing in dry cargo ships;

    o  1 port Captain specializing in tankers being also the Q&S Manager, DPA and CSO of the company;

    o  1 Engineer Technical Manager;

    o  2 Superintendent Engineers.

    o  3 Accountants.

    The Managing director of Marachart (Anastasios G Raissis) specialises in chartering, insurance and claims handling.

    The "back-office" is manned by:

    o  1 supply manager;

    o  1 crew manager and quality assistant;

    o  1 secretary.

5

A 84

Marachart employs also 1 broker dealing with smaller grain and vegetable oil shipments.

Marachart is ISM and ISPS compliant and certified.

Marachart is currently managing 2 dry cargo ships and is under negotiations to signing an order for 2 newbuilding product tankers of 12,000 MT each with a Chinese yard for delivery August and December 2006 respectively.

The expertise of Marachart is the biggest asset of STC and can only prove an asset to ICS.

### *HOW SHOULD THE BUSINESS BE STRUCTURED?*

In order to achieve better results, the business should be structured on a "program" basis. ICS should provide STC with their program of needs for import together with their program of purchases. Upon receiving this program, STC should work on the planning of movement of the various cargoes, some on a COA basis and some on SPOT shipments, always depending on the quantities of each origin.

It would be advisable, prior to signing any FOB purchase contracts to have STC review the shipping terms, so as to ensure that those terms are both fair and feasible. For already signed contracts it is advisable to pass on to STC the shipping terms of such contracts for review and incorporation, as much as possible, in the Charter Parties from each origin.

For the exports the same process should be followed. Having said that, due to the peculiarity of the exported cargo (Phosphoric Acid) requiring IMO II tankers with Stainless Steel Tanks, and keeping in mind that the three major players in the market are Messrs. Odfjeld, Stolt Nielsen and JO Tankers, it is advisable to cover the majority of the cargoes on COA basis. However it would be always a good idea to keep a few cargoes for the SPOT market in order to try and develop more options of carriage.

For the export cargoes STC would use the expertise of Acidchem Chartering APS, Copenhagen to act as the exclusive brokers to bring in tonnage for chartering.

The main aims of this venture would be to:

> Ensure that ICS does not remain without stocks of prime material and that their stored product for export is moved quickly so as to have sufficient storage space to allow the uninterrupted production;

> Make economy on the freights paid by good "freight management" thus giving ICS further profit.

### *WHAT WOULD BE THE COST OF MANAGEMENT OF CARGO MOVEMENT BY STC TO BE FACED BY ICS?*

STC is not charging management fees for this type of business but is earning its address commission from the shipowners by way of deducting the same from the paid freight.

The only cost of ICS in this venture would be to cover the cost of STC's P&I cover, which is entered into in order to protect the interests of ICS.

This is not a big cost, but a necessary one in that scale of cargo movement, given also the nature of the cargoes moved.

8

A 87