**EXHIBIT 11**

**TO THE**

**AFFIDAVIT OF THOMAS H. BELKNAP, JR.**

de las Cláusulas 7.04 y/o 7.07 y/o 7.08 y/o 7.09, el Acreedor
Hipotecario tendrá el derecho a pagar y cancelar todas las deudas y
obligaciones y a tomar las medidas que estime necesarias para efectos
de garantizar la liberación de la Nave. ----- 8.03 Para evitar dudas,
el Acreedor Hipotecario no estará bajo ningunas circunstancias sean
cuales fueren en ninguna obligación para con el Armador o cualquier
tercera persona de pagar cualquier suma a la que se hiciera referencia
en la Cláusula 8.02 o de otro modo (incluyendo las primas o cuotas sin
cancelar) salvo que se hubiera comprometido específicamente a hacerlo
por escrito. ----- **9.  CASOS DE INCUMPLIMIENTO** ---- En caso de que uno
o más de cualquiera de los siguientes casos ocurriese, entonces el
Acreedor Hipotecario tendrá los derechos establecidos en la Cláusula 10
del presente documento: ----- 9.01 el Armador dejara de pagar en la
fecha de vencimiento de pago cualquier suma que haya quedado vencida
conforme al Contrato Financiero o conforme a los demás Documentos de
Garantía; ----- 9.02 cualquier aseveración, garantía o declaración
hecha por el Armador en el Contrato Financiero o en cualquiera de los
demás Documentos de Garantía o en cualquier certificado, declaración u
opinión entregado o presentado conforme al presente documento o
conforme a los Documentos de Garantía o en relación con el presente
documento o con los Documentos de Garantía resultara incorrecta o
inexacta al ser hecha en cualquier sentido material; ----- 9.03 un Caso
de Incumplimiento conforme a cualquiera del Contrato Financiero o los
demás Documentos de Garantía (como allí se definen) ocurriese; -----
9.04 el Armador dejara de ejecutar u observar debida y puntualmente
cualquier otro término del Contrato Financiero o esta Hipoteca (según
sea el caso) y en cualquier tal caso dicha falta, fuera capaz de ser
solucionada, continuara por catorce (14) días después que el Acreedor
Hipotecario le hubiera dado al Armador aviso de dicha falta; ----- 9.05
salvo que sean impugnados de buena fe mediante los procedimientos



REPUBLICA DE PANAMA
PAPEL NOTARIAL

REPUBLICA DE PANAMA

26 XI 07

NOTARIA NOVENA DEL CIRCUITO DE PANAMA

correspondientes, cualquier otro adeudo del Armador que exceda en total
de US$150,000 quedara vencido y fuera pagadero o, con aviso o el
transcurso del tiempo o ambos, fuera capaz de ser declarado vencido y
pagadero, antes de su vencimiento declarado por motivo de cualquier
circunstancia que le diera derecho al(a los) acreedor(es) del mismo a
declarar dicho adeudo vencido y pagadero, y dicho adeudo no fuera
pagado dentro de catorce (14) días a partir de entonces; ----- 9.06 el
Armador entrara en quiebra, liquidación o disolución voluntaria o
involuntaria, o resultara insolvente, o un administrador, curador
administrativo, curador o liquidador fuera nombrado de todos o una
parte material de su empresa o activos o se instituyeran procedimientos
por o contra ellos conforme a cualquier ley o reglamento de
reorganización, arreglo, reajuste de deudas, disolución o liquidación,
o si cualquier caso ocurriese que, conforme a la legislación
pertinente, tuviera un efecto equivalente; ----- 9.07 el Armador dejara
o amenazara con dejar de ejercer la totalidad o una parte substancial
de sus negocios; ----- 9.08 el Armador transfiriera o dispusiera de
todos o una parte substancial de sus activos, ya sea mediante una
transacción o una serie de transacciones, relacionadas o no; ----- 9.09
los Documentos del Tema o cualquiera de ellos dejaran, en su totalidad
o en parte, de ser válidos, vinculantes y exigibles; ----- 9.10 el
Armador vendiera, transfiriera, enajenara o gravara la Nave o sin el
consentimiento previo del Acreedor Hipotecario a ello o conviniera en
hacerlo; ----- 9.11 la Nave se convirtiera en una Pérdida Total y el
Armador dejara de efectuar el pago requerido conforme a la Cláusula
10.01(b) del Contrato Financiero respecto a dicha Pérdida Total dentro
del tiempo que figura allí expuesto; ----- 9.12 cualquier
consentimiento, licencia o autoridad gubernamental o de otra índole
requerido para hacer que esta Hipoteca, el Contrato Financiero y/o
cualquiera de los demás Documentos de Garantía sea legal, válido,

vinculante, exigible y admisible en evidencia o requerido para permitirle al Armador desempeñar sus deberes y cancelar sus obligaciones conforme a éste o aquéllos fuera retirado o dejara de estar en pleno vigor y efecto, salvo que el Armador consiguiera que dicho consentimiento, licencia o autoridad fuera restablecido o expedido nuevamente a satisfacción del Acreedor Hipotecario, dentro de quince (15) días después de dicho retiro o cesación; ----- 9.13 cualquier embargo o ejecución fuera presentado o exigido contra una parte material (a criterio del Acreedor Hipotecario) de la propiedad y los activos del Armador y dicho embargo o ejecución no fuera retirado o levantado dentro de diez (10) Días Bancarios; ----- 9.14 el Armador parara el pago de, o fuera incapaz, o admitiera su incapacidad de pagar sus deudas a medida que se vencen, o celebrara cualquier acomodamiento u otro arreglo con sus acreedores en general o declarara una moratoria general sobre el pago del adeudo; ----- 9.15 el cumplimiento por el Armador con uno o más de cualquiera de las obligaciones, convenios y compromisos, contenidos en uno o más de cualquiera de esta Hipoteca, el Contrato Financiero, los demás Documentos de Garantía pertinentes y cualesquiera otros documentos otorgados de conformidad con éste o aquéllos o el ejercicio de cualquiera de los derechos investidos en el Acreedor Hipotecario conforme a éste o aquéllos resultara ya bien ilegal conforme a cualquier ley aplicable o no autorizado por cualquier autoridad que tenga jurisdicción o fuera de otro modo imposible; ----- 9.16 un cambio material adverso ocurriese en la condición financiera u operación del Armador; ----- 9.17 si el Armador repudiara o evidenciara una intención de repudiar uno o más de cualquiera de los Documentos del Tema o si cualquier Documento del Tema fuera reformado, variado, cancelado o terminado sin el consentimiento escrito previo del Acreedor Hipotecario; ----- 9.18 cualquiera de los casos anteriores ocurriese, *mutatis mutandis*, en relación con los otros Prestatarios, las demás



### NOTARÍA NOVENA DEL CIRCUITO DE PANAMA

Partes de la Garantía o cualquier miembro del Grupo o las Otras Naves o cualquiera de ellos. ----- **10. PODER PARA VENDER ETC.** ---- Al ocurrir cualquier Caso de Incumplimiento, el Acreedor Hipotecario tendrá el derecho y poder para: ----- 10.01 ejercer todos los derechos y recursos en juicio hipotecario y de otro modo conferidos al Acreedor Hipotecario por disposición legal o por ley; ----- 10.02 tomar posesión de la Nave y ejercer todos los derechos y poderes de un acreedor hipotecario; --- -- 10.03 instituir procedimientos legales para recobrar sentencia contra el Armador sobre el Adeudo; ----- 10.04 ordenar que la Nave proceda de inmediato, a riesgo y gasto del Armador, a un puerto o lugar designado por el Acreedor Hipotecario; el Armador impartirá las instrucciones necesarias al Capitán de la Nave para cumplir con cualquier tal orden del Acreedor Hipotecario y si el Armador dejara de impartir dichas instrucciones por cualquier motivo sea cual fuere, el Acreedor Hipotecario tendrá el derecho y el poder para impartir dichas instrucciones directamente al Capitán; ----- 10.05 vender la Nave o cualesquiera acciones o intereses en la misma en cualquier parte del mundo con o sin aviso al Armador, pero sujeto a que el Acreedor Hipotecario le dé por lo menos veinte (20) días calendarios de preaviso de que se propone vender la Nave por contrato privado (cuyo aviso será dado al Armador y a cada acreedor hipotecario de la Nave, cuya hipoteca será registrada en el Registro Público en Panamá) y de otro modo de acuerdo con el Artículo 1527 del Código de Comercio de la República de Panamá (ya fuera como acreedor hipotecario, apoderado especial del Armador o de otro modo) ya bien en remate público o por contrato privado en efectivo o en términos de pago diferido con el poder al Acreedor Hipotecario para adoptar cualesquiera tales estipulaciones especiales o de otra índole que estimaran apropiadas y/o posponer la venta sin resultar responsable de cualquier pérdida ocasionada en tal forma. En el caso de una venta por contrato privado, el Acreedor

Hipotecario tendrá el cuidado razonable por obtener un precio justo para la Nave. Una vez realizada cualquier venta de la Nave o cualquiera acción en la misma por el Acreedor Hipotecario conforme a la Cláusula 10.05, el comprador no estará obligado a indagar o inquirir si el poder para vender del Acreedor Hipotecario ha surgido en la forma aquí estipulada y la venta será considerada como dentro del poder del Acreedor Hipotecario, y el recibo por el Acreedor Hipotecario del precio de compra cancelará en forma efectiva al comprador, quien no se ocupará de la forma de aplicación de los réditos de venta ni será en cualquier forma responsable de ello; ----- 10.06 mientras estuviera pendiente la venta de la Nave, asegurar, administrar, mantener y reparar la Nave y fletar, operar o emplear o desarmar la Nave o usar de otro modo la Nave por el tiempo y conforme a los términos que estimara ventajosos para el Acreedor Hipotecario sin resultar responsable de cualquier pérdida o daño (siempre y cuando, que dicha pérdida o daño no haya sido ocasionado por el acto o incumplimiento premeditado del Acreedor Hipotecario) a la misma y rindiendo cuentas solamente de la utilidad neta, si la hay, que surgiera de dicho uso; ----- 10.07 recobrar del Armador al requerimiento, todas las pérdidas, gastos, pagos y desembolsos incurridos por el Acreedor Hipotecario por o en relación con, o respecto a, el ejercicio por ellos de cualquiera de los poderes antedichos, junto con los intereses que devenguen a la tasa especificada en la Cláusula 4.01 desde la fecha en que dichas pérdidas, gastos, pagos o desembolsos fueran incurridos por el Acreedor Hipotecario hasta la fecha de reembolso, ya sea antes o después de sentencia; ----- 10.08 exigir que todos los Documentos de Seguros y todos los reclamos correspondientes sean entregados al Acreedor Hipotecario o al corredor o ajustador nombrado por él; ----- 10.09 defender, cancelar, transigir, liberar o arreglar todos los reclamos contra el Armador respecto a la Nave y/o los Seguros y/o las Utilidades

REPUBLICA DE PANAMA
PAPEL NOTARIAL



NOTARIA
PANAMA



28.

0000400

302133

NOTARIA NOVENA DEL CIRCUITO DE PANAMA

incluyendo (pero sin limitarlo a) aquéllos que hayan dado o pudieran

dar lugar a cualquier carga o crédito sobre la Nave o que fueran o

pudieran ser exigibles mediante procedimientos contra la Nave; -----

10.10 recobrar, instituir, proseguir, cancelar, transigir, liberar o

arreglar todos los reclamos por el Armador respecto a la Nave y/o los

Seguros y/o las Utilidades contra los Aseguradores, cualquier fletador

o cualquier otra tercera persona sea cual fuere; y ----- 10.11 pagar

todas las sumas que el Acreedor Hipotecario estimara apropiadas a fin

de mantener y exigir sus derechos y poderes conforme a los Documentos

de Garantía. ----- 11.   **RÉDITOS DE VENTA** ---- Los réditos de la venta

de la Nave, las utilidades netas de cualquier fletamento, operación u

otro uso de la Nave por el Acreedor Hipotecario conforme a cualquiera

de los derechos o poderes aquí especificados, todas las demás sumas

incluyendo los recobros de seguros respecto a una Pérdida Total

recibidos por el Acreedor Hipotecario de conformidad con o según los

términos del presente documento o en cualesquiera procedimientos

conforme al presente documento, la aplicación de los cuales no se

hubiera estipulado específicamente en alguna parte del presente

documento serán aplicados en el siguiente orden: ---- PRIMERO - al pago

de todos los daños, pérdidas, gastos, costos y desembolsos sean cuales

fueren (junto con los intereses que devenguen según lo arriba

estipulado) incurridos por el Acreedor Hipotecario por o en relación

con, o respecto a, el ejercicio por el Acreedor Hipotecario de los

poderes especificados o a los que se hiciera referencia de otro modo en

la Cláusula 10 del presente documento o cualquiera de ellos; ----

SEGUNDO - al pago al Acreedor Hipotecario del Adeudo y cualesquiera

otras sumas pagaderas por el Armador conforme a esta Hipoteca en la

forma que figura expuesta en la Cláusula 12 del Contrato Financiero; y

---- TERCERO - al pago del saldo (si lo hay) al Armador o a quien

quiera que tuviera derecho al mismo. ---- En caso de que los réditos

fueran insuficientes para pagar las sumas especificadas en los párrafos PRIMERO y SEGUNDO, el Acreedor Hipotecario tendrá derecho a cobrar y recobrar el saldo del Armador o de cualquier otra persona responsable del mismo. ----- **12. APODERADO ETC.** ----- 12.01 El Armador nombra irrevocablemente por este medio al Acreedor Hipotecario como su apoderado (con poder para nombrar subapoderados) por el Período de Garantía para los efectos de realizar a nombre suyo todos los actos que el Armador pudiera él realizar en relación con la Nave (incluyendo, pero sin limitarlo a, efectuar una venta de la Nave) siempre y cuando, sin embargo, que dicho poder no será ejercible por o en representación del Acreedor Hipotecario hasta que haya ocurrido algún Caso de Incumplimiento. ----- 12.02 El ejercicio de dicho poder por o en representación del Acreedor Hipotecario no pondrá a ninguna persona que tenga negocios con el Acreedor Hipotecario en ninguna averiguación en cuanto a si cualquier suma se adeuda conforme a los Documentos de Garantía ni dicha persona será de modo alguno afectada por aviso de que cualquier tal suma no podría resultar pagadera, y el ejercicio por el Acreedor Hipotecario de dicho poder será evidencia concluyente de su derecho a ejercer el mismo. ----- 12.03 El Acreedor Hipotecario tendrá el poder para exigir, reclamar y recibir todas las sumas adeudadas al Armador en relación con la Nave y a instituir procedimientos legales (si el Acreedor Hipotecario lo estimara conveniente) para recobrar dichas sumas, siempre y cuando, sin embargo, que dicho poder no será ejercible por o en representación del Acreedor Hipotecario hasta que haya ocurrido algún Caso de Incumplimiento. ----- 12.04 El Acreedor Hipotecario, en cualquier momento y de tiempo en tiempo, podrá delegar mediante un poder legal o en cualquier otra forma a cualquier persona o personas todos o cualquiera de los poderes, autoridades y discreciones que sean por el momento ejercibles por el Acreedor Hipotecario conforme a esta Hipoteca en relación con la Nave. Cualquier tal delegación se

REPUBLICA DE PANAMA
PAPEL NOTARIAL



NOTARIA NOVENA DEL CIRCUITO DE PANAMA

REPUBLICA DE PANAMA

NOTARIA PANAMA

28. XI .07



podrá efectuar conforme a los términos y sujeto a los reglamentos que el Acreedor Hipotecario estimara de lugar. El Acreedor Hipotecario no será de modo alguno responsable para con el Armador de cualquier pérdida o daño que surgiera de cualquier acto, incumplimiento, omisión o mala conducta por parte de cualquier tal delegado. ----- **13. CURADOR ETC.** ----- 13.01 El Acreedor Hipotecario tendrá el poder en cualquier momento después de un Caso de Incumplimiento para nombrar a un curador y administrador cuyos poderes incluirán (pero no estarán limitados a) aquéllos estipulados en el Anexo 1 de la Ley de Insolvencia de 1986 de Inglaterra. ----- 13.02 El Acreedor Hipotecario tendrá el derecho en cualquier momento y tan a menudo como lo estime apropiado, a delegar todos o cualquiera de los derechos y poderes a ellos conferidos por esta Hipoteca en los términos, en la forma y a las personas que el Acreedor Hipotecario estimara apropiados. ----- **14. Indemnización** ----- 14.01 El Armador se compromete por este medio a indemnizar al Acreedor Hipotecario contra todas las obligaciones sean cuales fueren y como quiera que surgieran que el Acreedor Hipotecario pudiera incurrir de buena fe en relación con la Nave o de otro modo en relación con la garantía creada por los Documentos de Garantía. ----- 14.02 Sin perjuicio de la generalidad de la Cláusula 14.01, el Acreedor Hipotecario tendrá el poder (pero no estará bajo ningún deber) en cualquier momento de emitir garantías respecto a cualquier obligación del Armador en relación con la Nave y el Acreedor Hipotecario tendrá el derecho a exigir el pago por el Armador de todas las sumas real o condicionalmente vencidas conforme a cualesquiera tales garantías, el monto pagadero en tal forma estará garantizado por la garantía creada por los Documentos de Garantía. ----- **15. RENUNCIA** ----- 15.01 Cualquier falta por parte del Acreedor Hipotecario de ejercer o cualquier demora en el ejercicio de cualquier derecho o poder conforme a los Documentos de Garantía no operará como una renuncia al mismo. ---

-- 15.02 La concesión de tiempo o indulgencia por el Acreedor Hipotecario o la celebración de arreglos con cualquier otra persona o compañía responsable para con el Acreedor Hipotecario conforme a cualquier acuerdo o sobre cualquier garantía o cualquier caución o instrumento negociable por el momento tenido por el Acreedor Hipotecario o a los cuales el Acreedor Hipotecario pudiera tener derecho no afectará de modo alguno los derechos del Acreedor Hipotecario contra el Armador conforme a los Documentos de Garantía. --
--- 16.  GARANTÍA ---- Queda declarado y pactado en relación con la garantía creada por esta Hipoteca: ----- 16.01 que la misma será tenida por el Acreedor Hipotecario como una garantía continua del pago del Adeudo; y ----- 16.02 que la garantía creada en tal forma no será satisfecha ni levantada por cualquier pago o cancelación intermedia de cualquier parte de la suma garantizada conforme a la misma; y ----- 16.03 que la garantía creada en tal forma será una adición a y no será de modo alguno perjudicada ni afectada por cualquier garantía colateral o de otra índole actualmente o en el futuro tenida por el Acreedor Hipotecario por todas o cualquier parte de las sumas garantizadas en tal forma; y ----- 16.04 que cada poder y derecho conferidos al Acreedor Hipotecario conforme al presente documento serán en adición a y no en limitación de cualquier y cada otro poder o derecho del Acreedor Hipotecario conforme a los Documentos de Garantía y podrán ser ejercidos de tiempo en tiempo en el orden y tan a menudo como el Acreedor Hipotecario lo estimara apropiado. ----- 17.  LIBERACIÓN DE LA GARANTÍA ----- 17.01 Esta Hipoteca continuará en pleno vigor y efecto hasta que el Adeudo haya sido amortizado o pagado en su totalidad al Acreedor Hipotecario (cuya expresión no incluirá un pago de un dividendo en una liquidación de menos del 100%); cuando el Adeudo haya sido amortizado en su totalidad en tal forma, el Acreedor Hipotecario, a costo y gasto del Armador, liberará y cancelará esta Hipoteca. -----

**REPUBLICA DE PANAMA**
**PAPEL NOTARIAL**

NOTARIA - PANAMA

28.

0400

P 302 133

**NOTARIA NOVENA DEL CIRCUITO DE PANAMA**

18. **INVALIDEZ** ----- 18.01 En caso de que cualquier término o condición de esta Hipoteca fuera considerado o declarado inválido o inoperante en su totalidad o en parte por cualquier disposición legal, regla o reglamento o cualquier decisión de cualquier corte o tribunal de jurisdicción competente, entonces dicha determinación o declaración no afectará la validez de cualquier otro término o condición de esta Hipoteca o cualquiera de los otros Documentos de Garantía, los cuales (excepto según lo antedicho) continuarán en pleno vigor y efecto y el Armador conviene (además de los deberes impuestos por la Cláusula 7.31) en otorgar el documento o los documentos adicionales que el Acreedor Hipotecario pudiera razonablemente requerir para completar la garantía constituida por esta Hipoteca. ----- 19.  **INDEMNIZACIÓN POR MONEDA – INDEMINIZACIÓN POR IMPUESTO** ----- 19.01 El Armador se compromete a indemnizar al Acreedor Hipotecario contra cualquier pérdida incurrida por él como resultado de cualquier sentencia u orden que fuera emitida o dada para el pago de cualquier suma adeudada conforme al presente documento y dicha sentencia u orden ser expresada en una moneda que no sea aquélla en la cual el pago se adeudara conforme al presente documento y como resultado de cualquier variación haber ocurrido en los tipos de cambio entre la fecha en que cualquier tal suma quedara vencida conforme al presente documento y la fecha real de pago de la misma. La indemnización anterior constituirá una obligación separada e independiente del Armador y se aplicará sin tomar en cuenta cualquier renuncia otorgada al Armador de tiempo en tiempo y continuará en pleno vigor y efecto no obstante cualquier tal sentencia u orden según lo antedicho. ----- 19.02 El Armador se compromete a indemnizar al Acreedor Hipotecario contra cualesquiera Impuestos gravados y/o pagaderos por el Acreedor Hipotecario en relación con cualquier suma ya sea respecto al principal, los intereses o de otro modo recibidos o por cobrar por el Acreedor Hipotecario conforme al presente documento.

----- **20.** **CESIÓN Y TRANSFERENCIA** ----- 20.01 En caso de que el Acreedor Hipotecario cediera o transfiriera sus derechos de conformidad con la Cláusula 34 del Contrato Financiero entonces cualquier Prestamista cesionario o beneficiario será considerado como que se ha unido como parte a esta Hipoteca y el Acreedor Hipotecario otorgará e inscribirá una cesión o una cesión parcial de esta Hipoteca a favor de dicho cesionario o beneficiario correspondiente a la porción y los intereses en la Facilidad cedida o transferida. ----- **21.** **AVISOS** ----- 21.01 Salvo según fuera de otro modo específicamente estipulado, cualquier aviso conforme o en relación con esta Hipoteca será cursado por carta o por fax; y las referencias en esta Hipoteca a avisos escritos, avisos por escrito y avisos firmados por personas particulares serán interpretadas asimismo. ----- 21.02 Un aviso será enviado: ---- (a) al Armador: - c/o MARACHART SHIPPING COMPANY LIMITED, 5, Kapodistriou Street, Metamorfossi 144 52, Attiki, Grecia; Fax No. + 30 210 2807080 ----- (b) al Acreedor Hipotecario en su sucursal de Pireo: 63, Iroon Polytechniou Avenue and Skouze str., Pireo 185 36, Grecia; Fax No: +30 210 4283058 ---- o a cualquier otra dirección que la parte pertinente le pueda notificar a la otra parte o partes. ----- 21.03 Sujeto a las Cláusulas 21.04 y 21.05: ---- 21.03.1 un aviso cuando sea entregado en persona o anunciado será considerado como notificado, y entrará en vigencia, al momento de ser entregado; ---- 21.03.2 un aviso que sea enviado por fax será considerado como notificado, y entrará en vigencia, 2 horas después de terminada su transmisión. ----- 21.04 Sin embargo, si conforme a la Cláusula 21.03 un aviso fuera considerado como notificado: ---- 21.04.1 en un día que no sea un Día Bancario en el lugar de recibo; o ---- 21.04.2 en dicho Día Bancario, pero después de las 5 p.m., hora local; ---- el aviso (sujeto a la Cláusula 21.05) será considerado como notificado, y entrará en vigencia, a las 9 a.m. el día próximo que sí sea un Día Bancario. ----- 21.05 Las Cláusulas 21.03 y




**REPUBLICA DE PANAMÁ**
**PAPEL NOTARIAL**

NOTARIA PANAMÁ

**NOTARIA NOVENA DEL CIRCUITO DE PANAMA**

21.04 no se aplican si el destinatario de un aviso le notificara al remitente dentro de una hora después de la fecha en la cual el aviso fuera de otro modo considerado como notificado que el aviso ha sido recibido en forma, que sea ilegible en un sentido material. ----- 21.06 Un aviso conforme o en relación con esta Hipoteca no será inválido debido a que la forma en que el mismo fue notificado no cumple con los requisitos de esta Hipoteca conforme al cual sea notificado si la falta de notificar el mismo de acuerdo con los requisitos de esta Hipoteca u otro Documento de Garantía, según sea el caso, no ha hecho que cualquier parte sufra cualquier pérdida o perjuicio importante. ----- 21.07 Cualquier aviso conforme o en    relación con esta Hipoteca será en inglés. ----- 21.08 En esta Cláusula "aviso" incluye cualquier demanda, consentimiento, autorización, aprobación, instrucción, renuncia u otra comunicación. ----- **22.    LEY Y JURISDICCIÓN CORRESPONDIENTES** ----- 22.01 Esta Hipoteca se regirá y será interpretada de acuerdo con las leyes de la República de Panamá. ----- 22.02 Cualquier acción o procedimientos legales que surgieran de o en relación con esta Hipoteca serán instituidos en el Tribunal Superior de Justicia en Londres, Inglaterra. El Armador por este medio acepta por sí mismo y respecto a sus activos e ingresos general e incondicionalmente, la jurisdicción del tribunal antedicho y nombra irrevocablemente por este medio a los Sres. Reed Smith Richards Butler LLP, actualmente en Beaufort House, 15 Botolph Street, Londres, EC3A 7EE, Inglaterra, como su agente para notificación del proceso respecto a los procedimientos ante dicho tribunal y conviene en que a todo lo largo del Período de Garantía mantendrá un agente en Inglaterra para tal efecto. El sometimiento a dicha jurisdicción no limitará (ni será interpretado como que limita) el derecho del Acreedor Hipotecario a instituir cualquier acción o procedimientos    legales    respecto    a    esta    Hipoteca    en    cualquier jurisdicción competente. El Armador renuncia irrevocablemente por este

medio a cualquier objeción que pudiera tener actualmente o en el futuro
a la selección de jurisdicción para cualquier tal acción o
procedimientos y cualquier reclamo que pudiera tener de que dicha
acción o procedimientos han sido instituidos en un foro no conveniente.
Nada de lo aquí contenido afectará el derecho del Acreedor Hipotecario
a notificar el proceso en cualquier otra forma permitida por ley. -----
22.03 Cualquier acción o procedimiento legal que surgiera de o en
relación con esta Hipoteca será interpuesto, en el caso de los
procedimientos panameños, en las oficinas forenses de CHEN ESTRADA Y
WONG, Edificio P. H. Bonanza Plaza, oficina 3-B, Calle 41 Bella Vista
entre Calle Justo Arosemena y Cuba, Ciudad de Panamá, República de
Panamá. ----- 22.04 En la medida que el Armador pudiera en cualquier
jurisdicción reclamar para sí mismo o para sus activos o ser concedidos
inmunidad contra litigio, ejecución, embargo u otro proceso legal, el
Armador renuncia irrevocablemente por este medio a dicha inmunidad en
la medida plena que sea permitido por las leyes de dicha jurisdicción.
----- **23. PODER LEGAL** ----- 23.01 El Armador y el Acreedor Hipotecario
le confiere por este medio, un Poder Legal a la firma de abogados
denominada MORGAN Y MORGAN, Calle 53, Urbanización Obarrio, Torre Swiss
Bank, piso 16, Panamá 1, República de Panamá, con pleno poder para
actuar individualmente facultando a dicha firma y a cualquier miembro
de dicha firma conjuntamente y a cada uno de ellos por separado para
tomar toda medida necesaria para protocolizar esta Primera Hipoteca
Naval Preferida e inscribir la misma en los registros apropiados de la
Ciudad de Panamá, y además para tomar toda dicha medida que fuera de
tiempo en tiempo necesaria para inscribir en los registros apropiados
de la Ciudad de Panamá, cualquier incremento en los importes adeudados
conforme al Contrato Financiero, el Contrato de Garantía y esta
Hipoteca, y para inscribir en dichos registros cualquier demanda
presentada contra el Armador, por el Acreedor Hipotecario de

**REPUBLICA DE PANAMA**
**PAPEL NOTARIAL**

NOTARIA
PANAMA

26.VI.07

**NOTARIA NOVENA DEL CIRCUITO DE PANAMA**

conformidad con los Documentos de Garantía, el importe respecto al cual dicha demanda fuera presentada se hará constar por medio de notas marginales a esta Hipoteca en dichos registros. Dicha firma y cualquier miembro de la misma son por este medio facultados y cada uno de ellos es facultado para otorgar e inscribir dichas notas marginales por los importes de tiempo en tiempo estipulados por el Acreedor Hipotecario. ----- **24.** **CONFLICTO DE IDIOMA** ----- 24.01 En caso de cualquier conflicto entre el texto en inglés de esta Hipoteca otorgado por el Acreedor Hipotecario y el Armador y la traducción al español registrada en la Ciudad de Panamá, el texto en inglés prevalecerá. ----- **25.** **DATOS DE INSCRIPCIÓN** ----- 25.01 La garantía de esta Hipoteca será considerada como extendida a Siete millones de Dólares (US$7,000,000) más intereses, comisiones, costos y gastos y el cumplimiento de los convenios hipotecarios. ----- 25.02 Sujeto a los términos y condiciones del presente documento, la fecha de vencimiento de esta Hipoteca es al requerimiento. ----- **26.** **ACEPTACIÓN** ----- 26.01 El Acreedor Hipotecario asevera y declara que acepta esta Hipoteca sobre la Nave descrita en el Anexo como parte de la garantía de los dineros que aquí se indica que quedarán garantizados por este medio y de las obligaciones del Armador a las que aquí se hace referencia.------------ EN TESTIMONIO de lo cual, esta Hipoteca ha sido debidamente otorgada como una escritura en el día y año que aparecen escritos al principio.- (Fdo.) **DIMITRIOS SIOUFAS** --- OTORGADO y **ENTREGADO** como una **ESCRITURA** por **DIMITRIOS SIOUFAS**, por y en representación de **AMBIENT SHIPHOLDING CO.**, en presencia de:-------------------------------------------------- (Fdo.) **DIMITRIS GIALOURIS** - (Fdo.) **KATERINA ELEFTHERIOU** --- OTORGADO y **ENTREGADO** como una **ESCRITURA** por **DIMITRIS GIALOURIS** y por **KATERINA ELEFTHERIOU**, por y en representación de **LAIKI BANK (HELLAS) S.A.**, en presencia de:-------------------------------------------------------- --------------------------------------------------------------------

**CONSULADO GENERAL DE PANAMÁ** – EN PIREO, GRECIA --- **NOTARIZACIÓN** --- La suscrita, **ALEXANDRA DE VALETOPULOS**, Encargada de Asuntos Consulares en el Consulado General de la República de Panamá en Pireo, Grecia, en calidad de Notario Público **CERTIFICA:** --- Que, la firma que aparece en el documento adjunto que dice **DIMITRIOS SIOUFAS** es auténtica y corresponde a la que acostumbra usar en los documentos que autoriza en calidad de **APODERADO ESPECIAL** de **AMBIENT SHIPHOLDING CO.**, de acuerdo con pruebas suficientes.----------------------------------------------
Dado en la ciudad de Pireo, Grecia, el día **22** del mes de **FEBRERO** de **2007**.---------------------------------------------------------------
(Fdo.) **ALEXANDRA DE VALETOPULOS**, Encargada de Asuntos Consulares, Consulado de Panamá en Pireo, Grecia. *Lleva el sello del Consulado General de Panamá - Pireo, Grecia).* ---- SELLO-----------------------

----------------------------------------------------------------------

**CONSULADO GENERAL DE PANAMÁ** - EN PIREO, GRECIA --- **NOTARIZACIÓN** --- La suscrita, **ALEXANDRA DE VALETOPULOS**, Encargada de Asuntos Consulares en el Consulado General de la República de Panamá en Pireo, Grecia, en calidad de Notario Público **CERTIFICA:** --- Que, la firma que aparece en el documento adjunto que dice **KATERINA ELEFTHERIOU** es auténtica y corresponde a la que acostumbra usar en los documentos que autoriza en calidad de **APODERADA ESPECIAL** de **LAIKI BANK (HELLAS) S.A.**, de acuerdo con pruebas suficientes.----------------------------------------------
Dado en la ciudad de Pireo, Grecia, el día **22** del mes de **FEBRERO** de **2007**.---------------------------------------------------------------
(Fdo.) **ALEXANDRA DE VALETOPULOS**, Encargada de Asuntos Consulares, Consulado de Panamá en Pireo, Grecia. *Lleva el sello del Consulado General de Panamá - Pireo, Grecia).* ---- SELLO-----------------------

----------------------------------------------------------------------

**CONSULADO GENERAL DE PANAMÁ** – EN PIREO, GRECIA --- **NOTARIZACIÓN** --- La suscrita, **ALEXANDRA DE VALETOPULOS**, Encargada de Asuntos Consulares en

**REPUBLICA DE PANAMA**
**PAPEL NOTARIAL**



NOTARIA
PANAMA



REPUBLI... PANAMA
28.VI.07

NOVENA 02 133

### NOTARIA NOVENA DEL CIRCUITO DE PANAMA

el Consulado General de la República de Panamá en Pireo, Grecia, en calidad de Notario Público CERTIFICA: --- Que, la firma que aparece en el documento adjunto que dice DIMITRIS GIALOURIS es auténtica y corresponde a la que acostumbra usar en los documentos que autoriza en calidad de **APODERADO ESPECIAL** de **LAIKI BANK (HELLAS) S.A.**, de acuerdo con pruebas suficientes.-------------------------------------------------

Dado en la ciudad de Pireo, Grecia, el día **22** del mes de **FEBRERO** de **2007**.-------------------------------------------------------------------

(Fdo.) **ALEXANDRA DE VALETOPULOS**, Encargada de Asuntos Consulares, Consulado de Panamá en Pireo, Grecia. *Lleva el sello del Consulado General de Panamá - Pireo, Grecia*). ---- SELLO ------------------------

--------------------------------------------------------------------------

**ANEXO A** ----------------------------------------------------------------

1.   La Nave a la que se hace referencia en esta Hipoteca es la M.N. "PIONEER TRADER", cuyas generales son como sigue: --- Puerto de Registro: Panamá --- Número de Registro: 35429-PRXT --- Número de IMO: 7609661 --- Tonelaje Bruto: 10,320 --- Tonelaje Neto: 6,110 --- Eslora: 137.01 metros --- Manga: 21.01 metros --- Puntal: 13.01 metros --- Tipo y número de motores: 1 DIESEL PIELSTICK --- BHP del Motor: 12PC2-2V --- Señales Internacionales de Llamada: 3 EJK 8 --- Clasificación: Lloyd's Register of Shipping -------------------------------------------------

2.   El tipo de nave al que se hace referencia en la Cláusula 1 de esta Hipoteca es: Nave de Carga----------------------------------------------

3.   El Administrador al que se hace referencia en la Cláusula 1.01 de esta Hipoteca es MARACHART SHIPPING COMPANY LIMITED de Chipre y con una oficina en 24 Helmou Street, 145 62 Agios Stefanos, Attiki, Grecia, o cualquier otra compañía aprobada por el Acreedor Hipotecario.----------

--------------------------------------------------------------------------

**ANEXO B** ---- Detalles Principales de la Hipoteca----------------------

1. Nombre de la Nave: PIONEER TRADER ----- 2. Deudor Hipotecario:

**AMBIENT SHIPHOLDING CO.**, una compañía constituida y existente con arreglo a las leyes de la República de las Islas de Marshall, con su oficina registrada en Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Islas de Marshall MH96960; ----- 3. Acreedor Hipotecario: **LAIKI BANK (HELLAS) S.A.**, una compañía debidamente constituida con arreglo a las leyes de la República de Grecia, con su oficina registrada en 16, Panepistimiou Street, Atenas, Grecia y actuando a través de su oficina en 63, Iroon Polytechniou Avenue and Skouze Street, 185 36 Pireo ----- 4. Monto Hipotecario: US$ 7,000,000 más intereses, costos y gastos y la ejecución de los convenios hipotecarios; ----- 5. Tasa de Interés Normal: Dos punto cincuenta por ciento (2.50%) sobre el LIBOR (ver Cláusula 7 del Contrato Financiero y Cláusula 4.01.05 de la Hipoteca); ----- 6. Tasa de Interés por Mora: Cuatro punto cincuenta por ciento (4.50%) sobre el LIBOR (ver Cláusula 14.04 del Contrato Financiero y Cláusulas 4.01.07 y 4.01.08 de la Hipoteca); ----- 7. Fecha de Vencimiento: Al requerimiento; ----- 8. Moneda de Pagos: Todos los pagos serán efectuados en Dólares de Estados Unidos.------------------------------------------------------------------

------------------------------------------------------------------

**ANEXO C ---- Contrato Financiero** ------------------------------------- Fechado 17 de enero de 2007 ----- LAIKI BANK (HELLAS) S.A. **como Prestamista** --- y --- TOUGH TRADER MARITIME PTE LTD. - y - SWORD TRADING S.A. - y - AMBIENT SHIPHOLDING CO. **como Prestatarios conjuntos y separados** ----- **CONTRATO FINANCIERO** ----- Facilidad de Crédito Rotativo Disminuyente hasta por $7,000,000 - m/n.s TOUGH TRADER, GRAIN TRADER y PIONEER (a ser rebautizada PIONEER TRADER) ----- V & P Law Firm --------

----------------------------- **ÍNDICE** -------------------------------

1.  PROPÓSITO  -------------------------------------------------- 1

2.  DEFINICIONES  ----------------------------------------------- 1

3.  LA FACILIDAD  ---------------------------------------------- 14





**REPUBLICA DE PANAMA**
**PAPEL NOTARIAL**

NOTARIA NOVENA DEL CIRCUITO DE PANAMA

4. DISPONIBILIDAD ------------------------------------------------- 14

5. AVISO DE RETIRO DE FONDOS -------------------------------------- 14

6. PERÍODOS DE INTERESES ------------------------------------------ 16

7. INTERESES ----------------------------------------------------- 16

8. OBLIGACIÓN CONJUNTA Y SEPARADA DE LOS PRESTATARIOS -------------- 17

9. BASE SUSTITUTA ------------------------------------------------- 17

10. PAGO ADELANTADO ----------------------------------------------- 18

11. AMORTIZACIÓN -------------------------------------------------- 20

12. APLICACIÓN ---------------------------------------------------- 21

13. EVIDENCIA DE ADEUDO ------------------------------------------- 22

14. PAGOS -------------------------------------------------------- 22

15. CAMBIO EN LAS CIRCUNSTANCIAS ---------------------------------- 24

17. GARANTÍAS ----------------------------------------------------- 31

18. CONDICIONES PRECEDENTES ---------------------------------------- 31

19. COMPROMISOS FINANCIEROS Y GENERALES --------------------------- 36

20. COMPROMISOS DE SEGUROS ----------------------------------------- 39

21. COMPROMISOS OPERATIVOS ----------------------------------------- 42

22. MARGEN DE GARANTÍA --------------------------------------------- 47

23. CASOS DE INCUMPLIMIENTO ---------------------------------------- 47

24. COMPENSACIÓN -------------------------------------------------- 50

25. COMISIONES ---------------------------------------------------- 51

26. CUENTA DE UTILIDADES ------------------------------------------ 51

27. GASTOS -------------------------------------------------------- 51

28. INDEMNIZACIÓN ------------------------------------------------- 52

29. INDEMNIZACIÓN AMBIENTAL ---------------------------------------- 52

30. TIMBRES FISCALES ---------------------------------------------- 52

31. DETERMINACIONES ----------------------------------------------- 52

32. NO RENUNCIA --------------------------------------------------- 52

33. INVALIDEZ PARCIAL --------------------------------------------- 53

34. TRANSFERENCIA y CESIÓN ---------------------------------------- 53

35. NO-INMUNIDAD -------------------------------------------------- 54

36. AVISOS ------------------------------------------------------- 54

37. SUPLEMENTARIO -------------------------------------------------- 55

38. LEY Y JURISDICCIÓN ---------------------------------------------- 56

39. ESTE CONTRATO Y LOS OTROS DOCUMENTOS DE GARANTÍA ---------------- 57

ANEXOS ------------------------------------------------------------

1    AVISO DE RETIRO DE FONDOS ------------------------------------

2    RECONOCIMIENTO ----------------------------------------------

ESTE CONTRATO se suscribe el día 17 de enero de 2007 ---- ENTRE ---- 1) **LAIKI BANK (HELLAS) S.A.** como Prestamista; y --- 2) **TOUGH TRADER MARITIME PTE. LTD.**; y **SWORD TRADING S.A.**; y **AMBIENT SHIPHOLDING CO.**, como Prestatarios conjuntos y separados. ----- 1. **PROPÓSITO** ---- Este Contrato establece los términos y condiciones conforme a los cuales el Prestamista ha convenido en suministrarle a los Prestatarios una facilidad de crédito rotativa disminuyente, que no excederá en cualquier momento de Siete millones de Dólares de Estados Unidos (US$ 7,000,000) mediante múltiples adelantos para: (i) refinanciar determinado adeudo existente a EFG Eurobank Ergasias S.A., actualmente garantizado por las Naves Existentes y (ii) financiar parte del costo de adquisición de la Nave C y (iii) suministrarle a los Prestatarios el capital de trabajo e inversión, siempre y cuando, sin embargo, que sujeto a los términos de este Contrato en la medida en que los Prestatarios paguen por adelantado cualesquiera sumas inicialmente tomadas en préstamo respecto a la facilidad de crédito rotativa anterior, tendrán derecho a tomar en préstamo nuevamente las sumas pagadas por adelantado para efectos de capital de trabajo e inversión hasta por el Límite Aplicable de tiempo en tiempo. ----- 2. **DEFINICIONES** ----- 2.01 En este Contrato, los siguientes términos tendrán los siguientes significados: ---- **"Adelanto de Adquisición"** significa el Adelanto que será suministrado para los

**REPUBLICA DE PANAMA**
**PAPEL NOTARIAL**



NOTARIA
PANAMA



**NOTARIA NOVENA DEL CIRCUITO DE PANAMA**

fines a los que se hace referencia en la subcláusula 3.01(ii); ----
**"Adelanto"** significa la suma principal de cada empréstito por los
Prestatarios conforme a este Contrato o, si el contexto así lo requiere,
la parte del mismo que esté por el momento pendiente al Prestamista
conforme al presente documento o, según sea el caso, la suma principal
de dicha porción de cada empréstito por los Prestatarios conforme a este
Contrato para el cual los Prestatarios seleccionen un Período de
Intereses de una duración particular; ---- **"Límite Aplicable"** significa
la suma máxima de la Facilidad disponible para retiro conforme al
presente documento en cualquier fecha pertinente en la fecha del
presente documento Siete millones de Dólares ($7,000,000) y que es
reducida en cada Fecha de Reducción por Ochocientos mil Dólares
($800,000) para el primer año durante el cual la Facilidad esté
disponible y por Trescientos mil Dólares ($300,000) para cualquier año
subsiguiente durante el cual la Facilidad esté disponible y como fuera
reducida adicionalmente de acuerdo con la Cláusula 11.02 y/o cualquier
otra estipulación de este Contrato; ---- **"Margen Aplicable"** significa
dos punto cincuenta por ciento (2.50%) anual; ---- **"Corredores
Aprobados"** significa los corredores de seguros nombrados por los
Prestatarios con la aprobación previa del Prestamista; ----
**"Fletamento Aprobado"** significa un contrato de fletamento por tiempo
suscrito o que será suscrito respecto a la Nave C, que el Prestamista
apruebe en todo sentido y suscrito con un Fletador Aprobado a una tasa
diaria neta de por lo menos $8,094 por un período de por lo menos dos
(2) años y de otro modo en los términos que el Prestamista apruebe y
que el Prestamista considere que son y el Fletador Aprobado para
efectos de este Contrato; ---- **"Cesión de Fletamento Aprobado"**
significa respecto a la Nave C la cesión específica de primera
prioridad de los derechos, título e interés del Prestatario C en el
Fletamento por Tiempo Aprobado que será suscrita por y entre el

Prestatario C y el Prestamista; ---- **"Fletador Aprobado"** significa una compañía aprobada por el Prestamista a su entera discreción; ---- **"Período de Disponibilidad"** significa el período comenzando desde la fecha de este Contrato y terminando en la Fecha de Expiración de la Facilidad final; ---- **"Día Bancario"** significa un día en el cual bancos y mercados financieros estén abiertos al comercio en todo Atenas, Nueva York y Londres y cualquier otro centro financiero que el Prestamista estime apropiado para la operación de las estipulaciones de este Contrato; ---- **"Prestatario A"** significa TOUGH TRADER MARITIME PTE LTD., una compañía constituida y existente con arreglo a las leyes de la República de Singapur, con su oficina registrada en 4 Battery Road # 15-01 Bank of China Building, Singapur 049908, República de Singapur e incluye a sus sucesores en título; ---- **"Prestatario B"** significa SWORD TRADING S.A., una compañía constituida y existente con arreglo a las leyes de la República de Panamá, la oficina de cuyo agente residente es en Edificio P.H. Bonanza Plaza, Oficina 3-B, Calle 41 Bella Vista, entre Justo Arosemena y Cuba, Ciudad de Panamá, República de Panamá e incluye a sus sucesores en título; ---- **"Prestatario C"** significa AMBIENT SHIPHOLDING CO., una compañía constituida y existente con arreglo a las leyes de las Islas de Marshall, con su oficina registrada en Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Islas de Marshall MH96960 e incluye a sus sucesores en título; ---- **"Prestatarios"** significa colectivamente el Prestatario A, el Prestatario B y el Prestatario C y, en singular, significa cualquiera de ellos; ---- **"Sociedad de Clasificación"** significa Lloyd's Register of Shipping o cualquier otra sociedad de clasificación miembro del IACS que sea aprobada por escrito por el Prestamista; ---- **"Cuentas Combinadas"** significa el balance de situación auditado y no auditado anual combinado y las cuentas de ganancias y pérdidas del Grupo; ---- **"Carta de Compromiso"** significa la carta fechada el 19 de diciembre de 2006,





**REPUBLICA DE PANAMA**
**PAPEL NOTARIAL**

**NOTARIA NOVENA DEL CIRCUITO DE PANAMA**

emitida por el Prestamista dirigida a los Prestatarios y el Fiador Corporativo y aceptada por el Fiador Corporativo en representación de los Prestatarios y los Fiadores en la misma fecha; ---- **"Adquisición Obligatoria"** significa requisición para título u otra adquisición obligatoria, requisición, apropiación, expropiación, privación, decomiso o confiscación por cualquier motivo de una Nave por cualquier Entidad Gubernamental u otra autoridad competente, ya sea *de jure* o *de facto*, pero excluye la requisición para uso o arriendo, que no implique requisición de título; ---- **"Garantía Corporativa"** significa la garantía e indemnización respecto a las obligaciones de los Prestatarios conforme a este Contrato y los demás Documentos de Garantía a ser otorgada por el Fiador Corporativo a favor del Prestamista de modelo y contenido satisfactorios para el Prestamista a su entera discreción, como la misma sea de tiempo en tiempo reformada, variada o suplementada; ---- **"Fiador Corporativo"** significa MARACHART SHIPPING COMPANY LIMITED, una compañía constituida y existente según las leyes de la República de Chipre, con su oficina registrada en Vasileos Georgiou, 4A, Agios Dometios, 2373 República de Chipre y una oficina en 24 Helmou Street, 145 65 Agios Stefanos, Attiki, Grecia; ---- **"Partes de la Garantía Corporativa"** significa aquéllas de las Partes de la Garantía que sean compañías o sociedades, pero no personas naturales y, en singular, significa cualquiera de ellas; ---- **"Escritura de Convenios"** significa en relación con la Nave A, una escritura de convenios colateral a la Hipoteca sobre dicha Nave a ser otorgada por el Prestatario A a favor del Prestamista de modelo y contenido satisfactorios para el Prestamista a su entera discreción, como la misma fuera de tiempo en tiempo reformada, variada o suplementada; ---- **"Tasa por Mora"** significa la tasa a la que se hace referencia en la Cláusula 14.04; ---- **"Fecha de Entrega"** significa la fecha en la cual la Nave C sea entregada por el Vendedor al Prestatario C de conformidad con el

MDA; ---- "**Fecha de Requerimiento**" significa la fecha en la cual el Prestamista haga un requerimiento a los Prestatarios para la amortización de la Facilidad de acuerdo con la Cláusula 11; ---- "**Dólares**" o "**US$**" significa la moneda legal por el momento de los Estados Unidos de América; ---- "**Retiro de Fondos**" significa la realización de un Adelanto por el Prestamista a los Prestatarios; ---- "**Fecha de Retiro de Fondos**" significa, en relación con cada Adelanto, la fecha solicitada por los Prestatarios para que dicho Adelanto sea facilitado o (según el contexto requiera) la fecha en la cual dicho Adelanto sea en efecto facilitado; ---- "**Utilidades**" significa en relación con la Nave todo flete, arriendo y cualesquiera otras sumas sean cuales fueren que en cualquier momento fueran devengadas por o resultaran pagaderas por o a la cuenta del Prestatario o sus agentes, que surjan de o como resultado de la propiedad, posesión, administración y/u operación de la Nave por el Prestatario o sus agentes o conforme a cualquier fletamento, contrato de transporte u otro contrato (incluyendo un contrato de salvamento o remolque) para el uso, la operación o administración de la Nave, todos los pagos por cualquier variación de cualquier tal contrato y todos los daños por cualquier violación de cualquier tal contrato, toda avería gruesa y remuneración por salvamento y toda la compensación por requisición para arriendo; ---- "**Cuenta de Utilidades**" significa en relación con cada Nave la cuenta abierta o a ser abierta a nombre del Armador de dicha Nave con el Prestamista en Pireo designada Cuenta de Utilidades [nombre del Armador] en la cual todas las Utilidades de dicha Nave serán pagadas, de acuerdo con la Cláusula 21.02, cuya cuenta incluirá cualquier cuenta o subcuenta sustituta o cuenta modificada o designación modificada o número que fuere y, en plural, significa todas ellas; ---- "**Gravamen de Cuenta de Utilidades**" significa en relación con cada Cuenta de Utilidades, la cesión, prenda y gravamen de primera prioridad a ser otorgada por el

REPUBLICA DE PANAMA
PAPEL NOTARIAL




26.VI.07

## NOTARIA NOVENA DEL CIRCUITO DE PANAMA

Armador pertinente al Prestamista sobre cualesquiera dineros que aparezcan al crédito de dicha Cuenta de Utilidades de modelo y contenido satisfactorios para el Prestamista, como la misma fuera de tiempo en tiempo reformada o suplementada en adelante; ---- "**Gravamen**" significa una hipoteca, prenda, crédito, carga (ya sea fija o flotante), cesión, pignoración, derecho de garantía real, retención de título, derecho preferencial o arreglo fiduciario y cualquier otro contrato o arreglo de garantía, ya sea existente actualmente o que surgiera en el futuro sobre los activos e ingresos de los Prestatarios o cualquier otra Parte de la Garantía que no sea una prenda o crédito que surja por efecto de ley; -- -- "**Aprobaciones Ambientales**" significa cualquier permiso, licencia, aprobación, fallo, certificación, exoneración u otra autorización relacionada con una Nave; ---- "**Reclamo Ambiental**" significa: --- (a) cualquier reclamo por cualquier autoridad gubernamental, judicial o reglamentaria que surja de un Incidente Ambiental o un presunto Incidente Ambiental o que se relacione con cualquier Ley Ambiental; o --- (b) cualquier reclamo por cualquier otra persona que se relacione con un Incidente Ambiental o a un presunto Incidente Ambiental; --- y "**reclamo**" significa un reclamo por daños, compensación, multas, recargos o cualquier otro pago de cualquier clase, ya sea o no similar a lo anterior; una orden o directriz de tomar, o no tomar, determinada acción o de desistir de o suspender determinada acción; y cualquier forma de acción de ejecución o reglamentaria, incluyendo el secuestro o embargo de cualquier activo; ---- "**Incidente Ambiental**" significa: --- (a) cualquier liberación de Material de Importancia Medioambiental de una Nave Pertinente; o --- (b) cualquier incidente en el cual el Material de Importancia Medioambiental fuera liberado de una nave, que no sea una Nave Pertinente, y que resulte en el abordaje entre una Nave Pertinente y cualquier otra nave o en algún otro incidente de navegación u operación, en cualquier caso, en relación con el cual una Nave

Pertinente fuera real o potencialmente susceptible de ser secuestrada, embargada, detenida o decomisada y/o una Nave Pertinente y/o cualquier armador y/o cualquier otro operador o administrador de ésta tenga la culpa o sea de otro modo responsable de cualquier acción legal o administrativa; o --- (c) cualquier otro incidente en el cual el Material de Importancia Medioambiental fuera liberado de otro modo de una Nave Pertinente y en relación con el cual cualquier Nave Pertinente fuera real o potencialmente susceptible de ser secuestrada y/o donde cualquier armador y/o cualquier operador o administrador de cualquier Nave Pertinente tenga la culpa o sea de otro modo responsable de cualquier acción legal o administrativa; ---- **"Ley Ambiental"** significa cualquier ley relacionada con la contaminación o protección del ambiente, en el transporte de Material de Importancia Medioambiental o a las liberaciones reales o amenazadas de Material de Importancia Medioambiental; ---- **"Material de Importancia Medioambiental"** significa hidrocarburos, productos de hidrocarburos y cualquier otra sustancia (incluyendo cualquier sustancia química, gas u otra sustancia tóxica o nociva), que sea (o sea capaz de ser o convertirse) contaminante, tóxica o nociva; ---- **"Caso de Incumplimiento"** significa cualquier caso al que se hace referencia en la Cláusula 23; ---- **"Exceso de Riesgos"** significa en relación con una Nave la proporción de reclamos por averías gruesas y cargos de salvamento y bajo la cláusula corriente de responsabilidad en abordaje, que no sea recobrable como consecuencia del valor al cual una Nave fuera valorada para los efectos de dichos reclamos en exceso de su valor asegurado; ---- **"Contrato de Préstamo Existente"** significa un contrato de préstamo fechado el 8 de noviembre de 2006 suscrito por y entre Eurobank Ergasias S.A., como prestamista y el Prestatario A y el Prestatario B como prestatarios conjuntos y separados; ---- **"Naves Existentes"** significa juntas la Nave A y la Nave B y, en singular, significa cualquiera de ellas; ---- **"Facilidad"** significa una facilidad




REPUBLICA DE PANAMA
PAPEL NOTARIAL

NOTARIA NOVENA DEL CIRCUITO DE PANAMA

de crédito rotativa disminuyente por una suma de hasta Siete millones de Dólares (US$ 7,000,000) que será suministrada a los Prestatarios por el Prestamista mediante Adelantos múltiples de conformidad con los términos de la Cláusula 3, como la misma fuera reducida de acuerdo con los términos y condiciones de este Contrato o, si el contexto así lo requiere, la parte de la misma que esté por el momento pendiente de pago al Prestamista conforme al presente documento; ---- **"Fecha de Expiración de la Facilidad"** significa la fecha que cayera doce (12) meses después de la fecha de este Contrato (la **"Fecha de Expiración de la Facilidad Original"**) y en caso de cualquier renovación de la Facilidad de conformidad con las estipulaciones de la Cláusula 11 cada fecha especificada por el Prestamista como la nueva **"Fecha de Expiración de la Facilidad"**; ---- **"Cesión General"** significa en relación con cada Nave la cesión general de primera prioridad que será suscrita por y entre el Armador de dicha Nave y el Prestamista relativa a los Seguros, las Utilidades y la Compensación por Requisición de dicha Nave para garantizar el pago debido del Adeudo de modelo y contenido satisfactorios para el Prestamista como la misma fuera de tiempo en tiempo reformada, variada o suplementado y, en plural, significa todos ellos; ---- **"Entidad Gubernamental"** significa e incluye (ya sea o no que tenga una personería jurídica propia) cualquier autoridad gubernamental, junta, comisión, departamento, división, órgano, municipalidad, corte o agencia o tribunal nacional o local y cualquier asociación, organización o institución de lo cual cualquiera de los anteriores sea un miembro o a cuya jurisdicción cualquiera de los anteriores esté sujeto o en cuyas actividades cualquiera de los anteriores sea un participante; ---- **"Grupo"** significa juntos los Prestatarios y cada otra Parte de la Garantía Corporativa y todas las demás compañías en la misma o substancialmente la misma propiedad beneficiosa que los Prestatarios o que sean dueñas de naves de tiempo en

tiempo administradas por el Administrador; ---- **"Garantías"** significa
colectivamente la Garantía Corporativa y las Garantías Personales y, en
singular, significa cualquiera de ellas; ---- **"Fiadores"** significa
colectivamente el Fiador Corporativo y los Fiadores Personales y, en
singular, significa cualquiera de ellos; ---- **"Adeudo"** significa el
total de todas las sumas de tiempo en tiempo o en cualquier momento
pendientes de pago, vencidas, adeudadas o pagaderas al Prestamista por
los Prestatarios a título de principal, intereses, comisiones o de otro
modo real o condicionalmente, conforme a los términos de este Contrato
y/o conforme a los Documentos de Garantía y/o en relación con éste y/o
aquéllos; ---- **"Documentos de Seguros"** significa todos los resguardos
provisionales, notas de cobertura, contratos, pólizas, certificados de
inscripción u otros documentos de seguros que evidencien o constituyan
los Seguros de tiempo en tiempo vigentes; ---- **"Seguros"** significa todas
las pólizas y contratos de seguros (expresión que incluye todas las
inscripciones de una Nave en una asociación de protección e
indemnización o mutua de casco o riesgos de guerra) o cualesquiera otros
arreglos a manera de seguros que sean de tiempo en tiempo obtenidos o
celebrados respecto a o en relación con una Nave de conformidad con este
Contrato e incluyendo todos los beneficios de los mismos, incluyendo
todos los reclamos de cualquier naturaleza que fueren y la devolución de
primas; ---- **"Aseguradores"** significa los suscriptores, compañías de
seguros, asociaciones de seguros mutuos con o por los cuales los Seguros
fueran obtenidos; ---- **"Fecha de Determinación de Intereses"** significa
el Día Bancario que sea dos (2) Días Bancarios antes del inicio de un
Período de Intereses; ---- **"Fecha de Pago de Intereses"** significa,
respecto a cada Período de Intereses el último día de dicho Período de
Intereses, siempre y cuando, que si cualquier tal fecha no fuera un Día
Bancario, la Fecha de Pago de Intereses pertinente será el día próximo
siguiente que sea un Día Bancario, salvo que dicho Día Bancario próximo

REPUBLICA DE PANAMA
PAPEL NOTARIAL




NOTARIA NOVENA DEL CIRCUITO DE PANAMA

siguiente cayera en otro mes calendario, en cuyo caso, la Fecha de Pago de Intereses pertinente será el Día Bancario inmediatamente anterior y siempre y cuando, además, que donde dicho Período de Intereses sea de una duración de más de tres (3) meses, los intereses acumulados respecto a dicho Adelanto (o dicha parte del mismo) serán pagados cada tres (3) meses durante dicho Período de Intereses y el último día de dicho Período de Intereses; ---- **"Período de Intereses"** significa cada uno de los períodos sucesivos determinados de acuerdo con la Cláusula 6 de este Contrato, durante el cual la Facilidad o cualquier parte de la misma esté pendiente de pago y para el cual una Tasa de Interés respecto a la misma hubiera de ser establecida conforme al presente documento; ---- **"Tasa de Interés"** significa para cada Adelanto (salvo según fuera estipulado en la Cláusula 8) la tasa de interés aplicable a dicho Adelanto (o a cualquier parte del mismo) durante cada Período de Intereses respecto al mismo que sea/sean concluyentemente certificado(s) por el Prestamista al Prestatario como el total de (a) el Margen Aplicable y (b) el LIBOR o el costo del Prestamista de financiar el Adelanto pertinente, para Períodos de Intereses de más de doce (12) meses; ---- **"Adelanto de Capital de Trabajo e Inversión"** significa cualquier Adelanto que será suministrado para los fines a los que se hace referencia en la subcláusula 3.01(iii); ---- **"Código ISM"** significa, en relación con su aplicación al Administrador, cada Armador, la Nave propiedad de cada Armador y su operación: --- (a) 'El Código de Gestión Internacional para la Operación Segura de Naves y para la Prevención de la Contaminación', actualmente conocido o al que se hace referencia como el 'Código ISM', adoptado por la Asamblea de la Organización Marítima Internacional mediante Resolución A.741(18) del 4 de noviembre de 1993 e incorporada el 19 de mayo de 1994 al capítulo IX de la Convención Internacional para la Seguridad de la Vida en el Mar de 1974 (SOLAS 1974); y --- (b) todas las demás resoluciones, circulares,

códigos, normas, reglamentos y recomendaciones que sean actualmente o en el futuro emitidos por o en representación de la Organización Marítima Internacional o cualquier otra entidad con la responsabilidad de poner en práctica el Código ISM, incluyendo, sin limitación, las 'Normas sobre la implementación o administración del Código de Gestión de la Seguridad Internacional (ISM) por las Administraciones' producido por la Organización Marítima Internacional de conformidad con la Resolución A.788(19) adoptada el 25 de noviembre de 1995, --- como el mismo fuera reformado, suplementado o reemplazado de tiempo en tiempo; ----

**"Documentación del Código ISM"** incluye, en relación con cada Nave: --- (a) el documento de cumplimiento (DOC) y el certificado de gestión de seguridad (SMC) expedido de conformidad con el Código ISM en relación con dicha Nave, dentro de los períodos especificados por el Código ISM; y --- (b) todos los demás documentos e información que sean pertinentes al ISM SMS y su implementación y verificación que el Prestamista pudiera requerir; y --- (c) cualesquiera otros documentos que sean preparados o que sean de otro modo pertinentes para establecer y mantener el cumplimiento de dicha Nave o el cumplimiento del Armador de dicha Nave con el Código ISM que el Prestamista pudiera requerir; ---- **"ISM SMS"** significa, en relación con cada Nave, el sistema de gestión de seguridad para dicha Nave que tenga que ser desarrollado, puesto en práctica y mantenido por el Armador de la misma conforme al Código ISM; ----

**"Código ISPS"** significa el Código Internacional de Protección de los Buques y de las Instalaciones Portuarias adoptado por la Asamblea de la Organización Marítima Internacional como el mismo hubiera sido o pueda ser reformado o suplementado de tiempo en tiempo; ---- **"Documentación del Código ISPS"** incluye en relación con cada Nave: --- (a) el Certificado de Seguridad de Buque Internacional expedido de conformidad con el Código ISPS en relación con dicha Nave dentro de los períodos especificados por el Código ISPS; y --- (b) todos los demás documentos y

**REPUBLICA DE PANAMA**
**PAPEL NOTARIAL**





NOTARIA PANAMA 9ª

P 302133

**NOTARIA NOVENA DEL CIRCUITO DE PANAMA**

los datos que sean pertinentes al Código ISPS y su implementación y verificación que el Prestamista requiera; ---- **"Prestamista"** significa LAIKI BANK (HELLAS) S.A., una compañía debidamente constituida según las leyes de la República de Grecia, con su oficina registrada en 16, Panepistimiou Street, 105 56 Atenas, Grecia, y actuando en este caso a través de su oficina en 63 Iroon Polytechniou Avenue and Skouze Street, 185 36 Pireo, Grecia e incluye a sus sucesores en título y cesionarios y beneficiarios; ---- **"LIBOR"** significa, para un Período de Intereses: --- (a) la tasa anual igual a la cotización ofrecida para depósitos en Dólares por un período igual a, o lo más cerca posible igual a, el Período de Intereses pertinente que aparece en la página correspondiente del Servicio de Tasas de Dinero de la Pantalla Reuters a o alrededor de las 11:00 a.m. (hora de Londres) en la Fecha de Determinación de Intereses para dicho Período de Intereses (o en cualquier otro servicio que pudiera ser designado por la Asociación de Banqueros Británicos como el vendedor de información para los efectos de anunciar las Tasas de Ajuste de Intereses de la Asociación de Banqueros Británicos para Dólares; o --- (b) si ninguna tasa fuera cotizada en la página correspondiente del Servicio de Tasas de Dinero de la Pantalla Reuters, la tasa anual determinada por el Prestamista como el medio aritmético (redondeado hacia arriba, de ser necesario, al próximo un dieciseisavo de uno por ciento) de las tasas anuales a las cuales depósitos en Dólares fueran ofrecidos al Prestamista por los principales bancos en el Mercado Interbancario de Londres, a solicitud del Prestamista a o alrededor de las 11:00 a.m. (hora de Londres) de la Fecha de Determinación de Intereses para dicho Período de Intereses por un período igual a dicho Período de Intereses y para entrega el primer Día Bancario del mismo; ---- **"Cuenta de Préstamo"** significa colectivamente la cuenta o cuentas mantenidas por el Prestamista a las que se hace referencia en la Cláusula 13; ---- **"Siniestro Mayor"** significa, en

relación con cada Nave, cualquier siniestro de dicha Nave respecto al cual el reclamo o el total de los reclamos contra todos los aseguradores, antes del ajuste de cualquier franquicia o deducible pertinente, excediera de $150,000 o el equivalente en cualquier otra moneda; ---- **"Contrato de Administración"** significa, respecto a cada Nave, el contrato de administración respecto a dicha Nave, suscrito o que será suscrito por y entre (i) el Armador de dicha Nave y (ii) el Administrador, de modelo y contenido satisfactorios para el Prestamista, como el mismo fuera de tiempo reformado, variado o suplementado, con el consentimiento escrito previo del Prestamista y, en plural, significa todos ellos; ---- **"Administrador"** significa el Fiador Corporativo, en su calidad de administrador de cada Nave o cualquier otra compañía aprobada por el Prestamista como administrador de cualquier Nave; ---- **"Valor de Mercado"** significa respecto a cada Nave, el valor de la misma, determinado de acuerdo con las estipulaciones de la Cláusula 21.27; ---- **"MDA"** significa el memorándum de acuerdo fechado el 1º de diciembre de 2006 junto con cualesquiera reformas o suplementos de éste, entre el Vendedor como vendedor y el Prestatario C como comprador en relación con la compraventa de la Nave C; ---- **"Hipoteca"** significa en relación con cada Nave la hipoteca de primera prioridad o preferida sobre dicha Nave otorgada o a ser otorgada por el Armador de dicha Nave a favor del Prestamista para garantizar el pago debido del Adeudo de modelo y contenido satisfactorios para el Prestamista como la misma fuera de tiempo en tiempo reformada, variada o suplementada y, en plural, significa todas ellas; ---- **"Naves Hipotecadas"** significa en cualquier momento pertinente una Nave que estará en dicha fecha sujeta a una Hipoteca y las Utilidades, Seguros y Compensación por Requisición de la misma serán cedidos al Prestamista de conformidad con una Cesión General; ---- **"Fecha de Designación"** significa el Día Bancario, que sea tres (3) Días Bancarios antes del inicio de un Período de Intereses; --

**REPUBLICA DE PANAMA**
PAPEL NOTARIAL

 

**NOTARIA NOVENA DEL CIRCUITO DE PANAMA**

-- **"Aviso de Retiro de Fondos"** significa cada aviso escrito dado por el Prestatario al Prestamista de conformidad con la Cláusula 5.01.04 substancialmente en el modelo que figura expuesto en el Anexo 1 del presente documento; ---- **"Armador"** significa en relación con: --- (i) la Nave A, el Prestatario A; --- (ii) la Nave B: el Prestatario B; y --- (iii) la Nave C: el Prestatario C --- y, en plural significa todas ellas; ---- **"Créditos Permitidos"** significa cualquier crédito de abastecedor, transportista, trabajador o similar que surgiera en el transcurso normal de los negocios automáticamente por disposición legal o por efecto de ley y no a título de contrato respecto a sumas no aún vencidas y pagaderas, pero sin incluir cualquier crédito que surgiera de cualquier incumplimiento u omisión de las Partes de la Garantía o cualquiera de ellos; ---- **"Garantía Personal"** significa la garantía respecto a las obligaciones del Prestatario, conforme a este Contrato y los demás Documentos de Garantía, a ser otorgada por el Fiador Personal a favor del Prestamista, de modelo y contenido satisfactorios para el Prestamista, a su entera discreción, como la misma sea de tiempo en tiempo reformada, variada o suplementada; ---- **"Fiador Personal"** significa la persona aceptable para el Prestamista a su entera discreción que otorgue la Garantía Personal; ---- **"Caso de Incumplimiento Potencial"** significa cualquier caso que solamente con aviso o el transcurso del tiempo o una determinación del Prestamista y/o el cumplimiento de cualquier condición o cualquier combinación de lo anterior pueda convertirse en un Caso de Incumplimiento; ---- **"Riesgos de Protección e Indemnización"** significa los riesgos corrientes cubiertos por una asociación de protección e indemnización administrada en Londres, lo que incluye, pero no se limita a, riesgos de contaminación y la proporción (si la hay) de cualesquiera sumas pagaderas a cualquier otra persona o personas en caso de abordaje que no sean recobrables bajo las pólizas de casco y maquinaria por motivo de la

incorporación de las mismas de la Cláusula 1 de las Cláusulas de Tiempo (Casco) del Instituto (10/1/83) o la Cláusula 8 de las Cláusulas de Tiempo (Casco) del Instituto (11/1/1995) o la Cláusula de Responsabilidad en Abordaje Reformada del Instituto (10/1/71) o cualquier estipulación equivalente; ---- **"Adelanto de Compra"** significa un Adelanto que será suministrado para los fines que figuran expuestos en la subcláusula 3.01(ii); ---- **"Documentos de Compra"** significa, colectivamente, el MDA y todos los contratos, escrituras de venta y otros documentos sean cuales fueren suscritos o que serán suscritos mediante los cuales el Prestatario C se ha comprometido a comprar y adquirirá título sobre la Nave C; ---- **"Fecha de Reducción"** significa la fecha que cayera tres (3) meses después de la fecha del presente documento y cualquier fecha que cayera a intervalos trimestrales sucesivos conforme al mismo durante todo el Período de Garantía, en cada una de cuyas fechas el monto de la Facilidad disponible conforme al presente documento será reducido de acuerdo con la Cláusula 11.04; ---- **"Adelanto de Refinanciamiento"** significa el Adelanto que será suministrado para los fines que figuran expuestos en la subcláusula 3.01(i); ---- **"Nave Pertinente"** significa cada Nave y cualquier otra nave de tiempo en tiempo de propiedad, administrada o tripulada por, o fletada por entero o a casco desnudo a los Prestatarios o cualquiera de ellos, el Administrador o cualquier otro miembro del Grupo; ---- **"Compensación por Requisición"** significa toda compensación pagadera por motivo de cualquier Adquisición Obligatoria de una Nave; ---- **"Documentos de Garantía"** significa cada Hipoteca, la Escritura de Convenios, cada Cesión General, la Cesión de Fletamento Aprobado, las Garantías y los Gravámenes de Cuenta de Utilidades y, donde el contexto así lo admita, este Contrato y cualesquiera otros documentos otorgados de conformidad con el presente documento como garantía del pago debido del Adeudo; ---- **"Partes de la Garantía"** significa cada parte de los



**REPUBLICA DE PANAMA**
**PAPEL NOTARIAL**



NOTARIA NOVENA DEL CIRCUITO DE PANAMA

Documentos de Garantía (que no sea el Prestamista) y en singular significa cualquiera de ellos; ---- **"Período de Garantía"** significa el período durante el cual los Documentos de Garantía continuaran vigentes y que finalizaran cuando el Adeudo fuera pagado en su totalidad; ---- **"Vendedor"** significa Inno-Pacific Holdings Limited de Mahe, República de Seychelles; --- **"Nave A"** significa la nave motorizada "TOUGH TRADER", una nave de carga a granel construida en 1980, con un peso muerto de 15,200 toneladas métricas y un peso liviano de 3,806 toneladas métricas, registrada como propiedad del Prestatario A, bajo bandera de Singapur; ---- **"Nave B"** significa la nave motorizada "GRAIN TRADER", una nave de carga a granel construida en 1980, con un peso muerto de 30,084 toneladas métricas y un peso liviano de 7,456 toneladas métricas, registrada como propiedad del Prestatario B bajo bandera panameña; ---- **"Nave C"** significa la nave motorizada "PIONEER", construida en 1980, con un peso muerto de 17,150 toneladas métricas y un peso liviano de 4,300 toneladas métricas, actualmente registrada como propiedad del Vendedor bajo bandera de San Vicente y las Grenadinas que será adquirida por el Prestatario C de conformidad con el MDA y que será registrada como su propiedad bajo bandera panameña con el nuevo nombre de "PIONEER TRADER"; ---- **"Naves"** significa colectivamente la Nave A, la Nave B y la Nave C y, en singular, significa cualquiera de ellas; ---- **"Documentos del Tema"** significa todos los Documentos de Garantía, los Documentos de Compra, el Fletamento Aprobado, el Contrato de Administración (ninguno será reformado, variado, suplementado o modificado sin el consentimiento del Prestamista) y junto con cualquier otro instrumento, documento o memorándum, anexado a cualquiera de los documentos a los que se hace referencia arriba, y cualquier aviso, consentimiento o reconocimiento al que se hace referencia en o requerido de conformidad con cualquiera de los documentos a los que se hace referencia arriba y cualquier

documento, instrumento o memorándum que garantice cualquiera de las obligaciones de los Prestatarios conforme a cualquiera de los Documentos de Garantía o conforme a cualquier otro Documento del Tema; ---- "Impuestos" todos los impuestos, gravámenes, recaudos, aranceles, cargos, derechos, deducciones y retenciones actuales y futuros, y cualesquiera restricciones o condiciones que resultaran en un cargo (que no sean los impuestos sobre la renta neta total del Prestamista) e "Impuesto" e "Imposición Fiscal" serán interpretados asimismo; ---- "Pérdida Total" significa en relación con una Nave: --- 1. la pérdida total real o constructiva o comprometida o arreglada o convenida de dicha Nave; y --- 2. la Adquisición Obligatoria de dicha Nave; y --- 3. el apresamiento, embargo, secuestro, detención o confiscación de dicha Nave por cualquier Entidad Gubernamental o por una persona que actuara o pretendiera actuar en representación de cualquier Entidad Gubernamental si dicha Nave no fuera liberada o cancelada dentro de treinta (30) días o cualquier período menor estipulado en los Seguros de Riesgos de Guerra; y ---- "Riesgos de Guerra" incluye todos los riesgos a los que se hace referencia en las Cláusulas de Tiempo (Casco) del Instituto (10/1/83) y (11/1/95) lo que incluye, pero no se limita a, el riesgo de minas, bloqueo y atropamiento, nave desaparecida, confiscación y todos los riesgos excluidos por la Cláusula 23 de las Cláusulas de Tiempo (Casco) del Instituto (10/1/83) o la Cláusula 24 de las Cláusulas de Tiempo (Casco) del Instituto (11/1/1995). ----- 2.02 En este Contrato, los encabezamientos de cláusulas son para facilitar las referencias solamente y no se tomarán en cuenta en la interpretación de este Contrato. ----- 2.03 En este Contrato, salvo que el contexto requiera de otra cosa: ---- 2.03.01 las palabras en número singular incluyen el plural y viceversa; ---- 2.03.02 los derechos, costos y gastos serán exclusivos de cualquier impuesto sobre el valor agregado o impuesto similar (si lo hay) que sea pagadero asimismo en adición; ----

**REPUBLICA DE PANAMA**
**PAPEL NOTARIAL**





**NOTARIA NOVENA DEL CIRCUITO DE PANAMA**

2.03.03 cualquier referencia a un documento o instrumento será una referencia a dicho documento o instrumento como el mismo hubiera sido, o pudiera ser, de tiempo en tiempo reformado o suplementado; ---- 2.03.04 la liquidación, cierre o disolución de una compañía o sociedad anónima o el nombramiento de un curador, curador administrativo, gerente o administrador de o en relación con una compañía o sociedad o cualquiera de sus activos será interpretado como que incluye cualesquiera procedimientos equivalentes o análogos conforme a las leyes de la jurisdicción en la cual estuviera constituido o en cualquier jurisdicción en la cual ejerciera negocios o tuviera activos o pasivos; y ---- 2.03.05 las referencias a personas incluyen cualquier individuo, sociedad, firma, fideicomiso, sociedad anónima, gobierno, órgano gubernamental, autoridad, agencia, grupo no incorporado de personas o asociación; ---- 2.03.06 una referencia a cualquier promulgación o disposición reglamentaria incluirá cualquier promulgación o disposición reglamentaria que reforme, extienda, consolide o reemplace la misma o que haya sido reformada, extendida, consolidada o reemplazada por la misma e incluye cualesquiera órdenes, reglamentos, códigos de práctica, instrumentos u otras leyes subordinadas emitidas conforme a la promulgación o disposición reglamentaria pertinente; y ---- 2.03.07 las palabras "en el presente documento", "del presente documento" y "conforme al presente documento" se refieren a este Contrato en sí y no a ninguna Cláusula o Anexo en particular, en el cual las palabras puedan ser utilizadas; ----- 3. **LA FACILIDAD** ----- 3.01 El Prestamista conviene por este medio en suministrarle a los Prestatarios, conforme a los términos y sujeto a las condiciones de este Contrato, la Facilidad por una suma que no exceda en cualquier momento pertinente en su totalidad de Siete millones de Dólares: ---- (i) el Adelanto de Refinanciamiento por una suma de hasta Tres millones Cuatrocientos mil Dólares (US$3,400,000) para efectos de asistir al

Prestatario A y el Prestatario B con el refinanciamiento en su totalidad de determinado adeudo existente a EFG Eurobank Ergasias S.A., actualmente garantizado sobre la Nave A y la Nave B de conformidad con el Contrato de Préstamo Existente; ---- (ii) el Adelanto de Adquisición por una suma igual a la menor de Dos millones Ochocientos mil Dólares (US$2,800,000), (ii) el monto en Dólares que al ser agregada al Adelanto de Refinanciamiento producirá una cifra que no excederá del sesenta por ciento (60%) del Valor de Mercado de las Naves Hipotecadas, para efectos de asistir al Prestatario C con el financiamiento parcial del costo de adquisición de la Nave C; ---- (iii) el Adelanto de Capital de Trabajo e Inversión por una suma igual a la menor de (i) Siete millones de Dólares (US$ 7,000,000) y (ii) el monto en Dólares que, al ser agregada al monto total de todos los demás Adelantos en efecto retirados producirá una cifra que no excederá del sesenta por ciento (60%) del Valor de Mercado de las Naves Hipotecadas, para efectos de suministrarle a los Prestatarios capital de trabajo e inversión, ---- Siempre y cuando, sin embargo, que (i) el Adelanto de Adquisición no será retirado salvo que el Adelanto de Refinanciamiento haya sido previamente retirado y (ii) ningún Adelanto de Capital de Trabajo e Inversión será retirado salvo tanto el Adelanto de Refinanciamiento como el Adelanto de Adquisición hayan sido retirados. ----- 3.02 Los Prestatarios se comprometen a utilizar los réditos de cada Adelanto para los fines indicados en la Cláusula 3.01; el Prestamista tendrá derecho, pero sin estar obligado, a monitorear la aplicación de dichos réditos. ----- 4. DISPONIBILIDAD ---- Sujeto a lo aquí estipulado, cada Adelanto estará disponible para ser retirado por los Prestatarios solamente durante el Período de Disponibilidad. Cualquier parte de la Facilidad que permanezca sin ser retirada al cierre de los negocios en Atenas a la expiración del Período de Disponibilidad será cancelada automáticamente. ----- 5. AVISO DE RETIRO DE FONDOS ----- 5.01 Sujeto




**REPUBLICA DE PANAMA**
**PAPEL NOTARIAL**

NOTARIA PANAMA

**NOTARIA NOVENA DEL CIRCUITO DE PANAMA**

a: ---- 5.01.01 el recibo por el Prestamista de los documentos y cumplimiento de las demás condiciones especificadas en la Cláusula 18.01, 18.02, 18.03 y 18.04 (según corresponda) de modelo y contenido satisfactorios para el Prestamista y sus asesores legales antes de la Fecha de Retiro de Fondos pertinente; y ---- 5.01.02 ningún Caso de Incumplimiento haya ocurrido ni ningún caso que con aviso, el transcurso del tiempo o ambos u otra condición pudiera constituir un Caso de Incumplimiento; y ---- 5.01.03 las aseveraciones y garantías que figuran expuestas en la Cláusula 16 (actualizadas *mutatis mutandis* a una Fecha de Retiro de Fondos) sean ciertas y/o correctas; y ---- 5.01.04 el recibo por el Prestamista de un Aviso de Retiro de Fondos en el modelo que figura expuesto en el Anexo 1 del presente documento, a más tardar a las 11:00 a.m. (hora de Londres) tres (3) Días Bancarios antes de la Fecha de Retiro de Fondos pertinente que figura expuesta en la fecha del Adelanto propuesta ---- cada Adelanto será suministrado a los Prestatarios de acuerdo con y en los términos y condiciones de este Contrato. ----- 5.02 Cada Aviso de Retiro de Fondos será irrevocable y los Prestatarios estarán comprometidos a tomar en préstamo de acuerdo con dicho aviso. ----- 5.03 Una vez efectuado el pago de cada Adelanto retirado, los Prestatarios firmarán un Reconocimiento en el modelo del Anexo 2 del presente documento. ----- 5.04 Si los Prestatarios dieran un Aviso de Retiro de Fondos de conformidad con la Cláusula 5.01.04 y el Prestamista hiciera arreglos en base a dicho aviso para adquirir Dólares en el Mercado Interbancario de Londres para financiar la Facilidad o cualquier parte de la misma y a los Prestatarios no les estuviera permitido o dejaran de otro modo de tomar en préstamo de acuerdo con dicho Aviso de Retiro de Fondos (ya sea por concepto de cualquier condición precedente no ser cumplida o de otro modo), los Prestatarios indemnizarán al Prestamista contra cualesquiera daños, pérdidas o gastos que el Prestamista pudiera incurrir (ya sea directa o indirectamente)

como consecuencia de la falta por los Prestatarios de tomar en préstamo de acuerdo con dicho Aviso de Retiro de Fondos. ----- 5.05 Los Prestatarios podrán, en cualquier momento durante el Período de Disponibilidad, cancelar la Facilidad o, según sea el caso, cualquier parte de la misma que continuara sin ser retirada en su totalidad o en parte (pero si en parte por un mínimo de $100,000 y, si es más, en múltiplos íntegros de $100,000 siempre que se le den al Prestamista tres (3) Días Bancarios de aviso por escrito a tal efecto. Dicho aviso una vez cursado será irrevocable y una vez que dicha cancelación entre en vigencia la Facilidad o la parte pertinente de la misma será reducida asimismo. No obstante cualquier tal cancelación de conformidad con esta Cláusula 5.05, los Prestatarios seguirán siendo responsables por cualesquiera y todas las sumas debidas al Prestamista conforme a este Contrato incluyendo, sin limitación, cualesquiera sumas debidas al Prestamista conforme a las Cláusulas 7, 9, 15 y 28. ----- **6. PERÍODOS DE INTERESES** ----- 6.01 Sujeto según lo estipulado en la Cláusula 6.02, los Períodos de Intereses aplicables a cada Adelanto serán (sujeto a la disponibilidad del mercado) períodos de una duración de un (1) mes o tres (3) meses (o cualesquiera otros períodos que el Prestamista y los Prestatarios pudieran convenir) como fuera seleccionado por los Prestatarios mediante aviso escrito a ser recibido por el Prestamista a más tardar a las 11:00 a.m. (hora de Londres) en la Fecha de Designación pertinente; ----- 6.02 No obstante las estipulaciones de la Cláusula 6.01: ---- 6.02.01 el Período de Intereses inicial para cada Adelanto comenzará en la Fecha de Retiro de Fondos del mismo y finalizará en la fecha de expiración del mismo y cada Período de Intereses subsiguiente respecto a dicho Adelanto comenzará de inmediato en la fecha de expiración del Período de Intereses anterior respecto al mismo; ---- 6.02.02 si cualquier Período de Intereses finalizara de otro modo en un día que no fuera un Día Bancario, dicho Período de Intereses se

REPUBLICA DE PANAMA
PAPEL NOTARIAL




NOTARIA NOVENA DEL CIRCUITO DE PANAMA

extenderá al día próximo siguiente que sí sea un Día Bancario, salvo que dicho Día Bancario próximo siguiente cayera en otro mes calendario, en cuyo caso el Período de Intereses finalizará el Día Bancario inmediatamente anterior; ---- 6.02.03 si cualquier Período de Intereses comenzara el último Día Bancario de un mes calendario o si no hubiese ningún día numéricamente correspondiente en el mes en el cual dicho Período de Intereses finalizara, dicho Período de Intereses finalizará el último Día Bancario de ese mes siguiente; ---- 6.02.04 ningún Período de Intereses será extendido más allá de la Fecha de Expiración de la Facilidad; y ---- 6.02.05 si los Prestatarios dejaran de seleccionar un Período de Intereses de acuerdo con lo anterior, dicho Período de Intereses será de tres (3) meses de duración o de cualquier otra duración que el Prestamista a su entera discreción seleccionara. ----- 7. **INTERESES** ----- 7.01 Sujeto a los términos de este Contrato, los Prestatarios le pagarán al Prestamista intereses respecto a cada Adelanto (o la parte pertinente del mismo) que se acumularan a la Tasa de Interés para cada Período de Intereses pertinente al mismo vencidos en cada Fecha de Pago de Intereses respecto al mismo. ----- 7.02 Los intereses serán calculados en base al número verdadero de días transcurridos y a un año de trescientos sesenta (360) días. ----- 7.03 El Prestamista calculará y determinará la Tasa de Interés aplicable para cada Adelanto, cada determinación que será notificada con prontitud por el Prestamista a los Prestatarios al inicio de cada Período de Intereses respecto al mismo. El certificado del Prestamista en cuanto a la Tasa de Interés aplicable será final y (excepto en el caso de error manifiesto) vinculante para el Prestatario y las demás Partes de la Garantía. ----- 8. **OBLIGACIÓN CONJUNTA Y SEPARADA DE LOS PRESTATARIOS** ----- 8.01 Todas las responsabilidades y obligaciones de los Prestatarios conforme a este Contrato, ya sean o no expresadas en tal forma, son conjuntas y separadas de manera que cada Prestatario será